IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Brenda Kay Pfeiffer, | ) | |
| | ) | |
| On behalf of herself and all others similarly situated, | ) | Civil No. 1:07-cv-00522 (EGS) |
| | ) | |
| *Plaintiff,* | ) | CLASS ACTION |
| v. | ) | |
| | ) | |
| Margaret Spellings, in her official capacity as United States Secretary of Education, the United States Department of Education, and the United States of America, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
AND APPOINTMENT OF CLASS COUNSEL**

Plaintiff Brenda Pfeiffer ("Dr. Pfeiffer"), by and through her counsel and pursuant to Fed. R. Civ. P. 23 and LCvR 23.1, hereby moves the Court for an order permitting her to maintain this action as a class action, including the appointment of her counsel as class counsel. In support of her motion, Dr. Pfeiffer states as follows:

1.    Following investigation and discovery relating to her breach of contract claim against defendants, Dr. Pfeiffer requests that the Court certify a class consisting of:

> All borrowers who elected to repay their student loans issued by the United States Department of Education under the *Income Contingent Repayment Plan* and whose annual *scheduled payments* at any time after March 19, 2001 were insufficient to cover the interest accruing on their loan.

In the alternative, Dr. Pfeiffer requests that the Court certify a class or subclass consisting of:

> All borrowers who elected to repay their student loans issued by the United States Department of Education under the *Income Contingent Repayment Plan* and whose annual scheduled payments at any time after March 19, 2001 were insufficient to cover the interest accruing on the loan, but whose *actual payments* were equal to or greater than the interest accruing on their loan.

2021175

Members of both the proposed class and alternative class are readily identifiable from the records of defendant United States Department of Education.

2.      The proposed class and alternative class meet all of the requirements of Fed. R. Civ. P. 23(a), and should be certified under both Fed. R. Civ. P. 23(b)(2) and (b)(3).

3.      Pursuant to LCvR 23.1(c), Dr. Pfeiffer proposes that an appropriate form of class notice be sent to all class members by first-class mail, postage prepaid, within 45 days after the Court's ruling on the parties' cross-motions for partial summary judgment.  The class member mailing list should be generated by defendants from their computer databases and the cost of notice, including postage, should be borne by defendants.  Any class member who wishes to "opt out" of the class for purposes of obtaining monetary relief should notify both class counsel and defense counsel.  The parties should meet and confer concerning the contents of an appropriate class notice and should submit a proposed form of class notice for the Court's consideration within 15 days after its ruling on the parties' cross-motions for partial summary judgment.

4.      The Court should appoint Steven M. Sprenger and Daniel C. Bryden of the law firm of Sprenger & Lang, PLLC as class counsel pursuant to Fed. R. Civ. P. 23(g) because counsel has investigated, filed and prosecuted this action.   Moreover, counsel are experienced in handling federal court class actions and will commit the necessary resources to represent the certified class.

5.      In further support of her motion, Dr. Pfeiffer respectfully refers the Court to her accompanying memorandum, including exhibits and declarations, as well as her proposed form of order.

6.      Pursuant to LCcR 7(f), Dr. Pfeiffer and the proposed plaintiff class respectfully request oral argument on this motion.

WHEREFORE, plaintiff Brenda Pfeiffer prays that the Court enter the following orders:

(1)     Certifying the proposed class and/or alternative class pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), appointing plaintiff Brenda Pfeiffer as the class representative, and appointing attorneys Sprenger and Bryden as class counsel, and attorney Sprenger as lead class counsel; and,

(2)     Directing the parties to meet and confer concerning the contents of an appropriate class notice and to submit their proposed form of notice for the Court's consideration within 15 days after its ruling on the parties' cross-motions for partial summary judgment.

Dated:  January 31, 2008                Respectfully submitted,


 /s/ Steven M. Sprenger
Steven M. Sprenger (DC No. 418736)
SPRENGER & LANG, PLLC
1400 Eye Street, N.W., Suite 500
Washington, DC 20005
(202) 265-8010

Daniel C. Bryden (MN No. 302284 *Pro Hac Vice*)
SPRENGER & LANG, PLLC
310 Fourth Avenue S., Suite 600
Minneapolis, MN 55415
(612) 871-8910

*Attorneys for Plaintiff and the Class*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Brenda Kay Pfeiffer, | ) | |
| | ) | |
| On behalf of herself and all others similarly situated, | ) | Civil No. 1:07-cv-00522 (EGS) |
| | ) | |
| *Plaintiff,* | ) | CLASS ACTION |
| v. | ) | |
| | ) | |
| Margaret Spellings, in her official capacity as United States Secretary of Education, the United States Department of Education, and the United States of America, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM
IN SUPPORT OF HER MOTION FOR CLASS CERTIFICATION**

Steven M. Sprenger (DC No. 418736)
SPRENGER & LANG, PLLC
1400 Eye Street, N.W., Suite 500
Washington, DC 20005
(202) 265-8010

Daniel C. Bryden (MN No. 302284 *Pro Hac Vice*)
SPRENGER & LANG, PLLC
310 Fourth Avenue S., Suite 600
Minneapolis, MN 55415
(612) 871-8910

*Attorneys for Plaintiff and the Class*

## TABLE OF AUTHORITIES

### Cases

*Alliota v. Gruenberg,*
237 F.R.D. 4 (D.D.C. 2006).................................................................................... 7, 8

*Bowen v. Massachusetts,*
487 U.S. 879 (1988) ............................................................................................. 12

*Brown v. Pro Football,*
*Inc.*, 146 F.R.D. 1 (D.D.C. 1992) ........................................................................... 10

*\*Bynum v. District of Columbia,*
214 F.R.D. 27 (D.D.C. 2003).................................................................................. 9

*Cohen v. Warner Chilcott Public Ltd.,*
2007 U.S. Dist. LEXIS 84567 (D.D.C. Nov. 15, 2007) ................................... 7, 8, 11

*Disability Rights Council of Greater Wash. v. Wash. Metropolitan Area*
*Transit Authority,*
239 F.R.D. 9 (D.D.C. 2006)..................................................................................... 8

*\*Eubanks v. Billington,*
110 F.3d 87 (D.C. Cir. 1997) ........................................................................... 11, 12

*Franconia Associate v. United States,*
536 U.S. 129 (2002) ............................................................................................... 1

*Frazier v. Consolidated Rail Corp.,*
851 F.2d 1447 (D.C. Cir. 1988) .............................................................................. 8

*General Telegraph Co. v. Falcon, 4*
57 U.S. 147 (1982) ................................................................................................. 7

*\*McAnaney v. Astoria Finance Corp.,*
2006 U.S. Dist. LEXIS 66941 (E.D.N.Y. Sept. 19, 2006) ................................. 10, 12

*\*Mortimore v. Federal Deposit Insurance Ccorp.,*
197 F.R.D. 432 (W.D. Wash. 2000 ......................................................10, 12, 13, 14

*Pigford v. Glickman,*
182 F.R.D. 341 (D.D.C. 1998)............................................................................... 10

*Taylor v. D.C. Water & Sewer Authority,*
2007 U.S. Dist. LEXIS 17737 (D.D.C. Mar. 13, 2007) ............................................ 8

*Twelve John Does v. District of Columbia,*
    117 F.3d 571 (D.C. Cir. 1997) ............................................................................ 11

*In re Vitamins Antitrust Litigation,*
    209 F.R.D.251 ...................................................................................................... 10

*Wells v. Allstate Insurance Co.,*
    210 F.R.D. 1 (D.D.C. 2002) ............................................................................ 7, 13

*Wolfchild v. United States,*
    62 Fed. Cl. 521 (2004) ......................................................................................... 1

## Federal Statutes and Regulations

Higher Education Act of 1965,
20 U.S.C. § 1070 ....................................................................................................... 3

28 U.S.C. § 2401(a) .................................................................................................... 1

Federal Rules of Civil Procedure
    Rule 23 .................................................................................................................. 7
    Rule 23(a) .................................................................................................. 1, 7, 11
    Rule 23(a)(1) ......................................................................................................... 8
    Rule 23(a)(2) ...................................................................................................... 8, 9
    Rule 23(a)(3) ....................................................................................................... 10
    Rule 23(a)(4) ....................................................................................................... 11
    Rule 23(b) ............................................................................................................ 11
    Rule 23(b)(2) .............................................................................................. 1, 11, 12
    Rule 23(b)(3) .......................................................................................... 1, 11, 12, 13
    Rule 23(b)(6) ......................................................................................................... 2
    Rule 23(g) ............................................................................................................ 11
    Rule 30(b)(6) ...................................................................................................... 2, 6

## Miscellaneous

*Restatement of the Law (Second) of Contracts,* §§ 344, 357 ........................................... 12

## I.    INTRODUCTION

Plaintiff Brenda Pfeiffer ("Dr. Pfeiffer") seeks to maintain this action as a class action on behalf of "all borrowers who elected to repay their student loans issued by the United States Department of Education ("DOE") under the *Income Contingent Repayment Plan* and whose annual *scheduled payments* at any time after March 19, 2001[1] were insufficient to cover interest accruing on their loan."  In the event that the Court concludes that a borrower's actual payments (as opposed to scheduled payments) are pivotal for purposes of interpreting the form promissory notes at issue and determining whether DOE's interest capitalization practice constitutes a breach of contract, then Dr. Pfeiffer seeks to certify an alternative class or subclass consisting of "all borrowers who elected to repay their student loans issued by the United States Department of Education under the *Income Contingent Repayment Plan* and whose annual scheduled payments at any time after March 19, 2001 were insufficient to cover interest accruing on the loan, but whose *actual payments* were equal to or greater than the interest accruing on their loan."

As discussed below, the proposed class and alternative class satisfy the four requirements of Fed. R. Civ. P. 23(a), and certification of each class is proper under both Fed. R. Civ. P. 23(b)(2) and (b)(3).

## II.    PROCEDURAL BACKGROUND

On March 19, 2007, Dr. Pfeiffer instituted this action by filing her complaint against defendants Margaret Spellings, in her official capacity as United States Secretary of Education, the United States Department of Education, and the United States of America (collectively, "DOE").  In her complaint, Dr. Pfeiffer asserts a single claim for breach of contract, alleging that

---

[1]    The relevant limitations period in this case is six years and, accordingly, the class period should commence six years prior to the filing of the complaint herein. *See* 28 U.S.C. § 2401(a); *Franconia Assoc. v. United States*, 536 U.S. 129, 133 (2002); *Wolfchild v. United States*, 62 Fed. Cl. 521, 547 (2004).

77112                                           1

in 2002, 2004 and 2005 DOE capitalized the interest accruing on her student loan between her June payment date and June 30th, even though such interest was not due until her July payment date under the terms of her promissory note. Dr. Pfeiffer's complaint further alleges that DOE has engaged in the same interest capitalization practice with respect to numerous other student loan borrowers who, like her, have chosen to repay their loans under DOE's Income Contingent Repayment Plan. In her prayer for relief, Dr. Pfeiffer seeks, among other things, an order permitting her to maintain this case as a class action, and awarding class-wide declaratory, injunctive and monetary relief.

On May 30, 2007, DOE answered Dr. Pfeiffer's complaint, admitting many of its principal factual allegations, but denying liability as well as the propriety of class certification. Following an initial status conference, on September 24, 2007, the Court issued its scheduling order permitting the parties to conduct limited discovery focused on class certification and discovery necessary for summary judgment motions. On December 31, 2007, the parties completed the initial phase of discovery. Accordingly, Dr. Pfeiffer now moves for class certification.[2]

## III.     RELEVANT FACTS

### A.     Student Loans, Form Promissory Notes And Payment Due Dates.

The United States Department of Education lends money to post-secondary students through the William D. Ford Direct Loan Program (the "Program"). There are several loan types available under the Program, including Stafford Loans and Consolidation Loans. Ex. 1 (Battle[3] Depo. at 36-37). Regardless of the type of loan it issues, DOE requires student loan borrowers to

---

[2]     Dr. Pfeiffer is simultaneously moving for partial summary judgment on her individual claim as well as the proposed class claim for breach of contract.

[3]     DOE designated Cynthia D. Battle as its deposition representative pursuant to Fed. R. Civ. P. 30(b)(6). Ms. Battle's job title is Servicing Director for the Direct Loan Program.

execute a standard form promissory note.   The form promissory note for each loan type is
identical or substantially identical for all borrowers.  *Id.* at 79, 86-88;  Ex. 2 (Battle Depo. Ex. 1,
at 7-8);  Exs. 3 – 9 (Battle Depo. Exs. 4 – 10).   The form promissory note signed by the borrower
is the governing legal contract between DOE and the borrower.  Ex. 10 (Battle Depo. Ex. 13, at
P00406).  DOE informs borrowers that the "promissory note contains the terms and conditions of
the loan, including how and when the loan must be repaid."  *Id.*

Since at least March 19, 2001, the form promissory notes executed by Stafford and
Consolidation Loan borrowers have contained identical or substantially similar language with
respect to interest capitalization.  Ex. 2 (Battle Depo. Ex. 1, at 7-8); Ex. 1 (Battle Depo. at 86-
88); *compare* Ex. 11 (Battle Depo. Ex. 3, at P00486 (promissory note executed by Dr. Pfeiffer in
2001)) *with* Exs. 3 – 9 (Battle Depo. Exs. 4 – 10 (form promissory notes produced by DOE)).
Dr. Pfeiffer executed such a form promissory note when she obtained her Consolidation Loans
from DOE in 2001.  Ex. 11 (Battle Depo. Ex. 3).

The form promissory note executed by Dr. Pfeiffer provides that DOE may capitalize
interest if the borrower does not pay the interest when it is due:

> **Interest.**    Except for interest [DOE] does not charge me during an in-school, grace
> or deferment period, I agree to pay interest on the principal amount of my Direct
> Consolidation Loan from the date of disbursement until the loan is paid in full or
> discharged.  [DOE] may add interest that accrues but is not paid when due to the
> unpaid principal balance of this loan, as provided under the [Higher Education Act
> of 1965, as amended, 20 U.S.C. § 1070 *et seq.*, and applicable Department of
> Education regulations].   This is called capitalization.

*Id.* at P00486 (emphasis added).   The above-quoted provision is the only language in the form
promissory note which relates to interest capitalization.  Ex. 1 (Battle Depo. at 73-75).   DOE
concedes that this provision is identical or substantially similar for all members of the proposed
class.  Ex. 2 (Battle Depo. Ex. 1, at 7-8).

When a student loan borrower's loan enters repayment, he or she is assigned a "payment due date" of the 7th, 14th, 21st or 28th of each month. Ex. 1 (Battle Depo. at 49-50). A borrower's "payment due date" is also commonly referred to as the "monthly due date" or simply the "due date." Ex. 1 (Battle Depo. at 49-50); Ex. 12 (Battle Depo. Ex. 2 (monthly billing statements sent to Dr. Pfeiffer indicating the 21st of each month as the "current payment due date")); Ex. 13 (Battle Depo. Ex. 27 (DOE glossary defining the term "payment due date")). DOE documents define the "payment due date" as "[t]he date during the month when payment of the current due amount must be received." *Id.* DOE applies payments received first to fees (if any), second to accrued interest, and third to the principal balance. Ex. 1 (Battle Depo. at 51).

Thus, if a borrower's payment due date is the 21st of each month and the borrower makes a payment on February 21st, then DOE would apply that payment first to fees (if any), second to interest accrued through February 21st, and third to the principal balance. *See Id.* The borrower is not billed for or expected to pay the interest accruing after the February payment due date until his or her next payment due date, *i.e.*, March 21st. *Id.* at 76-77.

### B.     The Income Contingent Repayment Plan and "Negative Amortization".

Stafford and Consolidation Loan borrowers have the option of repaying their student loans under the Income Contingent Repayment Plan ("ICRP"). Under the ICRP, a borrower's monthly payment amount is determined by a formula which is based on his or her adjusted annual income, family size and the principal balance of the loan. *Id.* at 38. The payment amount determined by this formula is referred to by DOE as the "scheduled payment" or the "fixed payment amount." *Id.* at 48; Ex. 2 (Battle Depo. Ex. 1 (column labeled "fixed payment amount" contained within computer print-out showing payment history for Dr. Pfeiffer's loans)). Generally speaking, the higher a borrower's income, the higher his or her scheduled payments

and, conversely, the lower a borrower's income, the lower his or her scheduled payments. Notwithstanding the amount of a borrower's scheduled payments, he or she may voluntarily pay a greater amount in any month.  Ex. 1 (Battle Depo. at 48).

If a borrower's income is low in relationship to his or her loan balance, the scheduled payments may be less than the amount of interest accruing on the loan each month.  DOE refers to such borrowers as being on a "negative amortization payment schedule" or as "negatively amortized."  *Id.* at 45-47.  DOE treats approximately one-half of the 600,000 borrowers currently repaying their student loans under the ICRP as "negatively amortized."  *Id.* at 91-92.

### C.    The Interest Capitalization Practice at Issue.

Throughout the liability period, DOE has consistently capitalized interest accrued through June 30th on all "negatively amortized" loans – that is, loans being repaid by a borrower whose scheduled payments are less than the amount of interest accruing on the loan each month. *Id.* at 58-59, 87-88;  Ex. 2 (Battle Depo. Ex. 1, at 1).  DOE has engaged in this interest capitalization practice notwithstanding the borrower's payment due date or actual payment amounts.  *Id.* at 45-47, 55-56.  This capitalization on June 30th of each year includes interest accruing *after* the borrower's June payment date through June 30th.  *Id.* at 42-44, 55-56.

As explained in Dr. Pfeiffer's memorandum in support of her motion for partial summary judgment, DOE's interest capitalization practice constitutes a breach of contract.  Whether or not the loan is negatively amortized, DOE has no contractual right under its form promissory notes to capitalize interest accruing *after* a borrower's June payment due date but before the interest becomes due on his or her July payment due date.  In addition, DOE has no contractual right under its form promissory notes to capitalize interest when a borrower's actual (as opposed to scheduled) payments are sufficient to cover accrued interest as it becomes due each month.

Dr. Pfeiffer's loan repayment history is illustrative of DOE's unlawful interest capitalization practice. On June 14, 2002, Dr. Pfeiffer made a $725.00 payment on her student loan. *Id.* at 52. This payment was sufficient to cover all of the accrued interest, including interest that would have accrued through her June 21, 2002 payment due date. *Id.* Nonetheless, on June 30, 2002, DOE capitalized $368.76 in interest to Dr. Pfeiffer's principal loan balance, which is the amount of interest that would have accrued on Dr. Pfeiffer's student loan *after her June payment*, i.e., from June 15th through June 30th. *Id.* at 52-53. Dr. Pfeiffer was similarly subjected to interest capitalization in 2004 and 2005 pursuant to the same interest capitalization practice.[4] *See* Plaintiff's Statement of Undisputed Material Facts, ¶¶ 22-26 (in support of Plaintiff's Motion for Partial Summary Judgment).

The interest accruing *after* Dr. Pfeiffer's June payment, however, would not be billed to her or otherwise expected to be paid until July 21st, her next "due date." In her deposition, Cynthia Battle, DOE's Rule 30(b)(6) representative and Servicing Director for the Direct Loan Program, agreed that the interest that accrues *after* a borrower's June payment due date is not due until July. She testified:

> Q:      So isn't the interest that accrues after a borrower's June payment date not due until their July payment date?
>
> A:      Yes, they would be billed for July.

*Id.* at 76-77.

---

[4]      Dr. Pfeiffer was not considered negatively amortized by DOE in 2001, 2003, 2006 and 2007. Accordingly, DOE did not capitalize interest on her loan in these years.

In sum, DOE has maintained a uniform practice throughout the liability period of capitalizing interest accruing between a borrower's June payment date and June 30th on loans to borrowers who elected to repay their debt obligations under the Income Contingent Repayment Plan and whose scheduled payments were insufficient to cover interest accruing on the loan each month. *Id.* at 58-59, 87-88; Ex. 2 (Battle Depo. Ex. 1, at 1).

## IV.     LEGAL ARGUMENT

### A.     The Proposed Class And Alternative Class Satisfy The Requirements Of Rule 23.

Congress designed Rule 23 "to promote the efficient and economical conduct of litigation." *Alliota v. Gruenberg*, 237 F.R.D. 4, 10 (D.D.C. 2006).  A class action "is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.'"  *Id.* at 10 (*quoting Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 155 (1982)).  When a court is in doubt as to whether to certify a class, "it should err in favor of allowing a class."  *Id.*

### 1.     The Proposed Class and Alternative Class Satisfy the Requirements of Rule 23(a).

Under Rule 23(a) of the Federal Rules of Civil Procedure, a class may be certified when "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a); *see also Cohen v. Warner Chilcott Public Ltd.*, 2007 U.S. Dist. LEXIS 84567, \*\* 12-18 (D.D.C. Nov. 15, 2007); *Wells v. Allstate Ins. Co.*, 210 F.R.D. 1, 4-12 (D.D.C. 2002).

a.    **The Members of Proposed Class and Alternative Class are Too Numerous to Join in a Single Action.**

DOE cannot seriously challenge Dr. Pfeiffer's satisfaction of Rule 23(a)(1)'s numerosity requirement. Courts in this District have generally found that classes with 40 or more members meet the numerosity requirement. *See Frazier v. Consolidated Rail Corp.*, 851 F.2d 1447, 1456 n.10 (D.C. Cir. 1988); *Cohen*, 2007 U.S. LEXIS 84567, *12. Here, the proposed class consists of at least 300,000 borrowers – that is, borrowers who have been repaying their student loans under the ICPR and whose scheduled payments were less than the monthly interest accrual. It is clearly impracticable to join 300,000 or more individuals in a single action. Even the alternative class consists of too many individual members to join in one action. According to DOE, the alternative class includes approximately 26,000 individuals – that is, borrowers who have been repaying their student loans under the ICRP and whose scheduled payments were less than the monthly interest accrual, but whose *actual payments* were equal to or greater than the interest accruing on their loan. Ex. 2 (Battle Depo. Ex. 1 at 2-3).

b.    **Questions of Law and Fact are Common to the Proposed Class and Alternative Class.**

Rule 23(a)(2) requires that there be questions of law or fact common to the class. The commonality test is satisfied where there is at least one issue which, if resolved, affects all or a significant number of class members. *See, e.g., Cohen,* 2007 U.S. LEXIS 84567, ** 14-15; *Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth.*, 239 F.R.D. 9, 25-26 (D.D.C. 2006); *Alliota*, 237 F.R.D. at 11. Commonality does not require that every issue of law or fact be identical with respect to each class member. *See, e.g., Taylor v. D.C. Water & Sewer Auth.*, 2007 U.S. Dist. LEXIS 17737 at **7-8 (D.D.C. Mar. 13, 2007). Indeed, "factual variations among the class members cannot defeat the commonality requirement, so long as a

single aspect or feature of the claim is common to all proposed class members." *Bynum v. District of Columbia*, 214 F.R.D. 27, 33 (D.D.C. 2003).

Here, all members of the proposed class and alternative class face common issues of fact and law.  With respect to the proposed class, these issues include:

- Whether the class members signed promissory notes with identical or substantially identical language with respect to interest capitalization;

- Whether the class members' scheduled payments were less than the amount of interest accruing on their loans;

- Whether DOE capitalized interest accruing on the class members' loans between their June payment due dates and June 30th;  and,

- Whether DOE's practice of capitalizing interest accruing between the class members' June payment due dates and June 30th constitutes a breach of the form promissory note.

In the event that the Court concludes that the breach of contract claim turns on whether a borrower's actual payments as opposed to scheduled payments were equal to or greater than the monthly interest accrual, then the Court should certify the alternative class because its members would then be similarly situated with respect to the outcome.   There is but one additional common factual issue shared by the members of the alternative class:

- Whether the class members' actual payments (as opposed to scheduled payments) were equal to or greater than the amount of interest accruing on their loans.

If DOE's interest capitalization practice is improper as to one class member, then it is improper as to all other class members.  Accordingly, Rule 23(a)(2)'s commonality component is

easily met here. *See Brown v. Pro Football, Inc.*, 146 F.R.D. 1, 3-4 (D.D.C. 1992) (commonality satisfied where members of class signed similar contracts and asserted similar claims based on those contracts); *see also McAnaney v. Astoria Fin. Corp.*, 2006 U.S. Dist. LEXIS 66941, **10-11 (E.D.N.Y. Sept. 19, 2006) (commonality satisfied where all class members signed "uniform" loan documents and were subjected to the same penalties and fees); *Mortimore v. Fed. Deposit Ins. Corp.*, 197 F.R.D. 432, 436 (W.D. Wash. 2000) (commonality met where members of class signed same HUD form documents and were subjected to same interest rate adjustment practice).

        **c.**      **Dr. Pfeiffer's Breach of Contract Claim is Typical of the Class Claims.**

Rule 23(a)(3)'s typicality requirement is met if "each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability." *Pigford v. Glickman*, 182 F.R.D. 341, 349 (D.D.C. 1998) (internal citation omitted); *see also Mortimore*, 197 F.R.D. at 436-37 (typicality satisfied where the claims of the class representative and class members arose out of the same course of conduct). Courts have liberally construed the typicality requirement. *See In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 260 (D.D.C. 2002).

Applied here, Dr. Pfeiffer's claim and claim characteristics mirror those of the members of both the proposed class and the alternative class. She asserts the same breach of contract claim as the members of both classes, and was subjected to the same interest capitalization practice as the members of both classes. Like the members of the proposed class, her scheduled payments were not sufficient to cover the monthly interest accrual during several years of the liability period. And like the members of the alternative class, her actual payments in those years were equal to or greater than her monthly interest accrual. Accordingly, there is no legal difference between Dr. Pfeiffer's individual claim and the claims of the class members.

d.    **Adequacy of Representation is Satisfied.**

Courts in this District analyze two criteria to determine whether Rule 23(a)(4)'s adequacy of representation requirement is met: (1) whether the proposed class representative has antagonistic or competing interests with other class members; and (2) whether the class representative is able to vigorously prosecute the interests of the class through qualified counsel. *See Cohen*, 2007 U.S. Dist. LEXIS 84567, *16 (quoting *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997)). Here, Dr. Pfeiffer's interest does not conflict with those of the class members. She shares the same objectives with the class members in establishing DOE's contract liability and obtaining appropriate declaratory, injunctive and monetary relief. Moreover, she has actively represented the interests of the class members by initiating this litigation and actively participating in its prosecution.

In addition, Dr. Pfeiffer has retained experienced class counsel who has served as lead or co-lead counsel in several national class actions and class action settlements. (*See* Declaration of Steven M. Sprenger at ¶¶ 5-6, 8). Class counsel have devoted substantial time and energy to litigating this action, and have pledged to continue to do so. *Id.* at ¶¶ 3, 10. Therefore, the Court should find Rule 23(a)(4)'s adequacy requirement to be satisfied and, pursuant to Fed. R. Civ. P. 23(g), appoint Steven M. Sprenger and Daniel C. Bryden of Sprenger & Lang, PLLC to serve as lead class counsel and class counsel, respectively.

2.    **The Proposed Class And Alternative Class Satisfy Rule 23(b).**

In addition to satisfying all four Rule 23(a) requirements, Dr. Pfeiffer's proposed class and alternative class must also satisfy at least one of the provisions of Rule 23(b). Fed. R. Civ. P. 23(b). Here, both the class and alternative class satisfy Rule 23(b)(2) and (b)(3) and, accordingly, should be certified under both provisions. *See Eubanks v. Billington*, 110 F.3d 87,

96 (D.C. Cir. 1997) (approving district court's certification under (b)(2) for purposes of declaratory or injunctive relief, and (b)(3) for purposes of monetary relief); *Mortimore*, 197 F.R.D. at 438 (certifying breach of contract claim against FDIC under (b)(2) and (b)(3)); *McAnaney,* 2006 U.S. Dist. LEXIS 66941, \*\*17-18 (certifying consumer protection claims under (b)(2) and (b)(3)).

> **a.    Certification is Appropriate Under Rule 23(b)(2) Because the Proposed Class and Alternative Class Seek Declaratory and Injunctive Relief.**

Rule 23(b)(2) permits an action to be maintained as a class action when the defendant has acted on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.  Fed. R. Civ. P. 23(b)(2).  In her prayer for relief, Dr. Pfeiffer has specifically requested both declaratory and injunctive relief.  Moreover, the class members were subjected to the exact same interest capitalization practice.  If the Court finds DOE's interest capitalization practice to constitute a breach of contract, then both declaratory and injunctive relief are appropriate.  *See Restatement of the Law (Second) of Contracts*, §§ 344, 357 (explaining that declaratory and injunctive relief are appropriate remedies for breach of contract);  *Cf. Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988) (observing that a federal district court, unlike the federal claims court, has general equitable powers to grant prospective relief with respect to federal government action).  Accordingly, the proposed class and alternative subclass should be certified under Rule 23(b)(2).  *Mortimore*, 197 F.R.D. at 438 (certifying case under (b)(2) where government defendants "allegedly acted or refused to act on grounds generally applicable to the class").

**b.    Certification is Also Appropriate Under Rule 23(b)(3) Because Common Questions Predominate and a Class Action is the Superior Procedural Device for Resolution of the Claims.**

Rule 23(b)(3) allows a case to be certified as a class action when common issues predominate over individual issues and a class action is superior to other available methods of resolution.  Fed. R. Civ. P. 23(b)(3).  In this case the common issues overwhelm the individual issues – class members executed the same basic form of a promissory note, they assert the same legal theory, and they were subjected to the same interest capitalization.  Even as to damages the primary issue is common, that is, what is the appropriate formula for calculating damages, including pre-judgment interest.  Once the formula is established, a computer simply will have to perform arithmetic computations to determine the damages suffered by each class member.  The fact that the arithmetic will vary among class members does not prevent the satisfaction of the predominance requirement.  *See Mortimore*, 197 F.R.D. at 436 ("it almost goes without saying that the 'overwhelming weight of authority holds that the need for individual damages calculations does not diminish the appropriate of class action certification where common questions as to liability predominate.'") (internal quotation omitted).

To determine whether a class action is the superior procedural device, courts typically consider the following factors:  the interest of class members in exercising individual control over their own action; the extent and nature of litigation concerning the controversy already commenced; the desirability or lack thereof of concentrating the claims in this forum; and the difficulties likely to be encountered in the management of the case as a class action.  *Id.*  Each of the above factors weighs in favor of certification.  First, class members have shown no interest in controlling their own litigation.  In fact, due to the relatively small size of each individual class member's claim, it is likely that their claims will never be brought to court without use of the

class action procedure. *Id.* Second, neither Dr. Pfeiffer nor her counsel is aware of a single action against DOE that asserts similar breach of contract claims. Third, the use of a class action here would avoid future duplicative lawsuits reaching potentially inconsistent results. The resolution of DOE's contract liability in this case will resolve the issue as to the entire class. And fourth, there are no practical difficulties to managing this case as a class action. There will be one liability ruling, one damages formula, and a simple mailed notice process.

## IV.    CONCLUSION

The instant case is ideally suited for class action status. It involves a single claim for breach of contract. The contract at issue is a standard form promissory note governing student loans issued by the federal government. The note has been executed by the proposed class representative and all class members, and contains identical or substantially similar language concerning interest capitalization. The federal government has capitalized interest on the student loans of the proposed class representative and class members in the same manner. Accordingly, Dr. Pfeiffer respectfully requests that the Court grant her motion, and enter her proposed form of order certifying the proposed class and/or the alternative class and appointing her counsel as class counsel.

## REQUEST FOR ORAL ARGUMENT

Dr. Pfeiffer and the plaintiff class respectfully request an oral hearing on their motion.


Dated:  January 31, 2008

Respectfully submitted,


 /s/ Steven M. Sprenger
Steven M. Sprenger (DC No. 418736)
SPRENGER & LANG, PLLC
1400 Eye Street, N.W., Suite 500
Washington, DC 20005
(202) 265-8010

Daniel C. Bryden (MN No. 302284 *Pro Hac Vice*)
SPRENGER & LANG, PLLC
310 Fourth Avenue S., Suite 600
Minneapolis, MN 55415
(612) 871-8910

*Attorneys for Plaintiff and the Class*

77112                                          15

1

1    UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF COLUMBIA

3    --------------------------------x

4    BRENDA KAY PFEIFFER,              :

5    On behalf of herself and all      :

6    others similarly situated,        :

7        Plaintiff,              :Case No.:

8    vs.                          :1:07-CV-00522(EGS)

9    MARGARET SPELLINGS, Secretary     :

10   of Education, et al.,             :

11       Defendants.              :

12   --------------------------------x

13                              December 10, 2007

14                              Washington, DC

15   DEPOSITION OF:

16        CYNTHIA DENISE BATTLE,

17   called for oral examination by counsel for the

18   Plaintiff, at the Law Offices of Sprenger & Lang, PLLC,

19   1400 I Street, NW, Suite 500, Washington, DC,

20   beginning at 9:44 a.m., Monday, December 10, 2007,

21   before Lohna Esteb, Reporter and Notary Public,

22   when were present:

23

24

25

**2**

1  ON BEHALF OF PLAINTIFF:
2      DANIEL C. BRYDEN, ESQUIRE
3      SPRENGER & LANG, PLLC
4      310 Fourth Avenue S.
5      Suite 600
6      Minneapolis, Minnesota 55415
7      (612) 871-8910
8      E-mail: dbryden@sprengerlang.com
9  ON BEHALF OF DEFENDANTS:
10      JOHN WARSHAWSKY, ESQUIRE
11      CHRISTIAN J. GROSTIC, Esquire
12      U.S. Department of Justice
13      Civil Division
14      Commercial Litigation Branch
15      1100 L Street, NW
16      Washington, DC  20005
17      (202) 307-0010
18      E-mail: john.warshawsky@usdoj.gov
19  -and-
20      S. DAWN SCANIFFE, ESQUIRE
21      U.S. Department of Education
22      500 Maryland Avenue, SW
23      Room 6E120
24      Washington, DC  20202-2110
25      E-mail: Dawn.Scaniffe@ed.gov

**3**

1  -and-
2      RONALD B. SANN, ESQUIRE
3      U.S. Department of Education
4      Department of the General Counsel
5      400 Maryland Avenue, SW
6      Washington, DC  20202-2110
7      (202) 401-6292
8      E-mail: Ronald.Sann@ed.gov

**4**

1                  INDEX
2          EXAMINATION ON BEHALF OF THE
3          PLAINTIFFS: DEFENDANTS:
4  WITNESS:      (Mr. Bryden) (Mr. Warshawsky)
5  CYNTHIA D. BATTLE      8      123
6
7              EXHIBITS
8  EXHIBIT NO.:                      PAGE:
9  1      Defendants' Responses to      39
10      Plaintiff's First Set of
11      Interrogatories
12  2      Direct Loans, Billing Statements      63
13      Negative Amortization
14  3      Fax to Ms. Pfeiffer      72
15      from Department of Education
16      Loan Origination Center
17      Loan Consolidation
18  4      Federal Direct Consolidation      77
19      Loan Application and Promissory
20      Note
21  5      Federal Direct Consolidation      78
22      Promissory Note Endorser
23      Addendum
24
25

**5**

1  EXHIBITS CONTINUED                      PAGE:
2  6      Federal Direct Consolidation      80
3      Loan Promissory Note Exp. 1/31/99
4  7      Federal Direct Consolidation      81
5      Application and Promissory
6      Note
7  8      Federal Direct Consolidation Loan      82
8      Application and Promissory
9      Note
10  9      William D. Ford Federal Direct      83
11      Loan Program
12  10      Application and Promissory      83
13      Note Federal Direct
14      Consolidation Loan
15  11      Application and Promissory      84
16      Note Federal Direct
17      Consolidation Loan Exp. 12/19/94
18  12      Federal Direct Consolidation      84
19      Loan Instructions for
20      Promissory Note
21      Endorser Addendum
22  13      Glossary      96
23  14      Account Statement      99
24      for Ms. Pfeiffer
25      6/30/02

2 (Pages 2 to 5)

6

EXHIBITS CONTINUED:                                          PAGE:
15      Account Statement              100
        for Ms. Pfeiffer
        6/30/04
16      Account Statement              101
        for Ms. Pfeiffer
        6/30/05
17      Letter to Whom It May Concern:   102
        from Ms. Pfeiffer
        6/2/05
        re:  Grievance on Capitalization
18      Letter to Direct Loans Program   110
        Attn:  Lupe Lopez
        12/27/05
19      Account Statement              111
        form
20      Online Federal Student Aid      115
        Forms
21      Federal Direct Consolidation    116
        Loan, Borrower's Rights
        and Responsibilities
22      William D. Ford Federal Direct Loan   118
        Program, Repayment Plan Choices

7

EXHIBITS CONTINUED:                                          PAGE:
23      Addendum to Federal Direct      118
        Consolidation Loan Application
        and Promissory Note
24      Questions and Answers About     119
        Direct Consolidation Loans
25      Document with handwriting       120
        "Due Date"
26      Document with Handwriting       121
        "Monthly Payment"
27      Document with Handwriting       122
        "Payment Due Date"

8

1        P-R-O-C-E-E-D-I-N-G-S
2    Thereupon,
3         CYNTHIA DENISE BATTLE,
4    having been first duly sworn by the Notary Public, was
5    examined upon her oath and testified as follows:
6         EXAMINATION ON BEHALF OF THE PLAINTIFF
7    BY MR. BRYDEN:
8    Q   Good morning.
9    A   Good morning.
10   Q   My name is Dan Bryden.  I'm an attorney
11   for the plaintiffs in this action.
12        Have you ever had your deposition taken
13   before?
14   A   No.
15   Q   Can you first just state for the record
16   your name?
17   A   Cynthia Battle.
18   Q   Do you have a middle name?
19   A   Yes.
20   Q   What is that?
21   A   D-E-N-I-S-E.
22   Q   Let me just go over a couple basic rules
23   we try to follow in the deposition.  One thing you
24   may have noticed already, there's a court reporter
25   here and she's going to make a written record of

9

1    everything we say today.  To help her in her job, we
2    both have to give verbal responses.  It would be
3    hard for her to record shaking head, nodding head or
4    she might not be sure which one you're doing.  So if
5    you can say yes or no to the questions I ask, that
6    would be helpful.  Also, huh-uh, uh-huh, that sort
7    of thing might not come through on the record so
8    please, again, say yes or no.
9         The other thing that we will both have to
10   do is even if you think you know the question I'm
11   asking you while I'm halfway through asking it,
12   please wait until I'm done asking the question.  If
13   we both talk at the same time it will be very
14   difficult for her to write down.  And I'll do my
15   best to not talk at the same time you're talking.
16        And we can take a break any time you want
17   to, although I ask that we not take a break while a
18   question is pending.  In other words, if I ask you a
19   question, please don't ask for a break before you
20   answer the question.  But any time you want to take
21   a break is fine.
22        I don't expect this to last all day.  It
23   may go through lunch and if it does, we will break
24   for lunch and come back after lunch.
25        If you don't understand a question that I

3 (Pages 6 to 9)

10

1  ask you, please let me know and I'll try to clarify
2  the question. If you answer the question, I'll
3  assume that you understood the question.
4      I probably will ask you a couple questions
5  today that don't make a lot of sense or I haven't
6  phrased them well. If I do that, feel free to tell
7  me I don't understand what you're talking about or
8  the question didn't make any sense, that's fine and
9  I'll try to rephrase it for you.
10      I'll ask you to bear in mind that your
11  testimony is under oath today as if you were in
12  court. Do you have any questions about that?
13  A  No.
14  Q  Is there anything that prevents you from
15  giving your best testimony? Do you have any
16  condition that affects your memory? Do you take any
17  medications that might affect your ability to
18  testify accurately?
19  A  No.
20  Q  I would like to just get some basic
21  background information about you. You stated your
22  name for the record. Are you a college graduate?
23  A  No.
24  Q  No?
25  A  (Witness nods head affirmatively.)

11

1  Q  Can you tell me where you went to high
2  school?
3  A  High school, Suitland High School.
4  Q  How do you spell that?
5  A  S-U-I-T-L-A-N-D.
6  Q  Where is that?
7  A  Suitland, Maryland.
8  Q  Did you graduate from Suitland High
9  School?
10  A  Yes.
11  Q  What year did you graduate?
12  A  1984.
13  Q  Did you get any more education after you
14  graduated from high school?
15  A  Yes.
16  Q  Can you tell me what that was?
17  A  I went to a community college and then
18  transferred to a four-year institution.
19  Q  What community college did you go to?
20  A  Prince George's Community College.
21  Q  Did you have a major while you were there?
22  A  Initially, yes.
23  Q  What was your major initially?
24  A  Accounting.
25  Q  And then did you change majors or did that

12

1  change at some point?
2  A  Yes.
3  Q  When did that happen?
4  A  Midway through, I changed majors.
5  Q  Okay. What did you change your major to?
6  A  It was business at that time.
7  Q  Business administration?
8  A  Yes.
9  Q  Then you said you transferred to a
10  four-year institution?
11  A  Yes.
12  Q  What institution was that?
13  A  University of Maryland.
14  Q  Did you have a major while you were there?
15  A  No. Had not declared.
16  Q  What year did you transfer over to the
17  University of Maryland?
18  A  I don't recall.
19  Q  Was it before 1990?
20  A  I don't recall.
21  Q  Do you recall what years you were in
22  community college?
23  A  Oh, yes. That would have been '87.
24  Q  You were in community college from --
25  A  Like 1987 because I graduated in '84, yes.

13

1  Q  And what did you do from 1984 to 1987
2  before you went to community college?
3  A  I worked.
4  Q  What did you do?
5  A  I worked at a law firm.
6  Q  What was your position?
7  A  It was an entry-level position so I'm not
8  sure what the actual title of it was.
9  Q  Can you tell me what you did --
10  A  Yes.
11  Q  -- to the best of your recollection?
12  A  I did a couple of things. I started off
13  in the front office in a clerical capacity. And
14  then I worked as a bookkeeper for the partner's
15  properties.
16  Q  What do you mean by bookkeeper, what
17  specifically did you do?
18  A  I handled some of the basic accounting for
19  his rental properties; incoming, outgoing kind of
20  transactions.
21  Q  And then did you continue to do that when
22  you went to community college in 1987?
23  A  Yes.
24  Q  And then you said you went to community
25  college in 1987. Does that refresh your

14

1 recollection as to when you transferred to the
2 University of Maryland?
3     A   No.
4     Q   Do you know, was there a period of time
5 after you were going to community college before you
6 went to the University of Maryland?
7     A   I don't understand your question.
8     Q   You said you went to community college in
9 1987. Did you go 1988, 1989, or were you there for
10 just one year?
11     A   Ask your question again.
12     Q   What years were you in community college?
13     A   I don't recall the exact timeframe that I
14 was in community college versus when I transferred
15 to Maryland, I don't recall.
16     Q   You don't recall what year you started
17 going to University of Maryland?
18     A   For University of Maryland, I was at the
19 department by that time, I do remember that.
20     Q   I believe you stated that you did not
21 declare a major while you were at the University of
22 Maryland?
23     A   I don't believe I did.
24     Q   Did you complete some course work while
25 you were there?

15

1     A   Yes.
2     Q   Can you tell me generally what sort of
3 course work you did? Was it liberal arts?
4     A   More things in IT, computer-related
5 courses is what I completed at Maryland.
6     Q   Did you receive any sort of certificate or
7 degree?
8     A   No, did not complete.
9     Q   Have you completed any other education
10 since that time?
11     A   What do you mean?
12     Q   Have you attended any other university or
13 secondary education?
14     A   No.
15     Q   I believe you said you had some training
16 when you were in community college as an accountant,
17 is that right?
18     A   Ask your question again.
19     Q   Did you complete courses in accounting in
20 any of your educational background?
21     A   I don't recall my actual classes.
22     Q   Do you recall whether or not you completed
23 anything in accounting or you just don't know?
24     A   I don't recall. I don't recall how many
25 other courses I completed.

16

1     Q   But do you recall that you did complete
2 some courses in accounting?
3     A   I don't recall.
4     Q   When did you first become employed by the
5 Department of Education?
6     A   1993.
7     Q   What was your position when you first came
8 to the Department of Education?
9     A   I was hired as an assistant in a clerical
10 capacity.
11     Q   How long did you work in a clerical
12 position to the best of your recollection?
13     A   Approximately two years, two and a half
14 years.
15     Q   Did you change positions then?
16     A   Yes.
17     Q   What was your next position after that?
18     A   The series is management analyst.
19     Q   I'm sorry, you said the series?
20     A   Well, it's -- you're categorized as a
21 management analyst.
22     Q   Are there different levels of management
23 analyst?
24     A   What do you mean?
25     Q   I'll withdraw the question.

17

1         What does a management analyst do or what
2 did you do in your capacity as a management analyst?
3     A   I started out in -- I started working
4 personnel security when I joined that office. I
5 switched offices at that time.
6     Q   And how long did you work in personnel and
7 security for?
8     A   Approximately two years.
9     Q   So until approximately 1997?
10     A   Sounds right.
11     Q   Okay. Then I take it you changed
12 responsibilities approximately 1997?
13     A   Approximately, yes.
14     Q   What was your next position with the
15 Department of Education?
16     A   In that office, it was requirements. We
17 worked on the actual requirements for the program.
18     Q   And what do you mean by requirements for
19 the program? Which program are you talking about?
20     A   William D. Ford Federal Direct Loan
21 Program.
22     Q   And what do you mean requirements for the
23 program?
24     A   Our team was responsible for implementing
25 changes in the regulations so it was responsible for

5 (Pages 14 to 17)

18

1  taking whatever regulatory guidance we have and
2  implementing them into the system.
3      Q   What was your title at that time?
4      A   I don't know whether I had a specific
5  title. It was still management analyst. I don't
6  know whether there was another title I went by at
7  that time.
8      Q   So were you responsible for analyzing
9  regulations, implementing regulations, is that what
10 you did?
11     A   Yes.
12     Q   Can you tell me what aspects of the
13 William D. Ford loan program you were working on?
14     A   At that time, I believe I was working a
15 good percentage of my time on website functions.
16     Q   By website functions, do you mean the
17 websites that borrowers go to to get information
18 about their loans?
19     A   Yes.
20     Q   And was it your responsibility to
21 determine what material to put on the Department of
22 Education's websites about student loans?
23     A   Could you clarify your question?
24     Q   Was it your job to decide what content to
25 put onto the website?

19

1      A   Solely, no; but, I was involved in
2  deciding what information needed to be present on
3  the website.
4      Q   Did you do that as part of a team?
5      A   Yes.
6      Q   How many people were on your team?
7      A   Are we just talking about department
8  employees or contractor employees as well?
9      Q   Why don't you tell me just department
10 employees.
11     A   At that time there may have been two or
12 three people on a team, or involved.
13     Q   How long did you do that for?
14     A   I did that a number of years. To some
15 capacity, I still do that; but, at that time, that
16 was my primary function.
17     Q   At some point did your responsibilities
18 change or did your position change?
19     A   Yes.
20     Q   When was the next time that your title or
21 responsibilities changed?
22     A   I want to say around 2000, I took on a
23 team -- I took on team members and I became a team
24 lead.
25     Q   And can you explain to me the nature of

20

1  the team that you were the leader of?
2      A   The team at that time was responsible for
3  the call center. We have a direct loan services
4  call center and we were responsible for the
5  functions of that call center.
6      Q   When you say the functions of that call
7  center, was the team that you led responsible for
8  giving the people who answered the phones at the
9  call center direction as to how to answer certain
10 types of questions?
11     A   Yes, that is a function of the call center
12 team.
13     Q   What are the other functions of the call
14 center team?
15     A   Functions include helping with borrower
16 calls; the training of the customer service
17 representatives; the actual running; questions that
18 relate to the actual call center itself.
19     Q   Okay. And you recall who you reported to
20 at that time?
21     A   My division director at that time would
22 have been Dan Hayward.
23     Q   Is he still with the Department of
24 Education to the best of your knowledge?
25     A   Yes.

21

1      Q   Do you know what his title is now?
2      A   No, I do not.
3      Q   How long were you the team leader for the
4  team you have been describing?
5      A   I don't recall how long for that team
6  because subsequent to that, then my role expanded
7  and I took a larger team so I don't recall the time
8  span between when I took that role and when I got
9  additional staff.
10     Q   Can you estimate for me when that would
11 have been? Would it have been 2003, 2004?
12     A   Could have been 2002, 2003, sounds about
13 right.
14     Q   Tell me, you said your team expanded. Can
15 you explain to me what that was?
16     A   I was responsible for the function of the
17 call center. And then a position came up for the
18 supervisor for all of the -- all of the employees
19 for direct loan servicing. And I became the
20 supervisor for that entire group.
21     Q   And is that your current position?
22     A   No.
23     Q   Do you recall what your title was at that
24 time?
25     A   It's just been supervisor for direct loan

6 (Pages 18 to 21)

22

1  servicing.
2    Q   What were your responsibilities in that
3  position?
4    A   In addition to the management of the call
5  center, it would have involved the management of the
6  other -- of the employees that also managed
7  different parts of that contractor.
8    Q   And so did you have any responsibilities
9  other than the call center, then, at that time?
10   A   At that time, I would have still been
11 involved in the call center as well as the website
12 that still continues.  And then it was just the
13 management of the staff that was there.
14   Q   How many people did you supervise at that
15 time?
16   A   It would have been about 10 to 12.
17   Q   Can you tell me, when you say 10 to 12
18 people, is that the total number of employees that
19 answer the phones when people call into the call
20 center?
21   A   Are we referring to the department
22 employees?
23   Q   Well, maybe I need to clarify that.
24       Do you contract out some of the work for
25 people that work at the call center?

23

1    A   Yes.
2    Q   Who do you contract that out to?
3    A   It's contracted out to a contractor called
4  ACS.
5    Q   So ACS employees are the individuals that
6  will answer the phones?
7    A   Correct.
8    Q   Are there any Department of Education
9  employees that are responsible for answering phones
10 at the call center?
11   A   For customers, no.
12   Q   To be clear what we are talking about
13 here, when you say the call center --
14   A   That's the number that's provided to
15 borrowers to call if they have questions about their
16 loans, yes.
17   Q   What sort of training is required of the
18 ACS employees that answer the telephones?
19   A   They go through a three-week training in
20 the actual call center itself.
21   Q   Are they required to be high school
22 graduates?
23   A   I'm not positive of the criteria.  I
24 believe so but I'm not positive.
25   Q   Do you know if they are required to have

24

1  any background in accounting?
2    A   I do not know.
3    Q   Or mathematics?
4    A   I do not know.
5    Q   Do you know how many different employees
6  there are that answer calls, how many ACS people it
7  takes to answer all the phone calls that come in?
8    A   What period of time are we talking about?
9    Q   Let's talk about, I believe you said it
10 was around 2002 or 2003 when you were responsible
11 for the contractor.
12   A   I don't recall how many employees there
13 were at that time.
14   Q   Can you give an estimate?
15   A   An estimate?  Sure.  At that time we could
16 have had anywhere between 200 and 300
17 representatives answering calls.
18   Q   Do you receive a lot of calls every day,
19 then?  Do you have a sense of the call volume?
20   A   It depends on the time of year.  Can I
21 give you currently?
22   Q   Sure.
23   A   Okay.  Currently, if we are in peak, we
24 could get somewhere between -- we could get close to
25 100,000 calls a week.

25

1    Q   Do you still have 200 to 300 ACS employees
2  answering the phones?
3    A   Currently?
4    Q   Currently.
5    A   I think it's a little bit more than that
6  now.
7    Q   What was your next position with the
8  department?
9        Let me step back.  Did you continue to
10 report to the same individual when you took on the
11 added responsibilities of supervising the contractor
12 for the call center?
13   A   Clarify your question again.
14       MR. WARSHAWSKY:  Excuse me.  Are you
15 talking about Dan Hayward?
16       MR. BRYDEN:  Right.
17       MR. WARSHAWSKY:  I think she testified
18 that was who she reported to when she took on
19 the call center, am I correct?
20       THE WITNESS:  Uh-huh.
21 BY MR. BRYDEN:
22   Q   Is that correct?
23   A   Yes.
24   Q   So what was your next position with the
25 department?

7 (Pages 22 to 25)

26

1    A    After?  What are you referring to,
2  "after"?
3    Q    I believe you testified that in 2002, 2003
4  you took on additional responsibilities relating to
5  the call center.  When was the next time your
6  position or responsibilities changed?
7    A    Around 2005, our offices reorganized at
8  that time.  Our contract structure changed a little
9  bit and I became responsible for multiple call
10  centers.
11    Q    And were you responsible for all the call
12  centers at that point?
13    A    All, meaning what?
14    Q    Well, you said that there were 200 to 300
15  ACS employees, there may be more now, and there are
16  multiple physical locations where these people are
17  that answer the phones.
18    A    Our contract structure earlier in the
19  years just involved direct loan servicing.  It then
20  expanded to include direct loan servicing,
21  consolidation, total and permanent disability and
22  collections.  So our contract -- the contract
23  mechanism expanded and it was combining multiple
24  functions in one area.
25        So when I say all, I was referring to

27

1  earlier I was just responsible for direct loan
2  servicing.  When the contract structure changed,
3  then it would -- then it became multiple call
4  centers that did multiple functions.
5    Q    Do you recall when that was?
6    A    That would have been -- we reorganized in
7  2005, I believe it was.
8    Q    What were your responsibilities at that
9  time?
10    A    Similar to the previous where you monitor
11  call monitoring, insuring that -- customer
12  satisfaction; website was still a function; and
13  responsible for insuring that the contractor met
14  certain metrics.
15    Q    So if somebody called the 1-800 number and
16  they disagreed with the person they were talking to
17  and they asked to speak to a supervisor, would you
18  maybe be responsible for taking on those calls when
19  you had this position?
20    A    No.
21    Q    You would supervise other people that did
22  that, is that right?
23    A    No.  The escalation process in the call
24  center didn't necessarily mean that it came directly
25  to the department.  So if a customer wanted to

28

1  escalate their concern or issue, then it would go
2  through the escalation process established at the
3  call center.
4    Q    In other words, through ACS?
5    A    Correct.
6    Q    And your job was to monitor that contract?
7    A    Yes, our job was to monitor that contract.
8    Q    What the next time you had a change of
9  title or responsibility?
10    A    It would have been November of 2006.
11    Q    What was your change in title and
12  responsibilities in November 2006?
13    A    Then it was director of direct loan
14  servicing.
15    Q    Can you tell me what your responsibilities
16  are in that position?
17    A    In the current position, it's a little
18  different where it's more looking at the regulatory
19  changes, policy, that kind of thing; implementing --
20  implementing those changes, recommending changes;
21  delinquency management and condo portfolio trending.
22    Q    Is that your current position now?
23    A    Yes.
24    Q    Are there other people that have the same
25  title as you, or are you the director of student

29

1  loan servicing?  Why don't you tell me exactly what
2  your title is.
3    A    The -- the actual title that we refer to
4  at the department is -- it's director of direct loan
5  servicing, it's easier to kind of understand, but
6  it's director of non-default because we do have some
7  small -- a small balance that is handled by our
8  group as well.  There's a small non-defaulted
9  portfolio, but ...
10    Q    I take it what you are saying is that
11  there's a different director for the non-defaulted
12  portfolio, is that right?
13    A    No.  I'm still the director for --
14  director for -- non-default includes direct loan
15  servicing.
16    Q    So you are the director of student loan
17  servicing.  Are there other directors of student
18  loan servicing?
19    A    When you say student loan services?
20    Q    I'm sorry.  I thought that's what you
21  said.
22    A    No.  Director of direct loan servicing.
23    Q    Director of direct loan servicing.
24    A    Uh-huh.
25    Q    Are there other directors of direct loan

8 (Pages 26 to 29)

30

1 servicing, or are you the director of direct loan
2 servicing?
3    A  I'm the director of direct loan servicing.
4    Q  Who do you report to?
5    A  I report to Jenna Hernandez.
6 (phonetically)
7    Q  What is her position?
8    A  She is the general manager.
9    Q  General manager of?
10   A  Borrower servicing.
11   Q  Do you know who she reports to?
12   A  She reports to Sue S-Z-A-B-O.
13   Q  Do you know what her position is?
14   A  She is -- I'm not sure -- she is our
15 area -- it's business operations so I'm not sure
16 whether it's general manager, director. I'm not
17 sure what her actual title is. But she's
18 responsible for all of business operations.
19   Q  Do you know who she reports to?
20   A  She reports to the chief operating
21 officer.
22   Q  Who is that?
23   A  Larry Water.
24   Q  That's your current position, right?
25   A  That's my current position.

31

1    Q  Throughout your tenure at the Department
2 of Education, have they required you to take any
3 courses in either accounting or any sort of legal
4 training or analysis?
5   A  Required?
6   Q  Required.
7   A  No.
8   Q  Can you tell me how many different loan
9 programs are offered by the Department of Education
10 and could you list them for me?
11   A  There are two loan programs: The William
12 D. Ford Direct Loan Program and the FFEL program.
13   Q  What does FFEL --
14   A  Federal Family Education Loan Program.
15   Q  So those are the two loan programs?
16   A  Yes.
17   Q  And then there are a number of different
18 loans you can take out under each program? For
19 example, where would a Perkins loan come under those
20 two programs?
21   A  The -- where would Perkins fall? Perkins
22 is a school loan program so, yes, it's a -- yes,
23 Perkins is also another loan program.
24   Q  That's a different loan program?
25   A  Perkins, I guess, would be separate.

32

1    Q  Are there any other loan programs?
2   A  There is -- if we are doing categories, I
3 guess if you're looking for -- you have direct, you
4 have FFEL, you have Perkins, and you have campus
5 based.
6   Q  What do you mean by campus based?
7   A  Those could be work study programs.
8   Q  Then what about consolidation loans, where
9 do they come in?
10   A  Consolidation loans are a product of
11 either direct or the FFEL program.
12   Q  Can you tell me under the William D. Ford
13 loan program, I take it a borrower can take out a
14 subsidized loan, an unsubsidized loan, consolidation
15 loan. Are there other types of loans that are
16 available under the William D. Ford loan program?
17   A  Name then again. You said I could have a
18 Stafford loan which is unsubsidized or subsidized.
19 I can have a consolidation loan.
20      What else did you say?
21   Q  Those were the examples I gave. What I'm
22 looking for is a list of all the loans offered under
23 the William D. Ford loan program.
24   A  Okay. There is a plus loan that you can
25 also have.

33

1    Q  What's a plus loan?
2   A  Plus is a parent loan.
3   Q  It's a loan that's made to the parent
4 rather than the student, is that ...
5   A  It is a loan made to the parent.
6 There's -- there were changes in the regulations to
7 allow what is called a graduate plus loan which can
8 be made to the student as well.
9   Q  Let's turn to the FFEL program. What are
10 the different loans that can be taken out?
11   A  The program is the same. You can take out
12 the same types of loans in the FFEL program as well.
13   Q  What's the difference between the William
14 D. Ford program and the FFEL program?
15   A  The primary difference between the two
16 programs is -- is how the program is structured. So
17 the Direct Loan Program, the Department of Education
18 is the lender; whereas, in the -- and the schools
19 work directly with the Department of Education from
20 disbursement all the way through servicing.
21      Where the FFEL program is concerned, it
22 deals with the banks and guarantors.
23   Q  What role does the Department of Education
24 or the United States government play in the FFEL
25 loan program? Do they make the actual loan or do

9 (Pages 30 to 33)

34

1  they subsidize banks that do? Can you explain how
2  that works?
3     A   No, no, I cannot explain that in detail.
4     Q   Does the Department of Education make the
5  loans in the FFEL program, and is it money from the
6  department that is being lent as I take it it is from
7  the William D. Ford program?
8     A   I don't understand -- what do you mean --
9  I don't understand your question.
10    Q   If I take out a loan under the FFEL
11 program, do I owe my debt to the Department of
12 Education or do I owe it to a bank?
13    A   You would owe it to a bank.
14    Q   Okay.
15    A   Yes, you would owe it to a bank or, yeah,
16 a lending institution.
17    Q   What role does the Department of Education
18 play in those loans? Do they regulate them in some
19 fashion?
20    A   I don't understand what you are asking me.
21    Q   I guess my question is, if under the FFEL
22 program I take out a loan from a lending
23 institution, what role does the federal government
24 play in that?
25        MR. WARSHAWSKY: Objection. There's no

35

1  foundation. You can answer subject if you can.
2        THE WITNESS: I don't understand -- I
3  don't understand the question.
4  BY MR. BRYDEN:
5     Q   I guess I don't understand under the loan
6  program, but we can return back to that later.
7        Let me ask you about the Perkins loan
8  program. What is the nature of the Perkins loan
9  program?
10       MR. WARSHAWSKY: Object to the form. Go
11 ahead and answer subject.
12 BY MR. BRYDEN:
13    Q   There's another thing I should have
14 explained to you.
15       MR. WARSHAWSKY: I explained it.
16       MR. BRYDEN: Okay.
17       MR. WARSHAWSKY: Just to be clear, the
18 only reason I'm objecting is that Ms. Battle's
19 been offered. She's the director of the direct
20 loan servicing program. So to the extent you
21 are getting into areas beyond direct loans, it
22 may be beyond something she can answer.
23       MR. BRYDEN: If she doesn't have knowledge
24 of it, that's fine. I think if she has
25 relevant knowledge, I can ask her.

36

1        MR. WARSHAWSKY: Of course.
2        MR. BRYDEN: But, right, if you don't
3  know, you don't know.
4  BY MR. BRYDEN:
5     Q   So do you have any involvement in the FFEL
6  program?
7     A   Involved. What do you mean by
8  involvement?
9     Q   Is it part of your responsibility to
10 oversee that program?
11    A   No.
12    Q   Is it part of your responsibility to
13 oversee the Perkins loan program?
14    A   No.
15    Q   Are there any other loan programs that you
16 are aware of?
17    A   No. I've given you the ones that I'm
18 responsible for.
19    Q   But are there any other programs that
20 you're aware of that are offered by the department?
21    A   To my knowledge, you have everything
22 that's offered by the department.
23    Q   I believe you testified earlier that under
24 the William D. Ford Direct Loan Program, there are
25 Stafford loans that are offered, subsidized and

37

1  unsubsidized; there are consolidation loans; there
2  are plus loans.
3        Are there any other loans under the
4  William D. Ford Direct Loan Program?
5     A   That's it.
6     Q   Is the income contingent repayment plan
7  available to borrowers under all four of those types
8  of loans under the William D. Ford Direct Loan
9  Program?
10    A   The income contingent repayment plan is
11 available to Stafford borrowers, sub and unsub.
12 It's available to a consolidation borrower if they
13 have a plus, but it is not available to a direct
14 plus borrower.
15    Q   What is a direct plus loan?
16    A   That's the parent loan.
17    Q   What do you mean by parent loan?
18    A   Parent loan meaning a parent can take out
19 a loan on behalf of their child.
20    Q   I understand. Okay.
21    A   Sorry.
22    Q   That's all right.
23        And do you know when the income contingent
24 repayment plan was first implemented; was that
25 around 1984 to the best of your knowledge?

10 (Pages 34 to 37)

38

1    A    Yes, to the best of my knowledge, yes, it
2    was implemented in 1994.
3    Q    So you first came to the Department of
4    Education in 1993, I believe?
5    A    Yes.
6    Q    Can you explain what the income contingent
7    repayment plan is?
8    A    The income contingent repayment plan is a
9    plan that is based on the borrower's annual adjusted
10   income and family size and balance. So it's based
11   on income. And your payments are calculated based
12   on that income.
13   Q    Do you know, is there a formula for
14   determining what somebody's payments are going to be
15   under the income contingent repayment plan?
16   A    Yes.
17   Q    Do you know what that formula is?
18   A    Off the top of my head, no.
19   Q    Which borrowers are appropriate for the
20   income contingent repayment plan? Is it designed
21   for borrowers with high payments but low income?
22        MR. WARSHAWSKY: Object to the form of the
23   question. Vague. You can answer subject.
24        THE WITNESS: Clarify that, please. I'm
25   sorry. Say that again.

39

1    BY MR. BRYDEN:
2    Q    Can you tell me which borrowers would be
3    best suited for the income contingent repayment
4    plan?
5        MR. WARSHAWSKY: Same objection. Answer
6    subject.
7        THE WITNESS: It is suited for -- it was
8    designed for someone with low income that may
9    not be able to afford payments under some of
10   the other repayment plans.
11   BY MR. BRYDEN:
12   Q    So for borrowers with lower income than
13   borrowers under the other repayment plans?
14   A    Yes.
15        (Deposition Exhibit No. 1 was
16        marked for identification.
17   BY MR. BRYDEN:
18   Q    Have you seen Exhibit 1 before?
19   A    Have I seen Exhibit 1 before?
20        Yes.
21   Q    If you turn to -- well, can you turn to
22   Page 19 and then turn to the next page that I
23   believe is unnumbered. Is that your signature?
24   A    Yes.
25   Q    Can I have you turn to the payment history

40

1    which I believe is the next page.
2        Do you see where I am?
3    A    Yes.
4    Q    Did you make this chart or do you know who
5    did?
6    A    I did not make this chart.
7    Q    Do you know who did?
8    A    Yes.
9    Q    Then who is that?
10   A    The contractor, the servicing center
11   generated this chart.
12   Q    Is this chart accurate to the best of your
13   knowledge?
14   A    Yes.
15   Q    I ask you to turn to what's labeled Page 3
16   in -- I think you are on it. At the top.
17        MR. WARSHAWSKY: For the record, this is
18   the 11/1/, 2007 payment history sheet, Page 3.
19   BY MR. BRYDEN:
20   Q    If you look at the top of the chart here
21   on Page 3, it indicates that on December 7th, 2001,
22   there was a loan disbursement. Do you see where I
23   am?
24   A    No, 12/07/01?
25   Q    Correct.

41

1    A    Okay.
2    Q    Let me actually step back. Hold on a
3    second.
4        Let's go to the beginning of the chart.
5    Let's go to what is designated as Page 2 of the
6    payment chart.
7    A    Page 2?
8    Q    Which appears to begin in August of 1997.
9    Do you see where I am?
10        MR. WARSHAWSKY: Just to be clear, there
11   are two different payment history charts here.
12        MR. BRYDEN: Right.
13        MS. SCANIFFE: Now you are on the one
14   dated October 31, '07?
15        MR. BRYDEN: That's correct.
16   BY MR. BRYDEN:
17   Q    Can you go down to the line dated July 1,
18   1998.
19   A    Okay.
20   Q    Do you see where it says, "Rate
21   Chg./Neg-AM Capitalization."
22        Do you see where I am?
23   A    Yes.
24   Q    And then if you go along the line here, it
25   appears that the chart indicates that $2,913.09 was

11 (Pages 38 to 41)

42

1  capitalized to Dr. Pfeiffer's account.  Is that
2  right?
3     A  Yes, that's what it says.
4     Q  Then let's go down to the line dated
5  July 1, 1999.
6     A  Okay.
7     Q  And it appears that the chart indicates
8  that $6,721.76 was capitalized to Dr. Pfeiffer's
9  account, is that right?
10    A  Yes, that's what it says.
11    Q  If you go one line up, it appears that on
12  June 14th, 1999, Dr. Pfeiffer made a payment of
13  $100, is that correct?
14    A  June 14, 1999?
15    Q  Correct.
16    A  Yes, she made a payment of $100.
17    Q  Do you know, does that interest
18  capitalization of the $6,721.76, does that include
19  interest that would have accrued on her account from
20  June 15th, 1999 through June 30th, 1999?
21    A  I'm sorry.  Ask your question again.
22    Q  The interest capitalization that occurred
23  on July 1st, 1999, would that include interest
24  that accrued on Dr. Pfeiffer's account from
25  June 15th, 1999 through June 30th, 1999?

43

1     A  Yes, the interest -- the interest accrual
2  would have included any interest that accrued from
3  the last payment date to the end of the month, yes.
4     Q  Let's then turn back to Page 3 that we
5  were looking at before dated November 1, 2007.  At
6  the top of the chart, there's a December 7th,
7  2001, two loan disbursements.
8        Do you see those?
9     A  Yes.
10    Q  I take it that refers to the consolidation
11  loan taken out by Dr. Pfeiffer in 2001?
12    A  Yes.
13    Q  Do you know what the interest rate on Dr.
14  Pfeiffer's loan was?
15    A  No, I do not.
16    Q  Then if you go to the line dated
17  January 1, 2002 --
18    A  Yes.
19    Q  -- looks like there are actually three
20  entries there.
21    A  January 1, 2002?
22    Q  Yes.
23       The first entry says "Grace End."
24       Do you see where that is?
25    A  Yes.

44

1     Q  What does that mean?
2     A  Grace end is the sixth month after your
3  separation would be considered your grace end.
4  Borrowers are allowed six months before entering
5  repayment, which would be considered a grace end
6  date.
7     Q  During that sixth-month grace period, does
8  interest accrue on the student's account, on the
9  borrower's account?
10    A  If it's unsubsidized.
11    Q  Then do borrowers have the option of
12  paying off that interest each month during the grace
13  period?
14    A  The answer would be yes, they have the
15  option of paying that interest during the grace
16  period.
17    Q  And then if they don't pay the interest
18  during the grace period, does it capitalize at the
19  end of the grace period?
20    A  Yes, it does.
21    Q  Then the next line down it says,
22  "Neg-Amortization Start."
23       Do you see that?
24    A  Yes.
25    Q  What does that mean?

45

1     A  Negative amortization is a condition
2  where -- where your calculated payments are less
3  than the interest accrual.
4     Q  And how often are the scheduled payments
5  determined, the amount of the scheduled payments?
6     A  How often are they determined?
7     Q  I mean, when a borrower is repaying the
8  loan under the income contingent repayment plan, do
9  you annually review their income to determine their
10  monthly payment or do you do it every six months?
11  How does that work?
12    A  Annually.
13    Q  So does the department treat all loans
14  under the income contingent repayment loan where the
15  borrower's scheduled payment is less than the
16  interest accruing in the previous month as
17  negatively amortized?
18    A  Ask your question again.  Does the
19  department treat ...
20    Q  Does the department consider all loans
21  where the borrower is repaying under the income
22  contingent repayment plan and their monthly payments
23  have been calculated according to the plan, and the
24  amount that's going to be their monthly payment is
25  less than the interest accruing in the previous

12 (Pages 42 to 45)

46

1  month, does the department consider all those loans
2  to be negatively amortized?
3      A   I believe your question to be if we've
4  calculated your payment based upon annual income,
5  and your monthly payment, your interest accrual for
6  a given month is less than that -- if that
7  calculated payment is less than the interest
8  accrual, yes, you would negatively amortize.
9      Q   What if your actual payments are more than
10 the interest that was accrued in a previous month,
11 is it still considered negatively amortized?
12     A   Yes, because your calculated payments
13 are -- your calculated payments are in a negative
14 amoritizing condition.
15     MR. WARSHAWSKY:  We've been going almost
16 70 minutes so whenever you get to a stopping
17 point.
18     MR. BRYDEN:  We can take a break now.
19     Why don't we take five.
20     (Recess)
21 BY MR. BRYDEN:
22     Q   Before the break we were talking about
23 negative amortization.  Can you for the record tell
24 me what negative amortization means?
25     A   Negative amortization, as defined for

47

1  both -- the ICR plan, deals with a monthly
2  calculated payment that is less than the accrued
3  interest that would be earned during that month.
4      Q   And the way the department treats negative
5  amortization, it relates only to the calculated
6  scheduled payment, it does not relate to the actual
7  payment, is that right?
8      A   By scheduled, you mean the monthly fixed
9  payment?
10     Q   Right.
11     A   Is that what you are referring to?
12     Q   Right.
13     A   Yes, it would be -- refer to the monthly
14 fixed payment based upon that income.
15     Q   So even if the actual payments made by a
16 borrower exceed the interest which accrued each
17 month, the department still considers the loan
18 negatively amortized, is that right?
19     A   Yes.  It -- yes, the loan would still be
20 considered a negative amoritizing loan, yes.
21     Q   On the same line we were looking at,
22 January 1, 2002, do you see the line that says
23 "Repayment Begins"?
24     A   Yes.
25     Q   And then apparently the interest accrued

48

1  to date was $391.78, is that correct?
2      A   Yes.
3      Q   That interest is not capitalized, correct?
4      A   It is not capitalized, correct.
5      Q   Why isn't that interest capitalized?
6      A   I don't know why that interest is not or
7  whether it should be.
8      Q   Do you see there's a column, "Fixed
9  Payment Amount."
10     Do you see that?
11     A   Yes.
12     Q   Those figures that are in the column,
13 fixed payment amount, are those the monthly payment
14 amounts as determined by the formula that's used to
15 calculate payments under the income contingent
16 repayment plan?
17     A   Yes, that would be the fixed payment
18 amount.
19     Q   And under the income contingent repayment
20 plan, borrowers are allowed to pay more than that
21 fixed payment amount, correct?
22     A   Correct.
23     Q   And doesn't that happen routinely?
24     MR. WARSHAWSKY:  Object to the form.
25     Answer subject.

49

1      THE WITNESS:  I don't understand when you
2  say routinely.
3  BY MR. BRYDEN:
4      Q   Is it common for borrowers to pay more
5  than their fixed payment amount?
6      A   I do not know whether it's common.
7      Q   Is there a penalty for paying early?
8      A   No, there is not.
9      Q   But if a borrower pays more than the fixed
10 payment amount, obviously the more they pay the
11 sooner they are going to pay off their loans, right?
12     A   Yes.
13     Q   Do you know what Dr. Pfeiffer's monthly
14 due date was for her payments?
15     A   Not off the top of my head.  I don't know
16 whether it's changed during the course of the years.
17     Q   Can you tell me how the monthly due date
18 is determined for borrowers?
19     A   Sure.  There are four billing cycles:  The
20 7th, the 14th, the 21st and the 28th.  A
21 borrower can choose any one of those dates.
22     If a borrower gets a brand new loan, then
23 there's just -- when the loan is received into
24 servicing, it just distributes them across those
25 payment dates.

13 (Pages 46 to 49)

50

1     If the borrower already had an established
2  due date in the system, then that new loan gets
3  applied to that due date.
4     Q   So the computer generates one of the four
5  dates, sort of randomly distributes them, is that
6  right?
7     A   I don't think it's anything complex.  It
8  just goes one, two, three, and moves through the
9  actual input file.
10    Q   So borrowers are assigned a due date for
11 their monthly payments?
12    A   Provided a due date, yes.
13    Q   Can you tell me how interest is calculated
14 on a loan?  Is it simple interest that accrues
15 daily?
16    A   It's a daily accrual, yes.
17    Q   And let's go back to the chart.  Let's go
18 to the line dated January 15th, 2002.
19    A   January 15th, 2002?
20    Q   Right.  Below where we were just looking.
21    A   Uh-huh.
22    Q   And it appears that the fixed payment
23 amount on her loan was $512.07, is that right?
24    A   That's correct.
25    Q   And the total payment received on that

51

1  date was $725, is that right?
2     A   That's correct.
3     Q   Then it appears that $696.50 was applied
4  to interest?
5     A   Yes.
6     Q   And would that be all the interest that
7  had accrued on this loan as of that date?
8     A   Yes, it says, "Interest accrued to date."
9     Q   So at the time that she made this
10 January 15th, 2002 payment, she paid off all the
11 interest that had accrued as of January 15th,
12 2002; and then $28.50 was applied to principal,
13 correct?
14    A   That's correct.
15    Q   And every time a borrower makes a payment,
16 it's applied to any outstanding interest before it's
17 applied to principal, correct?
18    A   Fees, and then interest, and then to
19 principal.
20    Q   So is it fair to say that on this payment
21 chart, every time you see that one of her payments
22 is applied in part to principal, that that payment
23 paid off all the interest that had accrued as of
24 that date?
25    A   It's fair to say -- repeat your question

52

1  again.
2     COURT REPORTER: "So is it fair to say that
3  on this payment chart, every time you see that one
4  of her payments is applied in part to principal,
5  that that payment paid off all the interest that had
6  accrued as of that date?"
7     THE WITNESS: Yes, to my knowledge, yes.
8  BY MR. BRYDEN:
9     Q   Let's go down to the line dated June 14,
10 2002.
11    A   Okay.
12    Q   It appears that on June 14, 2002, Dr.
13 Pfeiffer made a payment of $725?
14    A   Yes, she did.
15    Q   And $629.58 was applied to principal.  And
16 then $95.42 was applied -- I'm sorry, did I say
17 principal?
18    A   You did.
19    Q   I'm sorry.  $629.58 was applied to
20 interest; and $95.42 was applied to principal.
21    So is it fair to say that the June 14,
22 2002 payment covered all the interest that had
23 accrued on her loan as of that date?
24    A   Yes, that's fair.
25    Q   Then on the next line, July 1, 2002, it

53

1  appears that $368.76 is capitalized to her account,
2  is that right?
3     A   Yes.
4     Q   And do you know where that $368.76 figure
5  would have come from?  Is that the interest that
6  accrued from June 15 to June 30 on her loan?
7     A   Yes.
8     Q   Why does this interest capitalization
9  happen on June 30, is that when the Department of
10 Education ends its fiscal year, or is there
11 something magical about June 30?
12    A   Not to my knowledge.
13    Q   Okay.  But in the normal course, if there
14 wasn't this capitalization that happened on
15 July 1st, in the normal course, the borrower
16 wouldn't pay off the interest accruing after the
17 payment date until the next month, correct?
18    MR. WARSHAWSKY: May I have that question
19 back?
20    COURT REPORTER: "Okay.  But in the normal
21 course, if there wasn't this capitalization
22 that happened on July 1st, in the normal
23 course, the borrower wouldn't pay off the
24 interest accruing after the payment date until
25 the next month, correct?"

14 (Pages 50 to 53)

54

1    MR. WARSHAWSKY: Object to the form. You
2  can answer subject.
3  BY MR. BRYDEN:
4    Q   Do you understand the question?
5    A   No. Could you ask it again?
6    Q   Sure.
7    A   Okay.
8    Q   The interest that accrues after a payment
9  is made in any given month, if my payment date is
10  the 21st --
11    A   Correct.
12    Q   -- I pay all the outstanding interest on,
13  let's say, February 21st, the interest that
14  accrues after that payment until March 21st isn't
15  due until March 21, my next monthly payment,
16  correct?
17    A   What do you mean by due?
18    Q   That's when the payment is expected by the
19  department.
20    A   You mean you are not billed?
21    Q   Right.
22    A   You are not billed until the next month.
23  But interest is due. It's still due. It's accrued
24  daily.
25    Q   Right.

55

1    A   So if you're referring to you are not
2  billed until -- you are not billed until the next
3  month, then, yes, I would agree.
4    Q   So just to make sure I have that right,
5  you are not billed for interest until your monthly
6  payment?
7    A   Until your monthly payment, correct.
8    Q   And so let me make sure I understand
9  what's going on here. I think we both know, but
10  let's be explicit about it.
11    After a borrower, under the income
12  contingent repayment plan that the department
13  considers negatively amortized, the department
14  capitalizes interest after their June payment
15  through June 30th, correct?
16    A   Okay. Annually, on June 30, the
17  department capitalizes interest -- capitalizes
18  interest, unpaid, for that period, for that cycle.
19  So if the borrower made a June payment, any interest
20  unpaid on June 30th would be capitalized.
21    Did I repeat what you understood?
22    Q   I think so but let me rephrase it a little
23  bit.
24    So the interest that accrues between the
25  borrower's June payment and June 30th is

56

1  capitalized regardless of whether or not the June
2  payment covered all the accrued interest as of the
3  June payment date?
4    A   Correct.
5    Q   Is that true for all borrowers under the
6  income contingent repayment plan?
7    A   You mean -- no. What do you mean,
8  borrowers under the income contingent repayment plan
9  who are negatively amoritizing, that's who we are
10  referring to, correct.
11    Q   I'm asking you.
12    A   I want to make sure I was clear on what
13  your question was.
14    So borrowers under the income contingent
15  payment plan that are in a negative amoritizing
16  condition, those are the ones we are referring to,
17  they are capitalizing on June 30th.
18    Q   And is that true with respect to all of
19  the direct loans, it's true with respect to all
20  Stafford loans, consolidation loans, plus loans and
21  direct plus loans?
22    A   What do you mean is that true?
23    Q   I believe you testified earlier that you
24  could repay any of those loans under the income
25  contingent repayment plan.

57

1    A   Yes.
2    Q   Is interest capitalized on June 30th in
3  the same manner under all those loan programs?
4    A   We are not talking about loan programs.
5  You're talking about a payment plan.
6    So under the income contingent repayment
7  plan, those borrowers are eligible to apply for the
8  income contingent repayment plan.
9    But when we are just talking about just
10  negative amortization, we are talking about a much
11  smaller group. And you are talking about borrowers
12  just on the income contingent repayment loan.
13    Q   It wouldn't matter which loan program you
14  took out your loan under?
15    A   You are talking about the loan type. When
16  you say loan program, I'm thinking you are referring
17  to FFEL or direct.
18    If you are talking about loan types, it
19  does not matter, with certain exceptions, what type
20  of loan you have. Those that are eligible for ICR
21  would be eligible for ICR.
22    When you talk about program, I am still
23  thinking you're referring to FFEL or direct and I
24  don't know -- I'm not talking about that. I'm only
25  talking about the loan types. Then with loan types,

15 (Pages 54 to 57)

58

1  you have a category called repayment plan which is
2  income contingent. And then income contingent, then
3  you have the ability to negative amortize. So am I
4  clear?
5      Q   Yes. But let me just try to summarize.
6          I believe what you are telling me is that
7  for all loan types that can be repaid under the
8  income contingent plan, interest is capitalized in
9  the same fashion for negatively amortized borrowers?
10         MR. WARSHAWSKY: May I have that back?
11         COURT REPORTER: "Yes. But let me just try
12  to summarize.
13         "I believe what you are telling me is that
14  for all loan types that can be repaid under the
15  income contingent plan, interest is capitalized
16  in the same fashion for negatively amortized
17  borrowers."
18  BY MR. BRYDEN:
19      Q   Do you not understand the question? I can
20  rephrase if you'd like.
21      A   That may be helpful.
22      Q   Does it matter what loan type you have
23  with respect to how your interest is capitalized by
24  the department?
25      A   Does it matter -- only under the income

59

1  contingent repayment plan. If you have an eligible
2  loan type being repaid under income contingent,
3  then, yes, it does not matter to us. So if your
4  question -- if I understand your question, if I have
5  a Stafford loan repaid under ICR, would I still
6  capitalize on June 30th? The answer is yes.
7          If I have a consolidation loan that is
8  under the ICR plan, would I capitalize on
9  June 30th? If I'm in a negatively amortization
10  condition, the answer is yes.
11      Q   Okay. And do you know whether or not
12  loans under the FFEL can be repaid under the income
13  contingent repayment plan?
14      A   They cannot.
15      Q   What about Perkins loans?
16      A   No, they cannot.
17      Q   Do you know why not?
18      A   No.
19      Q   Let's go down to the Line 112402. Do you
20  see where it says, "Neg-Amortization" -- or, I'm
21  sorry, "11/24/02 Neg-Amortization End."
22      A   Uh-huh.
23      Q   Can you tell me what that means?
24      A   Means the negative amortization. She
25  wasn't in a negative amortization condition.

60

1      Q   Can you tell me what that means?
2      A   Meaning her calculated payment -- her
3  calculated payment would have exceeded the interest
4  accrual.
5      Q   And then if you go down to the line dated
6  August 25th, 2003 --
7      A   Uh-huh.
8      Q   -- it says, "Neg-Amortization Start."
9      A   Yes.
10      Q   Can you tell me what that means?
11      A   Meaning her calculated payment, her
12  calculated fixed payment, would not have covered the
13  accrual, monthly accrual.
14      Q   Apparently her calculated fixed payment --
15  it looks like in January of 2003 her calculated
16  fixed payment went up, correct?
17      A   Yes, it looks like it went up.
18      Q   But then on October 9, 2003 it went back
19  down again?
20      A   October 9th, yes, that's what it
21  indicates, yes.
22      Q   But if you look at her actual payments --
23      A   Yes.
24      Q   -- on the total amount received --
25      A   Yes.

61

1      Q   -- it appears that at least as of June of
2  2003 through April of 2004, those payments have gone
3  up; she's actually paying $900, and then $925,
4  right?
5      A   I'm sorry. Where are you?
6      Q   I'm sort of at the bottom of the chart
7  here. If you look at where her -- we were looking
8  at October 9th, 2003 where her fixed payments went
9  down.
10      A   Yes.
11      Q   If you look over at the total payments
12  received --
13      A   Yes.
14      Q   -- in fact, she's paying $925 each month,
15  correct?
16      A   Correct.
17      Q   It appears that beginning 2003, each
18  payment she was making covered all the accrued
19  interest on her loan and then the remainder was
20  applied to principal, correct?
21      A   That's correct.
22      Q   Let's go to the next page, and let's begin
23  on the very top line of June 21, 2004.
24      A   Yes.
25      Q   It appears that Dr. Pfeiffer makes a

16 (Pages 58 to 61)

62

1  payment of $900?
2      A   That's correct.
3      Q   And $665.60 is applied to interest, and
4  $234.40 is applied to principal, correct?
5      A   That's correct.
6      Q   And then on July 1, 2004, $207.56 is
7  capitalized to her account?
8      A   That's correct.
9      Q   Is that $207.56, is that the interest
10 accruing on her account between her June payment and
11 June 30th?
12     A   That's correct.
13     Q   Let's go down to the line dated
14 June 9th, 2005.
15     A   Yes.
16     Q   It appears that Dr. Pfeiffer made a
17 payment of $900, and $482.93 was applied to pay off
18 all accrued interest, correct?
19     A   That's correct.
20     Q   Then $417.07 was applied to pay down her
21 principal balance, correct?
22     A   Correct.
23     Q   And then July 1st, 2005, $440.95 is
24 capitalized to her account, correct?
25     A   That's correct.

63

1      Q   And that $440.95, is that the interest
2  that accrued after Dr. Pfeiffer's June 9th, 2005
3  payment and June 30th, 2005?
4      A   Yes.
5      Q   Then it doesn't appear there's any
6  interest capitalization for 2006 and 2007, correct?
7      A   That's correct.
8      Q   And do you know why not?
9      A   Because it states that her negative
10 amortization ended and her calculated payment of
11 $1,140.50 covered the interest accrual so she was
12 not in a negative amortization condition.
13     Q   Because her scheduled payments --
14     A   Her fixed scheduled payments.
15     Q   Because her scheduled payments were
16 greater than the interest accruing each month?
17     A   Scheduled fixed payments were greater than
18 the interest.
19     Q   By scheduled fixed payments, you are not
20 referring to her actual payments?
21     A   That's correct.
22     Q   Okay.
23         (Deposition Exhibit No. 2 was
24          marked for identification.)
25     MR. WARSHAWSKY: Excuse me. Just for the

64

1  record, I assume that this spreadsheet we went
2  through in Battle Exhibit 1 and Battle Exhibit
3  2, those are being treated subject to the
4  protective order, is that correct?
5      MR. BRYDEN: Yes. I appreciate your
6  comment. I think that we can assume, I can say
7  this with respect to any document that has Dr.
8  Pfeiffer's Social Security number, we'd like to
9  treat that as confidential.
10     I don't think we've had any testimony that
11 needed to be marked as confidential yet; but,
12 at least the portion of these exhibits that
13 contain account numbers or Social Security
14 numbers, we would like to treat as
15 confidential.
16     MR. WARSHAWSKY: It's certainly your call
17 whether, for example, you want payment amounts
18 to be treated as confidential.
19     MR. BRYDEN: We don't need to keep those
20 confidential, but we would like to keep all the
21 Social Security numbers confidential. And it
22 appears the account numbers are Social Security
23 numbers so we'd like to treat those as
24 confidential.
25     We can talk later if we want to have a

65

1  redacted version of the exhibits.
2      MR. WARSHAWSKY: Okay.
3  BY MR. BRYDEN:
4      Q   Now, do you see in the lower right-hand
5  corner, we have numbers?
6      A   Yes.
7      Q   P00279, do you see that?
8      A   Yes.
9      Q   Could I have you thumb backwards to
10 P00287.
11     A   Okay.
12     Q   And have you ever seen this document
13 before? Are you familiar with this billing
14 statement?
15     A   Yes.
16     Q   And is this a form statement that's sent
17 to -- why don't you tell me. Who is this type of
18 billing statement sent to?
19     A   This statement is sent to borrowers on ICR
20 in a negative amortization condition.
21     Q   And this apparently is dated February
22 2002?
23     A   Yes.
24     Q   If you go to the box at the top, let's go
25 to the last sentence where it says, "To avoid

17 (Pages 62 to 65)

66

1  capitalization you can, (1) send a payment to cover
2  all or part of interest owed or, (2) pay at least
3  the amount of interest charged monthly to your
4  account. (About 587.53)"
5      Do you see where I am?
6      A   Yes.
7      Q   So is this statement informing the
8  borrower that if you want to pay more than your
9  scheduled payment, you can do that to pay off all
10 the accrued interest on your account?
11     MR. WARSHAWSKY: Objection. The document
12 speaks for itself.
13     You can answer, subject.
14     THE WITNESS: Ask your question again.
15 BY MR. BRYDEN:
16     Q   Is the purpose of what I just read to you
17 to notify the borrower that if they want to pay more
18 than their scheduled amount, they can do that to pay
19 off all the interest which has accrued to avoid
20 capitalization?
21     MR. WARSHAWSKY: Same objection.
22     You may answer, subject.
23 BY MR. BRYDEN:
24     Q   Does my question make sense?
25     A   I believe it does.

67

1      Right, it explains how to avoid
2  capitalization.
3      Q   And here it's telling Dr. Pfeiffer that if
4  she were to pay $587.53 each month, she could avoid
5  capitalization?
6      A   It's an approximation; but, yes.
7      Q   Let's turn back to the payment chart.
8      A   The payment chart?
9      Q   In Exhibit 1.
10     A   Okay.
11     Q   And can you go to the line dated
12 February 19, 2002.
13     A   Uh-huh, yes.
14     Q   Apparently she paid $725 that month,
15 correct?
16     A   Correct.
17     Q   And that's more than the 587.53, correct?
18     A   Correct.
19     Q   Can I have you turn to Page P00286?
20     A   Uh-huh, yes.
21     Q   And, again, let's look at that same
22 sentence. Apparently this billing statement told
23 Dr. Pfeiffer that if she paid $662.33, that would
24 avoid capitalization, correct?
25     MR. WARSHAWSKY: Why not make a running

68

1      objection, standing objection to the extent you
2  are asking her to interpret what a statement is
3  in the billing statement. I think it speaks
4  for itself.
5      You can answer subject.
6      MR. BRYDEN: I am just asking her to
7  confirm what it says.
8      MR. WARSHAWSKY: That's why I'm going to
9  make a standing objection so we don't have
10 interruptions.
11     THE WITNESS: It says pay amount, pay at
12 least the amount of interest charged, which is
13 about 662.
14 BY MR. BRYDEN:
15     Q   And then if you go beneath the box here,
16 it says the current payment due date is March 21,
17 2002?
18     A   Correct.
19     Q   And then if you look on the payment chart,
20 you see on March 18th, 2002, Dr. Pfeiffer makes a
21 payment of $725, correct?
22     A   That's correct.
23     Q   Let's go to the next page.
24     A   Which is the next page?
25     Q   P00285.

69

1      A   Okay.
2      Q   And, again, this billing statement, this
3  apparently is the billing statement for April 21,
4  2002?
5      A   Yes.
6      Q   And it suggests to Dr. Pfeiffer that to
7  avoid capitalization, she could send in a check for
8  $661.75 is that correct?
9      A   Yes.
10     Q   Then if you go to the payment chart, on
11 April 15th, 2002, Dr. Pfeiffer sends in a check
12 for $725, correct?
13     A   That's correct.
14     Q   Let's go to P00284.
15     A   Okay.
16     Q   And I take it this is the billing
17 statement for May 2002?
18     A   May 2002, that's correct.
19     Q   And the billing statement suggests to Dr.
20 Pfeiffer that to avoid capitalization, she could pay
21 at least the amount of interest charged monthly to
22 her account, which is approximately $661.08, is that
23 correct?
24     A   That's correct.
25     Q   And then if you go to the payment chart,

18 (Pages 66 to 69)

70

1  on May 16th, 2002, Dr. Pfeiffer makes a payment of
2  $725, correct?
3      A   On May 16th?
4      Q   2002.
5      A   That's correct.
6      Q   Can I ask you to turn to P00283.  I take
7  it this is the June billing statement?
8      A   Yes.
9      Q   And the June billing statement suggests to
10  Dr. Pfeiffer that to avoid capitalization, she could
11  pay at least the amount of interest charged monthly
12  to her account which is approximately $660.79
13  correct?
14     A   That's correct.
15     Q   And then if you go to the line on the
16  payment chart for June 14, 2002, Dr. Pfeiffer makes
17  a payment of $725, correct?
18     A   That's correct.
19     Q   And then on July 1st, 2002, $368.76 is
20  capitalized to her account, is that correct?
21     A   That's correct.
22     Q   Can I have you turn to P00282.
23         I take it this is the July 21, 2002
24  billing statement?
25     A   Yes.

71

1      Q   And, again, this document suggests to Dr.
2  Pfeiffer that she pay at least the amount of
3  interest charged monthly to her account, which is
4  approximately $660.24, is that correct?
5      A   Yes.
6      Q   Then if you go to the payment chart, on
7  June 16, 2002, the department receives a payment of
8  $725, is that correct?
9      A   That's correct.
10     Q   Can I have you turn to P00281?
11     A   Yes.
12     Q   Again, I take it this is the August 2002
13  billing statement?
14     A   Yes.
15     Q   And it suggests one way to avoid
16  capitalization is to pay at least the amount of
17  interest charged monthly to the account, which is
18  approximately $660.07, correct?
19     A   Yes.
20     Q   Then if we go to the payment chart, on
21  August 16th, 2002, the department received payment
22  of $725, is that correct?
23     A   Yes.
24     Q   Is it fair to say that Dr. Pfeiffer in
25  fact paid more than these notices that we just

72

1  reviewed suggested she pay each month to avoid
2  capitalization?
3      A   I'm sorry.  Say your question again.  Is
4  it fair to say...
5      Q   Is it fair to say Dr. Pfeiffer, in fact,
6  paid more than what the notices we just reviewed
7  suggested she pay to avoid capitalization?
8      A   Yes.
9          (Deposition Exhibit No. 3 was
10         marked for identification)
11  BY MR. BRYDEN:
12     Q   Do you know, does the Department of
13  Education keep a copy of all borrowers' promissory
14  notes in a file somewhere, or does your contractor
15  do that?
16     A   The contractor -- a contractor is
17  responsible for housing the promissory notes.
18     Q   Does the Department of Education keep a
19  file on each borrower with information about their
20  loan or do you contract that out?
21     A   By file, what are you referring to?
22     Q   Is there a manila envelope like this that
23  has basic information about every borrower, or do
24  you send that over to ACS, or how does that work?
25     A   No, the borrower records are imaged into

73

1  an imaging system.  So file as manila, no; but, we
2  do have information regarding that particular
3  customer.
4      Q   That's kept in a Department of Education
5  system?
6      A   When you say Department of Education
7  system, yes, the contractors are agents of the
8  department; so, yes, if that's what you are
9  referring to.
10     Q   Could I ask you to take a look at
11  Exhibit 3.  Why don't we skip the first page and go
12  to the second page.
13         Can you tell me what the next three pages
14  appear to be?
15     A   This appears to be her -- it is her
16  promissory note for her loan.
17     Q   Okay.  Can I get you to turn to P00486?
18     A   Uh-huh.
19     Q   Do you see the paragraph about a third of
20  the way down on the left-hand side captioned
21  "Interest"?
22     A   Yes.
23     Q   And I would like to read the last sentence
24  in that paragraph:
25         "ED may add interest that accrues but is

19 (Pages 70 to 73)

74

1  not paid when due to the unpaid principal balance of
2  this loan, as provided under the Act. This is
3  called capitalization."
4      Did I read that accurately?
5      A  Yes.
6      Q  Do you know, is there any other discussion
7  of interest capitalization in the promissory note?
8      MR. WARSHAWSKY: Object. The document
9  speaks for itself.
10     You can answer subject.
11     THE WITNESS: I think -- I guess this is
12  the only reference to interest capitalization
13  in this section.
14 BY MR. BRYDEN:
15     Q  And does this promissory note make
16 reference to interest for borrowers that are
17 negatively amortized being capitalized between their
18 June payment and June 30th?
19     MR. WARSHAWSKY: May I make a standing
20  objection to the extent you are asking the
21  witness to testify about what the document
22  says? It speaks for itself. We can avoid the
23  interruption, okay. Do you agree?
24     MR. BRYDEN: Yes, you can have a standing
25  objection.

75

1  BY MR. BRYDEN:
2      Q  Did you understand my question before the
3  objection?
4      A  If you could repeat it for me.
5      Q  Is there anything in the promissory note
6  that says anything about interest being capitalized
7  between a borrower's June payment date and
8  June 30th for borrowers that are in the income
9  contingent repayment plan and considered to be
10 negatively amortized?
11     A  I haven't -- I don't know. I don't know
12 whether there's any other -- I didn't read the note.
13 Would you like me to read the note?
14     Q  If you'd like to review it, you can. I
15 can tell you it's not in there, but don't take my
16 word for it.
17     If I were to tell you it doesn't say
18 anything about capitalizing interest between the
19 June payment date and June 30th for those
20 borrowers, would you have any reason to disagree
21 with me?
22     A  No.
23     Q  Do you know when the practice of
24 capitalizing interest between the borrower's June
25 payment and June 30th began, do you know how long

76

1  that had been done?
2      A  The actual date I think was provided in
3  the documentation. Can I look at it?
4      Q  If you'd like. You don't have to give me
5  an exact date. If you have an idea...
6      MR. BRYDEN: Is that in the
7  interrogatories, John?
8      THE WITNESS: Your question was when did
9  we begin to ...
10     MR. BRYDEN: If it's in the
11 interrogatories, I'll withdraw the question.
12     MR. WARSHAWSKY: I think you're referring
13 to Interrogatory 9.
14     MR. BRYDEN: I'll take a quick look at
15 that.
16     (Pause)
17     Okay. I'll withdraw the question.
18 BY MR. BRYDEN:
19     Q  So isn't the interest that accrues after a
20 borrower's June payment date not due until their
21 July payment date?
22     MR. WARSHAWSKY: Object to the extent
23 you're calling for a legal conclusion.
24     You can answer subject.
25     THE WITNESS: Ask your question again.

77

1      COURT REPORTER: "So isn't the interest
2  that accrues after a borrower's June payment
3  date not due until their July payment date?"
4      THE WITNESS: Yes, they would be billed
5  for July.
6  BY MR. BRYDEN:
7      Q  I have a number of different forms of
8  promissory note that were produced in this
9  litigation. I would like to show them to you to see
10 if you recognize them, and I'm going to ask you if
11 you know when they were in use. I don't know if you
12 will know that or not but if you can tell me to the
13 best of your knowledge, that would be great.
14     (Deposition Exhibit No. 4 was
15     marked for identification)
16 BY MR. BRYDEN:
17     Q  Do you see on Exhibit No. 4, there's a
18 reference to it being a clearance draft in kind of
19 the upper right-hand corner. Do you see that?
20     A  Yes.
21     Q  Do you know what that means?
22     A  This -- this particular version is going
23 through the clearance process.
24     Q  So this particular version, looking at
25 Exhibit 4, is not in use yet?

20 (Pages 74 to 77)

78

1    A   I cannot attest to that --
2    Q   Okay.
3    A   -- because the date is August 2nd, 2007.
4    Q   It wasn't in use before August 2nd,
5    2007, is that right?
6    A   I would assume, yes.
7    Q   Do you recognize this document, though?
8    Do you recognize this as a form promissory note that
9    the department is considering using or may be using?
10   A   Yes.
11          (Deposition Exhibit No. 5 was
12          marked for identification)
13   BY MR. BRYDEN:
14   Q   If you look in the upper right-hand corner
15   on Exhibit 5, there's an OBM number.  Does that
16   refer to the Office of Management and Budget?
17   A   OMB?
18   Q   I'm sorry, OMB.
19   A   Yes, it does.
20   Q   That's some number that tracks these
21   forms, is that right, or identifies the form?
22   A   Yes.
23   Q   And does that notation where it says "Form
24   Approved, Exp. date 1/31/2005," can you explain to
25   me what that information is there?

79

1    A   Just what it says.  OMB number is assigned
2    to a particular document provided by OMB.  The form
3    was approved, and that the expiration date on this
4    particular document is that 2005 date.
5    Q   And do we know when it would have been in
6    use, then?
7    A   It would have been in use no earlier than
8    that date.  I'm not sure how long it would have been
9    in use until we know what the next series is.
10   Q   Is it fair to say that -- I take it this
11   is the Federal Direct Consolidation Loan Promissory
12   Note, is that right?
13   A   This one says, "Federal Direct
14   Consolidation Loan Promissory Note Endorser
15   Addendum."
16   Q   Is it fair to say that all borrowers under
17   the Federal Direct Consolidation Loan Program that
18   consolidated their loans while this form was in use
19   would have signed the same promissory note, or would
20   there be more than one at any given time?
21   A   No, there would only be one in use.
22   Q   And so the line, again, in the upper
23   right-hand corner where it says, "EXP period, date,
24   1/31/, 2005," that's when this would have stopped
25   being used, is that right?

80

1    A   Not always.  Not always.  There could be
2    relief provided if a new form is in the clearance
3    process.  So we could have a form that is still in
4    use after an expiration date assuming we have worked
5    with OMB to get some kind of waiver while we are in
6    the clearance process.
7          (Deposition Exhibit 6 No. was
8          marked for identification)
9    BY MR. BRYDEN:
10   Q   Can you just tell me what Exhibit 6
11   appears to be?
12   A   It appears to be another Federal Direct
13   Consolidation Loan Promissory Note with an
14   expiration date of 1/31, 1999.
15   Q   So this particular form would have gone
16   out of approval in 1999; but, there may have still
17   been some in use, or there may have been some
18   layover.  Is it fair to assume that this form maybe
19   by June of 1999 was no longer in use, or is it
20   possible this form would have been still being used?
21       MR. WARSHAWSKY:  Objection to the extent
22   you are asking the witness to speculate.
23       You can answer subject to the objection.
24       THE WITNESS:  I couldn't speak to how long
25   it was in existence.

81

1    BY MR. BRYDEN:
2    Q   Okay.  Is there any estimate you can place
3    on when it's likely that it was no longer in use?
4    A   If the expiration date was 1/31/99, it's
5    estimated that something else would have been in
6    place around that timeframe.
7        MR. BRYDEN:  It's noon.  Can we go another
8    15, 20 minutes, and then take a lunch break?
9    Is that okay?
10       MR. WARSHAWSKY:  Let's keep going.
11       MR. BRYDEN:  I think I have about ten more
12   of these.
13       MR. WARSHAWSKY:  Maybe we could stipulate
14   to this.
15       MR. BRYDEN:  I don't know any of this is
16   controversial.
17          (Deposition Exhibit No. 7 was
18          marked for identification)
19   BY MR. BRYDEN:
20   Q   Looking at Exhibit 7, I take it there's no
21   information provided on this document, correct me if
22   I'm wrong, but you don't know when this was
23   approved.  There's information in the upper
24   right-hand corner that tells you when this form will
25   expire but we don't know when it was approved, is

21 (Pages 78 to 81)

82

1  that right?
2      A   I do not know.
3      Q   You don't know. Okay.
4          Do you know, does the department somewhere
5  track that information, does it keep track of when
6  which forms were in use?
7      A   Yes, we do.
8      Q   Have you seen that information before? Is
9  it set forth in a spreadsheet or something like
10 that?
11     A   I do not know how it's kept.
12     Q   Okay. How do you know that they do keep
13 that information?
14     A   Only because we work with the office that
15 is responsible for the clearance process.
16     Q   You know from your personal knowledge that
17 they keep track of that information?
18     A   Yes, they keep track of all forms.
19     Q   Again, does Exhibit 7 appear to be a
20 Federal Direct Consolidation Loan Application and
21 Promissory Note?
22     A   Yes.
23     Q   Okay.
24         (Deposition Exhibit No. 8 was
25         marked for identification)

83

1  BY MR. BRYDEN:
2      Q   Looking at Exhibit 8, does this appear to
3  be a Federal Direct Consolidation Loan Application
4  and Promissory Note?
5      A   Yes.
6      Q   We know apparently when the form expired,
7  is that right? So we are not sure when it may have
8  been approved, at least from this document we can't
9  figure that out?
10     A   Yes, I cannot figure it out.
11     Q   Okay.
12         (Deposition Exhibit No. 9 was
13         marked for identification)
14 BY MR. BRYDEN:
15     Q   This one apparently goes back a ways,
16 No. 9.
17         Can you tell me or can you verify this
18 appears to be a Federal Direct Loan Program
19 Consolidation Loan Application and Promissory Note,
20 Exhibit No. 9?
21     A   Yes. Appears to be an application and
22 promissory note.
23     Q   Okay.
24         (Deposition Exhibit No. 10 was
25         marked for identification)

84

1  BY MR. BRYDEN:
2      Q   Can you tell me what Exhibit 10 appears to
3  be?
4      A   Application and Promissory Note for the
5  Federal Direct Consolidation Loan Program.
6      Q   Again, looking at the information in the
7  upper right-hand corner, apparently this particular
8  form expired June 30, 1995, is that right?
9      A   That's correct.
10         (Deposition Exhibit No. 11 was
11         marked for identification)
12 BY MR. BRYDEN:
13     Q   Can you just tell me what Exhibit No. 11
14 appears to be?
15     A   Application and promissory note for the
16 Federal Direct Consolidation Loan. Expires
17 12/19/94.
18         (Deposition Exhibit No. 12 was
19         marked for identification)
20 BY MR. BRYDEN:
21     Q   Can you tell me what Exhibit No. 12 is?
22     A   Federal Direct Consolidation Loan
23 Instructions for Promissory Note Endorser Addendum.
24     Q   And how was this used, if you know?
25     A   This is an instructional. So this is used

85

1  to help complete the promissory note.
2      Q   So this is not an actual promissory note
3  or part of the promissory note?
4      A   These are the instructions. So it's
5  probably -- it says it's an instruction so it's not
6  the actual note itself, if that's your question.
7      Q   Can I have you turn back to Exhibit 1 for
8  a minute. Could I have you turn to Page 7.
9          MR. WARSHAWSKY: Interrogatory 6?
10         MR. BRYDEN: Yes.
11 BY MR. BRYDEN:
12     Q   Have you reviewed Interrogatory No. 6
13 before?
14     A   Yes.
15     Q   And I take it you verified the accuracy of
16 the answer to Interrogatory No. 6?
17     A   Yes.
18     Q   And if you go to the very bottom of
19 Page 7, it reads -- well, I won't read the whole
20 sentence into the record, but can I ask you what it
21 means?
22         I understand the part that says that the
23 form promissory note contains language identical to
24 Dr. Pfeiffer's, but what do you mean by
25 substantially similar?

22 (Pages 82 to 85)

86

1      A  I don't understand your question.
2      Q  Can you just read the paragraph beginning
3  at the bottom of Page 7 beginning with, "All
4  borrowers who have had"--
5          MR. WARSHAWSKY:  This is language from
6      your interrogatory.  She's responding to that.
7          MR. BRYDEN:  I understand.
8  BY MR. BRYDEN:
9      Q  Are there promissory notes executed by
10  borrowers that have language that is substantially
11  different than the language in Dr. Pfeiffer's
12  promissory note to the best of your knowledge?
13      A  No.
14          MR. BRYDEN:  Why don't break for lunch?
15          (Off the record)
16          (Luncheon Recess)
17          AFTERNOON SESSION
18      CONTINUED EXAMINATION BY COUNSEL FOR PLAINTIFF
19  BY MR. BRYDEN:
20      Q  Before the break we went through a series
21  of different promissory notes, correct?
22      A  Yes.
23      Q  Is there any variation in the way that the
24  department capitalizes interest with respect to
25  different promissory notes for these consolidation

87

1  promissory notes we've been looking at, or are they
2  all treated in the same manner?  Does that make
3  sense?
4      A  No.
5      Q  Okay.  Let me try to rephrase it.
6          Again, I want to talk about the interest
7  capitalization we've been talking about, interest
8  capitalization that occurs on June 30th of each
9  year.
10      A  Okay.
11      Q  Is there any difference in the way that
12  interest is capitalized depending on what form of
13  promissory note the borrower signed?
14      A  No.  Capitalization, as documented in the
15  promissory note, it's going to be consistent, if I'm
16  answering your question correctly.
17      Q  I believe you are.
18          So there isn't some, you know, if you
19  signed Form 0007, then your interest is capitalized
20  in this manner; but, if you signed some other form,
21  it's capitalized in some other manner.  There's
22  nothing like that, correct?
23          MR. WARSHAWSKY:  Within the context of the
24      Direct Loan Program?
25          MR. BRYDEN:  Correct.

88

1          THE WITNESS:  No, not to my knowledge.
2  BY MR. BRYDEN:
3      Q  Are there regulations, Department of
4  Education regulations, that address when interest
5  may be capitalized?
6      A  Yes.
7      Q  And do you know the cites for those
8  regulations?
9      A  Off the top of my head, no.  It's probably
10  in the documentation.  Do you want me to cite that?
11      Q  You can look in there, sure.  I don't know
12  if the interrogatory answer has all the cites.
13          MR. WARSHAWSKY:  I'm reasonably sure it
14      does not.  That was getting into a legal area.
15          MR. BRYDEN:  Sure.
16          MR. WARSHAWSKY:  That was in response --
17      that was in response to one of your document
18      production requests that we talked about.
19          MR. BRYDEN:  Right.
20  BY MR. BRYDEN:
21      Q  You don't know off the top of your head
22  the cites to the regulations that address interest
23  capitalization?
24          MR. WARSHAWSKY:  I'll just object to the
25      extent you are asking for a legal conclusion

89

1      from the witness.
2          You may answer subject to.
3          THE WITNESS:  No, I do not.
4  BY MR. BRYDEN:
5      Q  Okay.  Can I ask you to take another look
6  at Exhibit No. 3.  Can you turn to Page P00486.
7          And do you see in the upper left-hand
8  corner, there's a paragraph captioned "Governing Law
9  and Notices."
10      A  Yes.
11      Q  Could I ask you to read that paragraph to
12  yourself.
13          (Pause)
14      A  Okay.
15      Q  Do you know what Department of Education
16  regulations that paragraph refers to?
17      A  Not specifically, no.
18      Q  Do you know what provisions of the Higher
19  Education Act that paragraph is referring to?
20      A  Not specifically, no.
21      Q  Is there any information that's given to
22  borrowers about what regulations or parts of the
23  Higher Education Act are referred to in that
24  paragraph when they took out their loans?
25          MR. WARSHAWSKY:  You mean aside from the

23 (Pages 86 to 89)

90

1    language contained in the promissory note?
2        MR. BRYDEN: Right.
3    BY MR. BRYDEN:
4        Q   Is there anything other than the language
5    in that paragraph that tells a borrower what
6    regulations or portions of the Higher Education Act
7    might be applicable to their loans?
8        A   Not to my knowledge.
9        Q   Let's go back to Exhibit No. 1. I would
10   like you to take a look at the response to
11   Interrogatory No. 2. Can you just go ahead and read
12   the answer to yourself.
13       I don't know if you have to read the whole
14   thing, but can you read Interrogatory No. 2 and then
15   read the answer to yourself.
16       (Pause)
17       A   Okay.
18       Q   Did you verify the accuracy of that
19   answer?
20       A   Yes.
21       Q   Can you tell me how the 26,900 borrowers
22   figure was come up with?
23       A   The 26,900 figure was derived from looking
24   at borrowers under income contingent repayment where
25   negative amoritizing and satisfied the interest in

91

1    their June payment, and thus capitalized between
2    their last June payment and June 30th.
3        Q   Okay. So the 26,900 figure does not
4    include borrowers whose June payments did not cover
5    all the interest that had accrued as of their June
6    payment date, is that right?
7        A   The -- repeat your question. It does not
8    cover...
9        Q   It does not include borrowers whose June
10   payment did not cover all the accrued interest as of
11   the June payment?
12       A   Correct.
13       Q   And do you know approximately how many
14   borrowers there are that are repaying under the
15   income contingent repayment plan, total?
16       A   There are a little over 600,000 that are
17   repaying under income contingent repayment.
18       Q   And do you know approximately how many of
19   those borrowers were negatively amortized according
20   to the department at one time or another?
21       A   There are approximately half that are in a
22   negative amortization condition or payments that are
23   calculated in a negative amortization condition.
24       Q   And by approximately half, you mean half
25   of the 600,000?

92

1        A   That's correct.
2        Q   The other half, their scheduled payments
3    were enough to cover the accrued interest in the
4    previous month, is that right?
5        A   Yes.
6        Q   What about the alternative repayment plan,
7    are there any borrowers that are negatively
8    amortized pursuant to an alternative repayment plan?
9        A   Yes.
10       Q   Do you know, are they included in this
11   26,900 figure?
12       A   No, they are not.
13       Q   Do you have an approximation of how many
14   negatively amortized borrowers there are on
15   alternative repayment programs?
16       A   Less than five.
17       Q   And does the 26,900 figure include
18   borrowers that have Stafford loans?
19       A   I would assume, yes. I didn't look at
20   loan types but I would assume that, yes, that would
21   include all loan types eligible for ICR.
22       Q   Why would you assume that?
23       A   Why would I assume what?
24       Q   Your understanding is that the 26,900
25   relates to all borrowers under the income contingent

93

1    repayment plan, it was not broken out by loan type?
2        A   Correct, right. This includes all
3    borrowers, the 26,9, all borrowers that are on the
4    income contingent repayment loan despite loan type.
5        Q   And in calculating the 26,900 figure, were
6    actual payments looked at or were just the scheduled
7    payments looked at; in other words, my
8    understanding, correct me if I'm wrong, is that the
9    26,900 -- I'll withdraw the question.
10       Can you tell me how interest
11   capitalization increases the cost of a loan?
12       A   Clarify what you mean by increases the
13   cost of the loan.
14       Q   My understanding is when interest is
15   capitalized, it is added to the principal balance,
16   correct?
17       A   That's correct.
18       Q   And then interest accrues on the interest
19   that was capitalized, correct?
20       A   Interest would accrue on your new
21   principal balance outstanding, correct.
22       Q   So it increases the cost of your loan in
23   the sense that more interest accrues on your loan,
24   correct?
25       A   Yes.

24 (Pages 90 to 93)

94

```
1      Q   And it increases the principal balance on
2   your loan, correct?
3      A   When you capitalize, it increases the
4   principal on your loan, yes.
5      Q   Does it increase the amount that a
6   borrower has to repay on the loan in any other way?
7      A   What are you referring to?
8      Q   Well, maybe the answer is no; but, I mean,
9   are there any other costs that are associated with
10  interest capitalization other than it seems to me
11  you have the interest that accrues on the
12  capitalization, and you have an increased principal
13  balance.  And my question is, is there any other
14  manner in which interest capitalization increases
15  the cost of your loan?
16     A   No.
17         MR. BRYDEN:  Do you have an objection?
18         MR. WARSHAWSKY:  No, not at this point.
19  BY MR. BRYDEN:
20     Q   So if you want to determine how much an
21  interest capitalization had increased the cost of
22  the loan, all you would need to know is the amount
23  of the interest capitalization and the amount of
24  interest that accrued on the interest
25  capitalization, correct?
```

95

```
1          MR. WARSHAWSKY:  Object to the form of the
2   question.
3          You can answer subject.
4          THE WITNESS:  Clarify.
5   BY MR. BRYDEN:
6      Q   If you wanted to explain to a borrower how
7   interest capitalization had increased or was going
8   to increase the cost of their loan, all you would
9   have to know to calculate that would be the amount
10  of the interest capitalization and the amount of
11  interest that accrued on that capitalization,
12  correct?
13         MR. WARSHAWSKY:  Objection.  Again, I'll
14  object to the form of the question.
15         Does this somehow pertain to any of the
16  subjects that we are producing Ms. Battle for?
17         Seems to me you are getting into your
18  legal theory.  That may be something we will
19  end up discussing with Judge Sullivan.
20         But I'm not sure how this relates to
21  subjects she's been identified to testify about
22  as a fact witness.
23         MR. BRYDEN:  She's a witness with respect
24  to the practice of capitalizing interest.
25         MR. WARSHAWSKY:  She's discussed that
```

96

```
1   practice.  But you're asking how you would go
2   about calculating damages, basically, and
3   that's not what she's here to testify about.
4          You can ask the questions if you want,
5   but...
6          MR. BRYDEN:  If she doesn't know an
7   answer, that's fine and I understand that.
8          MR. WARSHAWSKY:  But it's also an
9   objectional line of questioning.
10         I'll state the objection and we can make
11  it a standing objection if you like, but she's
12  not here to provide opinions about your legal
13  theory of damages.
14         MR. BRYDEN:  I disagree it's a legal
15  theory.  I can show you some of the documents
16  later, but there are documents that the
17  Department of Education provides to borrowers
18  that say if interest is capitalized, this is
19  how it's going to increase the cost of your
20  loan.
21         MR. WARSHAWSKY:  Maybe that might be the
22  way to do it.
23         MR. BRYDEN:  Right.
24         (Deposition Exhibit No. 13 was
25         marked for identification)
```

97

```
1   BY MR. BRYDEN:
2      Q   Can you tell me what Exhibit 13 appears to
3   be?
4      A   Appears to be a glossary.
5      Q   And is there a glossary provided in the
6   direct consolidation loan application packet?
7      A   Currently?  When are you referring to?
8      Q   Is there one currently?
9      A   I don't know.
10     Q   If you go down to the bottom of the first
11  page of Exhibit 13, it refers to direct
12  consolidation loan application packet?
13     A   Uh-huh.
14     Q   Was there at least some period in time
15  during which a glossary was provided along with a
16  direct consolidation loan application packet?
17     A   Yes.
18     Q   Can you go down to the portion where they
19  have a definition of capitalized interest.
20     A   Okay.
21     Q   Do you see the last sentence in that
22  paragraph that reads:
23         "It then becomes capitalized interest.
24  Capitalizing interest increases the principal amount
25  of the loan and therefore the total cost of the
```

25 (Pages 94 to 97)

98

1  loan."
2    A   Yes.
3    Q   Can you tell me how you would determine
4  how much the total cost of your loan had increased
5  because you had capitalized interest?
6    A   Okay.  What is your question?
7    Q   Well, the paragraph says, "Capitalizing
8  interest increases the principal amount of the loan
9  and therefore the total cost of the loan."
10       My question is how do you determine how
11  much capitalizing interest increased the amount of
12  your loan and the total cost of your loan?
13    A   So over time, if you capitalize on your
14  principal amount, then you are going to pay interest
15  on that capitalized amount.
16    Q   Are there any other additional costs
17  associated with interest capitalization?
18    A   I don't -- I don't know what you are
19  referring to.
20    Q   I think your answer is no.
21    A   Okay.
22       MR. WARSHAWSKY:  I think her answer was
23  she doesn't know what you are referring to.
24       MR. BRYDEN:  Oh, okay.
25       MR. WARSHAWSKY:  But the record says what

99

1  she said.
2       (Deposition Exhibit No. 14 was
3        marked for identification)
4  BY MR. BRYDEN:
5    Q   Can you tell me what this document,
6  Exhibit No. 14, is?
7    A   This is a disclosure, interest
8  capitalization disclosure.
9    Q   Is this the same form that's sent to all
10  borrowers whose interest is being capitalized?
11    A   Yes.  If they are in a negative
12  amortization condition, then, yes, they would
13  receive the same form.
14    Q   This is dated June 30th, 2002, is that
15  correct?
16    A   Yes.
17    Q   And if you go down to the notification of
18  capitalization, do you see the first sentence there
19  beginning, "During the past year"?
20    A   Yes.
21    Q   The portion that says, "During the past
22  year," does that refer to June 30th, 2001 through
23  June 30th, 2002?
24    A   During the past year would be referring
25  to -- June 30th -- what were the dates that you...

100

1    Q   Well, the document says, "During the past
2  year." And the document is dated June 30th, 2002.
3  So my question was by during the past year, does
4  this notice mean June 30th, 2001 through June 30th
5  2002?
6    A   It would more accurately be July 1st,
7  2001 through June 30th, 2002.
8    Q   Okay.  That's what it means by during the
9  past year?
10    A   Yes.
11       (Deposition Exhibit No. 15 was
12        marked for identification)
13  BY MR. BRYDEN:
14    Q   I'm looking at Exhibit No. 15. Does this
15  appear to be the same type of notice as Exhibit 14?
16    A   Yes, it appears to be the same.
17    Q   And, again, then, I take it right
18  underneath where it says, "Notification of
19  Capitalization" --
20       (Off-the-record discussion)
21       MR. BRYDEN:  We would like to clarify for
22  the record we are looking at Exhibit 15 here.
23  I don't know if that's your note, John, but
24  there's a note "Battle Exhibit 15," at the
25  bottom, that was not part of the original

101

1  exhibit, that was just added because I handed
2  the court reporter the wrong exhibit.
3       MR. WARSHAWSKY:  Right. The first
4  officially marked version of Battle Exhibit 15
5  included a notation you had made so we will go
6  with the substituted one with the little box at
7  the bottom that says "Battle X15", which is my
8  handwritten note.  Okay.
9  BY MR. BRYDEN:
10    Q   All right.  So Exhibit 15 is the same form
11  of notification as Exhibit 14, right?
12    A   Yes, same form of notification.
13    Q   And then I take it, then, the reference in
14  the first paragraph where it states, "During the
15  past year," would refer to July 1, 2003 through
16  June 30th, 2004, is that right?
17    A   That's correct.
18       MR. WARSHAWSKY:  For the record, Battle
19  Exhibit 15 is from the plaintiff's production
20  P00425.
21       (Deposition Exhibit No. 16 was
22        marked for identification)
23  BY MR. BRYDEN:
24    Q   Looking at Exhibit 16, does this appear to
25  be the same form of notification as Exhibits 14 and

26 (Pages 98 to 101)

102

1    15?
2       A   Yes, it does.
3               (Deposition Exhibit No. 17 was
4           marked for identification)
5    BY MR. BRYDEN:
6       Q   Can you take a moment and read Exhibit
7    No. 17?
8       A   Okay.
9       Q   Now, if a borrower's total payments
10   between July 1st in one year and June 30th in
11   the next year, if you were to total all their
12   payments during that time period, and, it was more
13   than the interest that had accrued during that same
14   time period, should there be any interest
15   capitalization on June 30th?
16      A   Repeat your question.
17      COURT REPORTER: "Now, if a borrower's
18      total payments between July 1st in one year
19      and June 30th in the next year, if you were
20      to total all their payments during that time
21      period and it was more than the interest that
22      had accrued during that same time period,
23      should there be any interest capitalization on
24      June 30th?"
25      MR. WARSHAWSKY: May I ask for

103

1       clarification? Are you asking her about total
2       scheduled payments, or total actual payments?
3    BY MR. BRYDEN:
4       Q   Well, I guess we could ask it either way;
5    but, how about total actual payments?
6       A   Okay. The total actual payments, if I
7    calculate it -- if I added those all up, and the
8    remaining portion of the question is what?
9           If I added my actual payments for an
10   entire year.
11      Q   If you were to add a borrower's actual
12   payments for an entire year and the total amount
13   that the borrower had paid during that year was more
14   than the interest accruing during that same time
15   period, should there be any interest capitalization?
16      A   I guess I'm still unclear as to what
17   you're asking me because we don't calculate payments
18   that way. So ...
19      Q   Okay.
20      A   So I'm unclear.
21      Q   Let's go back to the exhibits we were just
22   looking at, 14, 15 and 16.
23      A   Uh-huh.
24      Q   If you look at the first sentence on all
25   of these, it reads, "During the past year, your

104

1    total payments were less than your accrued interest
2    on the loans you had."
3           If a borrower's total payments during the
4    past year were more than the accrued interest on
5    their loans, should there be any interest
6    capitalization?
7       A   Oh, I understand. I guess the answer would
8    be -- should there be capitalization?
9           I guess the answer would be no.
10      Q   But, in fact, there could be
11   capitalization or there was in Dr. Pfeiffer's case,
12   correct?
13      A   There was capitalization between her last
14   payment and June 30th, yes.
15      Q   And so there's interest being capitalized
16   to her account, even though her payments from
17   July 1st, for example in 2004, through
18   June 30th, 2004, were larger than the interest
19   that accrued during that year?
20      A   They weren't until June 30th, but it
21   depends on what her payment date was. I understand
22   your question. As of her -- from July 1st through
23   whatever her last payment date was.
24      Q   I guess I don't understand your answer.
25      A   Okay. Clarify your question and I'll

105

1    clarify my answer.
2       Q   So I believe you testified earlier,
3    correct me if I'm wrong, that if a borrower's total
4    payments between July 1st and June 30th of the
5    next year totaled more than the interest that
6    accrued during that time period, there should not be
7    interest capitalization, is that correct?
8       A   That would be correct.
9       Q   Okay. But if you look at -- can we go
10   back to that payment chart?
11      A   Uh-huh.
12      Q   Why don't we look at July 1st, 2004.
13      A   July 1st, 2004, okay.
14      Q   Through June 30th, 2005.
15      A   Okay.
16      Q   Now, as we discussed earlier, every time
17   principal is being paid off, that's because her
18   payment covered all the interest that accrued, and
19   there was also some left over to pay off principal,
20   right?
21      MR. WARSHAWSKY: Interest. Say that
22   again.
23      MR. BRYDEN: Did I say it backwards?
24      THE WITNESS: I think you said -- say it
25   again.

27 (Pages 102 to 105)

106

1  BY MR. BRYDEN:
2      Q   Let me say it again.
3          Every time we see a payment where a
4  portion of the principal is being paid down, that
5  means that the payment was large enough to cover all
6  the accrued interest, and what was left was applied
7  to pay down the principal?
8      A   Yes.
9      Q   Okay. And so if we go through all of the
10 payments between July 1st, 2004 and through
11 June 30th, 2005 --
12     A   Yes.
13     Q   -- is it fair to say that Dr. Pfeiffer's
14 payments exceeded the interest that accrued on her
15 loan during that time period?
16         MR. WARSHAWSKY: The document speaks for
17     itself. You can answer subject to.
18 BY MR. BRYDEN:
19     Q   Do you understand my question?
20     A   Okay. Repeat.
21     Q   All I am asking is between July 1, 2004
22 and June 30th, 2005, is it accurate to say that Dr.
23 Pfeiffer's payments exceeded the interest accruing
24 on her loan during that time period?
25     A   No.

107

1      Q   Okay. And why do you say no?
2      A   Because Dr. Pfeiffer's payments from,
3  whatever the first payment date in June, to, if we
4  are talking about 2005, only covered the period up
5  until June 9th. It didn't cover the entire month.
6      Q   Right. I understand that. But if you
7  look at --
8          MR. WARSHAWSKY: I'm sorry. Were you
9      finished?
10         THE WITNESS: I was finished.
11 BY MR. BRYDEN:
12     Q   But if you look at -- and I understand
13 what you're saying -- let me just state it to make
14 sure I understand it right.
15         I think what you're saying is that between
16 June 9th, 2005 and June 30th, 2005, there was $440
17 in interest that accrued, right? Is that what you
18 are referring to?
19     A   Yes, between June 9th, 2005 and June 30th,
20 there was $440 that capitalized.
21     Q   But if you look at the amounts that her
22 loan was paid down over that year period, it's a lot
23 more than $440, isn't it?
24         MR. WARSHAWSKY: I am going to object.
25     Mr. Bryden, you are arguing with the

108

1      witness. This is obviously going to be the
2      issue we ask Judge Sullivan to resolve. We can
3      all add that up and make arguments to the
4      judge. I think you have asked her about
5      payments and how they total up and compared the
6      interest that's accrued. And she's answered
7      that.
8          And you can answer again subject to.
9  BY MR. BRYDEN:
10     Q   I am just asking a factual question. I
11 don't know if I'm misreading this document --
12     A   Okay.
13     Q   -- but can you answer my question?
14     A   Ask your question.
15     Q   My question is, isn't it fair to say that
16 the amount that the principal balance was paid down
17 on the loan between July 1, 2004 and June 30th, 2005
18 was greater than $440.
19     A   If I'm adding those up. You are asking me
20 if those amounts are greater than $440.95?
21     Q   Right.
22     A   Yes, those amounts are greater than.
23     Q   Isn't it, true, then, that her payments
24 during that time period were greater than the
25 interest that accrued during that time period?

109

1          MR. WARSHAWSKY: Objection.
2      Argumentative.
3          You can answer subject to.
4          THE WITNESS: Her scheduled payments, her
5      fixed scheduled payments, or the payments
6      received each month appear to be greater than
7      the interest accrual that month.
8          Okay, is that what you asked me?
9  BY MR. BRYDEN:
10     Q   I was asking about the entire year.
11     A   The entire year?
12     Q   Yes, July 1st 2004 through June 30th,
13 2005.
14     A   We are still going back to June 30th
15 because, again, you can't pre-pay interest.
16     Q   Right.
17     A   Okay. So for that period of time, her
18 payments covered both the principal -- well, she
19 covered the interest accrual and some principal.
20         I guess I'm not understanding.
21     Q   My question was did her total payments,
22 were they equal to or greater than the interest that
23 accrued during that same time?
24     A   Were they equal to or greater? It would
25 be equal to.

110

1    Q   Okay. Let me ask you, looking at Exhibit
2    17, was the procedure when a borrower makes a formal
3    grievance like this when they send in a letter that
4    formally complains about something that has
5    happened, what's the procedure that's supposed to
6    happen after that?
7    A   All correspondence is received by the
8    servicing center, imaged in, and goes through a work
9    flow queue, and it's worked appropriately.
10   Q   Are borrowers supposed to receive a
11   response when they complain like that, or not?
12   A   It doesn't matter whether it's -- it's
13   a -- a complaint or informational, all letters are
14   worked as they come in.
15   Q   Is there some protocol that all people who
16   write a formal letter complaining about something
17   are given a response or supposed to be responded to?
18   A   All letters are supposed to receive a
19   response regardless of the subject matter.
20          (Deposition Exhibit No. 18 was
21          marked for identification)
22   BY MR. BRYDEN:
23   Q   If you would just take a moment to review
24   at least the first page of Exhibit 18.
25   A   Okay.

111

1    Q   Have you are seen Exhibit 18 before?
2    A   Yes.
3    Q   And, again, your testimony is that when a
4    borrower makes a formal complaint in a letter, they
5    should be responded to, they should get some
6    response?
7    A   Yes.
8          (Deposition Exhibit No. 19 was
9          marked for identification)
10   BY MR. BRYDEN:
11   Q   Looking at Exhibit 19, is this a blank
12   form for the notices we were looking at in Exhibits
13   14, 15 and 16?
14   A   It's a -- yes, it appears to be a form
15   notice for -- a similar notice, yes, 14, 15 and 16.
16   Q   So this is for all borrowers that would be
17   negatively amortized, this is the form of notice
18   they would receive, is that right, Exhibit 19?
19   A   This is similar to the other ones we saw,
20   14, 15 and 16.
21   Q   My question is, I mean, that looks like a
22   fill-in-the-blank type of form --
23   A   Right. This is -- I talked over you. I'm
24   sorry.
25   Q   I take it Exhibit 19 is from a

112

1    fill-in-the-blank form that's sent to all negatively
2    amortized borrowers regarding their interest
3    capitalization?
4          MR. WARSHAWSKY: Can you read that back,
5    please?
6          COURT REPORTER: "I take it Exhibit 19 is
7          from a fill-in-the-blank form that's sent to
8          all negatively amortized borrowers regarding
9          their interest capitalization?"
10         THE WITNESS: No, it's not a
11         fill-in-the-blank form.
12   BY MR. BRYDEN:
13   Q   Okay. What type of a form is it?
14   A   This is a template for the
15   system-generated form.
16   Q   By the system, you mean the computer
17   system?
18   A   Yes.
19   Q   And does the computer system automatically
20   generate those notices of capitalization and send
21   them out?
22   A   Yes.
23   Q   So nobody has to go in and individually
24   fill each form out?
25   A   No.

113

1          MR. BRYDEN: You want to take five?
2          (Recess)
3    BY MR. BRYDEN:
4    Q   I want to step back and ask you a question
5    about the monthly payment dates that we talked about
6    a little bit earlier.
7    A   Okay.
8    Q   You were describing how borrowers are
9    assigned a monthly payment date. And my question
10   was, if the borrower's payment date is the 7th of
11   each year, and they are negatively amortized, I take
12   it then the interest from the June 7th payment
13   through June 30th would be capitalized, correct?
14         MR. WARSHAWSKY: You meant the 7th of each
15   month?
16         MR. BRYDEN: Right.
17         THE WITNESS: Okay. So if the borrower's
18         payment is the 7th, then -- had they had
19         outstanding interest and, yes, made a payment
20         to the 7th, yes, their capitalization would
21         still occur between the last payment date in
22         June to June 30th.
23   BY MR. BRYDEN:
24   Q   If your payment date was the 7th, it would
25   be interest accruing from the 7th to the 30th,

29 (Pages 110 to 113)

114

1  correct?
2      A   Yes.
3      Q   If the monthly payment date for all
4  borrowers in a negatively amortized situation was
5  moved to June 30th, then you wouldn't have any
6  interest capitalization between the June payment
7  date and June 30th, would you?
8      A   You said -- your question was, if your
9  payment date, meaning you made a payment on June
10 30th?
11     Q   No, what if the due dates that we've been
12 talking about that are the 7th, the 14th or
13 21st, what if your due date was June 30th?
14     A   Okay.
15     Q   It seems to me then you wouldn't have any
16 interest capitalization for the interest accruing
17 between your June payment and June 30th because
18 you'd be making your payment on June 30th. Would
19 you agree?
20     A   I would agree if you made your payment on
21 June 30th, then you would not have a capitalization
22 event, right.
23     Q   You could have a system where everybody
24 under the income contingent repayment plan, their
25 payments were due on the 30th of each month,

115

1  couldn't you?
2      A   Sure, we could.
3      Q   Let me show you just a few more documents.
4  I'm getting close to wrapping things up here.
5          (Deposition Exhibit No. 20 was
6          marked for identification)
7  BY MR. BRYDEN:
8      Q   Do you recognize Exhibit 20?
9      A   I'm not positive what this came out of.
10     Q   Do you see in the caption there's a
11 reference to an IFAP online library?
12     A   Yes.
13     Q   Do you know what that is?
14     A   Yes.
15     Q   What is that?
16     A   IFAP is a web-based system that is used
17 for our financial aid community.
18     Q   By financial aid community, do you mean
19 borrowers, or do you mean people that are involved
20 in administering these programs?
21     A   Mostly the latter, the people that are
22 used to administer programs.
23     Q   Is the IFAB library still available
24 online?
25     A   Yes.

116

1      Q   Does it include all the Department of
2  Education's regulations?
3      A   All the department's regulations?
4      Q   Yes.
5      A   I am not sure. I do not know if it
6  contains all of the department's regulations.
7      Q   Do you know whether or not it contains
8  regulations that relate to the capitalization of
9  interest on student loans?
10     A   You said all. I couldn't attest to that.
11     Q   Does it have some of them?
12     A   Yes.
13     Q   This apparently relates to entrance and
14 exit counseling. Are schools or other individuals
15 required to give counseling to student loan
16 borrowers?
17     A   Schools, yes, are required to administer
18 both entrance and exit counseling.
19     Q   Are you involved in that at all? Do your
20 responsibilities include informing schools what to
21 tell students in entrance or exit borrowing?
22     A   No.
23     Q   That's not part of your responsibility?
24     A   No.
25          (Deposition Exhibit No. 21 was

117

1          marked for identification)
2  BY MR. BRYDEN:
3      Q   Do you recognize Exhibit No. 21?
4      A   Yes.
5      Q   What is Exhibit 21?
6      A   Direct Consolidation Loan Borrower's
7  Rights and Responsibilities document.
8      Q   Is this a document that's given to
9  borrowers when they take out their loans?
10     A   When they take out consolidation loans,
11 yes.
12     Q   And is this informations given -- let me
13 step back.
14         Can borrowers fill out all the required
15 payment work online to take out a consolidation loan
16 or a Stafford loan, if you know?
17     A   Ask your question again. Can they
18 complete a consolidation loan application online?
19 The answer is yes.
20     Q   And then if they do that online, are they
21 still given a copy of the borrower's rights and
22 responsibilities?
23     A   Yes, it's available online.
24     Q   Do you know if it's part of the
25 application packet?

30 (Pages 114 to 117)

118

1    A   I'm not sure how it's designed on the web
2  but it is available online.
3              (Deposition Exhibit No. 22 was
4              marked for identification)
5  BY MR. BRYDEN:
6    Q   Do you recognize Exhibit No. 22?
7    A   Yes.
8    Q   Can you tell me what it is?
9    A   It's a repayment plan choices document.
10   Q   And is this document given to student loan
11 borrowers?
12   A   By given to, clarify your question.
13   Q   Is this information or is this document
14 part of the application materials?
15   A   A form of this document would be available
16 or made available to the borrower as part of the
17 application packet, yes.
18              (Deposition Exhibit No. 23 was
19              marked for identification)
20 BY MR. BRYDEN:
21   Q   Do you recognize Exhibit No. 23.
22        MR. WARSHAWSKY: I note this is indicated
23 as being a two-page document.
24        MR. BRYDEN: Yes, you're right.  I have
25 not included Page 2, but we can review it with

119

1    the understanding that it appears there's a
2    second page that is included.
3        MR. WARSHAWSKY: Okay.  Very good.
4  BY MR. BRYDEN:
5    Q   I want to ask you first of all, do you
6  recognize Exhibit 23?
7    A   Yes.
8    Q   Could I ask you to go down under No. 4.
9  If you go down to where in bold it says, "Income
10 Contingent Repayment Plan."
11   A   Yes.
12   Q   Apparently -- am I reading that right to
13 say that as of July 1, 2006, direct plus
14 consolidation loan borrowers can choose the income
15 contingent repayment plan, is that accurate?
16   A   That's correct.
17   Q   They were prohibited from doing that
18 before July 1, 2006?
19   A   Yes.
20   Q   Do you know why that changed?
21   A   No, I do not.
22              (Deposition Exhibit No. 24 was
23              marked for identification)
24 BY MR. BRYDEN:
25   Q   I can tell you with respect to Exhibit 24,

120

1  I have not included every page.  I have included
2  select pages but I did keep the first page.  Are you
3  familiar with the question and answers about direct
4  consolidation loans document?
5    A   I've seen this before.  This is a very old
6  document but I've seen it before.
7    Q   You think this is an old one?
8    A   Yes.
9    Q   Do you know how old?
10   A   I don't know how old, but it's an older
11 document.
12   Q   Do you know, was this a document that was
13 available or given to student borrowers at one time?
14   A   Yes, I do know that.
15   Q   Were you involved at all in the document
16 production in this case?
17   A   By document production, you mean the
18 documents that were provided?
19   Q   Yes.
20   A   Yes.
21              (Deposition Exhibit No. 25 was
22              marked for identification)
23 BY MR. BRYDEN:
24   Q   Have you ever seen Exhibit No. 25 before?
25   A   Yes.

121

1    Q   Is this part of an online help system for
2  student borrowers?
3    A   No.
4    Q   What is it?
5    A   This is an online help for our customer
6  service reps and the servicing center.
7    Q   It appears that in the right-hand side
8  somebody has written "Due Date."
9    A   Yes.
10   Q   Do you know whose writing that is?
11   A   I do not.
12   Q   The way I read this document is that the
13 definition provided down below is the definition of
14 due date on this online?
15   A   That's correct.
16   Q   So it's your understanding that the
17 definition given there is the definition of due date
18 provided to your customer service representatives?
19   A   Yes.
20   Q   I have the same questions about Exhibit
21 No. 26.
22              (Deposition Exhibit No. 26 was
23              marked for identification)
24 BY MR. BRYDEN:
25   Q   The way I read Exhibit 26 is that the

VERITEXT/NEW JERSEY REPORTING COMPANY (973) 410-4040

122

1  definition given below is the definition of monthly
2  payment --
3      A  Yes.
4      Q  -- is that right?
5      A  Yes.
6      Q  Okay.
7          (Deposition Exhibit No. 27 was
8          marked for identification)
9  BY MR. BRYDEN:
10     Q  I have the same question with No. 27. I
11 take it that the definition set forth on Exhibit
12 No. 27 is the definition of payment due date that's
13 provided to your customer service representatives?
14     A  That's correct.
15         MR. WARSHAWSKY:  Just for your
16 information, I'm advised that the handwriting
17 on those documents is my co-counsel's from when
18 she was compiling the response.
19         MR. BRYDEN:  Okay. Okay.
20         MS. SCANIFFE:  When Cindy verified all the
21 documents, she verified every one of these.
22 She, I don't think, ever clarified with me that
23 this is my handwriting.  But she, in my
24 recollection, you went through every one of
25 these and verified the online system with my

124

1  use no earlier than January 31, 2005.  Would it have
2  been no earlier than or no later than?
3      A  Oh.  It would have been in use prior to
4  the January 31st, 2005 date.
5          MR. WARSHAWSKY:  I have no more questions.
6  Thank you.
7          MR. BRYDEN:  Thank you for your
8  clarification.
9          MR. WARSHAWSKY:  We will review the
10 transcript.
11         (Signature reserved, the deposition was concluded
12 at 2:47 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

123

1  printout.
2          THE WITNESS:  Yes, that's correct.  I
3  didn't know whose handwriting it was.
4          MR. BRYDEN:  Okay.  Great.  Thank you for
5  that clarification.
6          MS. SCANIFFE:  She knew the handwriting
7  was there whenever she verified it.
8          MR. BRYDEN:  Right.  Okay.  Thank you.
9          I guess I would like to take five just to
10 review my notes but I think I'm done.  In fact, I
11 think I'm prepared to conclude.
12         MR. WARSHAWSKY:  Do you want to take a
13 break, then?
14         MR. BRYDEN:  Just give me two minutes, I
15 guess.
16         (Recess)
17         MR. BRYDEN:  I have no further questions
18 for the witness.
19         EXAMINATION BY COUNSEL FOR DEFENDANTS:
20 BY MR. WARSHAWSKY:
21     Q  Ms. Battle, I've placed before you what's
22 been previously marked Battle Exhibit 5, and I'm not
23 sure, my notes may be wrong, but I thought you
24 testified with respect to the date in the upper
25 right-hand corner, that this form would have been in

125

1  CERTIFICATE OF STENOTYPE REPORTER - NOTARY PUBLIC
2
3          I, Lohna Esteb, Court Reporter, the officer
4  before whom the foregoing proceeding was taken,
5  do hereby certify that the foregoing transcript
6  is a true, correct, and complete record of the
7  proceeding; that said proceeding was taken by me
8  stenographically and thereafter reduced to
9  typewriting by me; and that I am neither counsel
10 for, related to, nor employed by any of the parties
11 to this litigation nor have I interest, financial or
12 otherwise, in its outcome.
13         IN WITNESS WHEREOF, I have hereunto set
14 my hand and affixed my notarial seal this 18th day
15 of December, 2007.
16
17         LOHNA ESTEB
18         Notary Public in and for
19         the District of Columbia
20 My commission expires: 9/30/12
21
22
23
24
25

32 (Pages 122 to 125)

EXHIBIT #2
Pfeiffer v Spelling
C.A. #1:07cv00522 (EGS)

NOV 0 5 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRENDA KAY PFEIFFER,                          )
                                              )
                    Plaintiff,                )
                                              )
          v.                                  )    Case No. 1:07-cv-00522
                                              )    (Judge Sullivan)
MARGARET SPELLINGS, Secretary of Education,   )
          et al.,                             )
                                              )
                    Defendants.               )
                                              )
_____)

DEFENDANTS' RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, defendants Secretary

of Education Margaret Spellings, the United States Department of Education, and the United

States of America respond to the first set of interrogatories propounded by plaintiff Brenda Kay

Pfeiffer as follows:

GENERAL OBJECTIONS:

Defendants object to the Definitions and Instructions contained in plaintiff's first set of

interrogatories and to plaintiff's first set of interrogatories to the extent they seek to impose upon

defendants any requirements beyond those established by the Federal Rules of Civil Procedure.

Defendants object to the Definitions and Instructions and to plaintiff's first set of

interrogatories to the extent they seek the disclosure of any information or documents protected

from disclosure by the attorney-client privilege or attorney work product doctrine.

Defendants object to plaintiff's first set of interrogatories to the extent they are not

relevant to class certification and summary judgment motions, as required by the Court in its



September 24, 2007 Scheduling Order.

      Finally, defendants' object to plaintiff's references in her interrogatories to the "Federal Direct Consolidated Loan Program" because the program at issue in the complaint is the William D. Ford Federal Direct Loan Program.  Solely for purposes of responding to plaintiffs' interrogatories, defendants' responses should be construed as referring to the William D. Ford Federal Direct Loan Program.

      In responding to plaintiff Brenda Kay Pfeiffer's first set of interrogatories, defendants do not waive any of the foregoing general objections or any objections specifically set forth below in responses to individual interrogatories.

<u>FIRST SET OF INTERROGATORIES</u>

<u>Interrogatory 1</u>:

State whether the interest capitalization practices complained of by Dr. Pfeiffer are limited to the Income Contingent Repayment Plan for the Federal Direct Consolidated Loan Program. If your answer is "no," identify all other student loan programs and/or repayment plans for which interest is capitalized in the same or substantially similar manner as complained of by Dr. Pfeiffer.

<u>Response</u>:

Defendants object to Interrogatory 1 on the grounds that the phrases "interest capitalization practices complained of by Dr. Pfeiffer" and "capitalized in the same or substantially similar manner as complained of by Dr. Pfeiffer" are vague and ambiguous.

Subject to and without waiving the foregoing objections, defendants respond as follows:

In responding to this interrogatory, defendants interpret the two phrases "interest capitalization practices complained of by Dr. Pfeiffer" and "capitalized in the same or substantially similar manner as complained of by Dr. Pfeiffer" as referring to the capitalization that occurs on June 30th each year for interest that has accrued between a borrower's June scheduled payment and June 30th, on loans with a negative amortization payment schedule (defined as a payment schedule for which the monthly accrued interest is greater than the scheduled monthly payment). Defendants capitalize interest in this fashion for applicable loans under the Income Contingent Repayment Plan and the Alternative Repayment Plan.

-1-

<u>Interrogatory 2</u>:

State the approximate number of borrowers during the liability period (i.e., between March 19, 2001 and the present) whose loans have been subject to the same or substantially similar interest capitalization practices complained of by Dr. Pfeiffer.

<u>Response</u>:

Defendants object to Interrogatory 2 on the grounds that the phrase "same or substantially similar interest capitalization practices complained of by Dr. Pfeiffer" is vague and ambiguous.

Defendants further object to the phrase "liability period" because it improperly implies that liability has been established with regard to defendants.

Subject to and without waiving the foregoing objections, defendants respond as follows:

In responding to this interrogatory, defendants interpret the phrase "same or substantially similar interest capitalization practices complained of by Dr. Pfeiffer" as referring to the capitalization that occurs on June 30th each year for interest that has accrued between a borrower's June scheduled payment and June 30th, on loans with a negative amortization payment schedule (defined as a payment schedule for which the monthly accrued interest is greater than the scheduled monthly payment). Further, in responding to this interrogatory, defendants interpret the phrase "liability period" as referring to the period of time between March 19, 2001, and the present.

It is not feasible to provide an "approximate number of borrowers" in response to this interrogatory because the process of estimating the number of borrowers depends on defining which borrowers are considered to be similarly situated to the plaintiff. In addition, the process of estimating the number of borrowers is complicated by the fact that a borrower is permitted to

-2-

change plans during the life of his or her loan. Subject to the foregoing, defendants state that a minimum of approximately 26,900 borrowers have been subject to the same or substantially similar interest capitalization practices complained of by the plaintiff.

<u>Interrogatory 3</u>:

State the approximate total dollar amount of interest capitalized by you during the liability period to the principal balances of borrowers pursuant to the interest capitalization practices complained of by Dr. Pfeiffer.

<u>Response</u>:

Defendants object to the phrase "liability period" because it improperly implies that liability has been established with regard to defendants.

Defendants further object to Interrogatory 3 on the grounds that it is not relevant to class certification and summary judgment motions, as required by the Court in its September 24, 2007 Scheduling Order.

Interrogatory 4:

Identify all documents made available by you to student loan borrowers or potential student loan borrowers that refer to the manner and method in which you capitalize interest on loans issued under the program(s) and subject to the repayment plan(s) identified in your answer to Interrogatory No. 1.

Response:

Defendants will produce for inspection and copying by plaintiff copies of all responsive documents at a mutually agreeable time and place.

-5-

<u>Interrogatory 5</u>:

Identify all documents that reflect written or verbal communications among or between you, your agents and/or employees with respect to the manner and method by which you capitalize interest on loans issued under the program(s) and subject to the repayment plan(s) identified in your answer to Interrogatory No. 1.

<u>Response</u>:

Defendants will produce for inspection and copying by plaintiff copies of all responsive, nonprivileged documents at a mutually agreeable time and place.

-6-

<u>Interrogatory 6</u>:

State whether all borrowers whose loans have been subject to the same interest capitalization practices complained of by Dr. Pfeiffer have executed a form promissory note containing the same or substantially similar language concerning interest capitalization as the notes executed by Dr. Pfeiffer. If your answer is "no," identify by OMB No. or otherwise the form promissory note(s) executed by other borrowers and explain how the interest capitalization provision(s) of such note(s) differ from the provision contained in Dr. Pfeiffer's notes.

<u>Response</u>:

Defendants object to Interrogatory 6 on the grounds that the phrases "interest capitalization practices complained of by Dr. Pfeiffer" and "same or substantially similar language" are vague and ambiguous.

Subject to and without waiving the foregoing objection, defendants respond as follows:

In responding to this interrogatory, defendants interpret the phrase "interest capitalization practices complained of by Dr. Pfeiffer" as referring to the capitalization that occurs on June 30th each year for interest that has accrued between a borrower's June scheduled payment and June 30th, on loans with a negative amortization payment schedule (defined as a payment schedule for which the monthly accrued interest is greater than the scheduled monthly payment). Further, in responding to this interrogatory, defendants interpret the phrase "same or substantially similar language" as referring to the language contained in the notes executed by plaintiff.

All borrowers who have had capitalized on June 30th interest that accrued between the

borrower's June scheduled payment and June 30th on loans with a negative amortization payment schedule have executed a form promissory note containing language concerning interest capitalization identical to or substantially similar to that in the notes executed by plaintiff.

Interrogatory 7:

State whether there is a uniform monthly payment date for all borrowers with loans issued under the Federal Direct Consolidated Loan Program and subject to the Income Contingent Repayment Plan and, if so, provide the date of the month.

Response:

For loans issued under the William D. Ford Federal Direct Loan Program, including consolidation loans, defendants offer borrowers the choice of four separate dates within each month for making scheduled payments. Borrowers may select to have their scheduled payments due on the 7th, 14th, 21st, or 28th day of each month. These four dates apply to loans under all repayment plans, including the Income Contingent Repayment Plan.

<u>Interrogatory 8</u>:

State whether there is a uniform monthly payment date for each other specific loan program and repayment plan identified in your answer to Interrogatory No. 1 and, if so, provide the date of the month for each.

<u>Response</u>:

For loans issued under the William D. Ford Federal Direct Loan Program, including consolidation loans, defendants offer borrowers the choice of four separate dates within each month for making scheduled payments.  Borrowers may select to have their scheduled payments due on the 7th, 14th, 21st, or 28th day of each month.  These four dates apply to loans under all repayment plans, including the Income Contingent Repayment Plan and the Alternative Repayment Plan.

Interrogatory 9:

State the approximate date on which you began the interest capitalization practices complained of by Dr. Pfeiffer.

Response:

Defendants object to Interrogatory 9 on the grounds that the phrase "interest capitalization practices complained of by Dr. Pfeiffer" is vague and ambiguous.

Subject to and without waiving the foregoing objections, defendants respond as follows:

In responding to this interrogatory, defendants interpret the phrase "interest capitalization practices complained of by Dr. Pfeiffer" as referring to the capitalization that occurs on June 30th each year for interest that has accrued between a borrower's June scheduled payment and June 30th, on loans with a negative amortization payment schedule (defined as a payment schedule for which the monthly accrued interest is greater than the scheduled monthly payment).

Defendants began tracking, on November 8, 1997, interest that accrued to borrowers' accounts while in a negative amortization repayment schedule. Defendants first capitalized on June 30, 1998, all unpaid interest that had accrued to a borrower's account while in a negative amortization payment schedule, including interest that accrued between the June scheduled payment and June 30, 1998.

-11-

<u>Interrogatory 10</u>:

      Identify all individuals involved in creating and implementing the interest capitalization practices complained of by Dr. Pfeiffer and briefly state each individual's role.

<u>Response</u>:

      Defendants object to Interrogatory 10 on the grounds that the phrase "interest capitalization practices complained of by Dr. Pfeiffer" is vague and ambiguous.

      Subject to and without waiving the foregoing objection, defendants respond as follows:

      In responding to this interrogatory, defendants interpret the phrase "interest capitalization practices complained of by Dr. Pfeiffer" as referring to the capitalization that occurs on June 30th each year for interest that has accrued between a borrower's June scheduled payment and June 30th, on loans with a negative amortization payment schedule (defined as a payment schedule for which the monthly accrued interest is greater than the scheduled monthly payment).

      The regulation establishing the practice of capitalizing annually interest that accrues on loans with a negative amortization payment schedule was developed in 1994 as part of negotiated rulemaking for the William D. Ford Federal Direct Loan Program.  Defendants no longer have the names of the individual members of the negotiation committee.  However, the Federal Register notice of December 28, 1993 lists the organizations that were members of the Direct Student Loan Regulations Negotiated Rulemaking Advisory Committee.  <u>See</u> 58 Fed. Reg. 68619.  Department of Education personnel who were involved in the negotiated rulemaking were:

      Brian Kerrigan (negotiator for the Department of Education)

      Ronald Sann (legal advisor to the Department of Education's negotiator)

<div align="center">-12-</div>

Brian Siegel (legal advisor to the Department of Education's negotiator)

The following Department of Education personnel were or are involved in the implementation of the practice of capitalizing annually interest that accrues on loans with a negative amortization payment schedule:

Cindy Battle (Direct Loan Program servicing director, 2006 - present)

Dwight Vigna (Direct Loan Program servicing director, 2003 - 2006)

Dan Hayward (Direct Loan Program servicing director, 1995 - 2003)

All of the individuals listed above are currently employed by the U.S. Department of Education and their business address is U.S. Department of Education, 400 Maryland Avenue, S.W., Washington, D.C. 20202.

-13-

Interrogatory 11:

Identify all individuals involved in drafting the form promissory note executed by Dr. Pfeiffer and any other form notes identified in your answer to Interrogatory No. 6 and briefly state each individual's role.

Response:

The form promissory notes used in the William D. Ford Federal Direct Loan Program are cleared through the forms clearance process. Notices are published in the Federal Register and interested persons are invited to comment. Federal Register Notices of Clearance issued in connection with the forms clearance process generally make no mention of public comments received, regardless of whether comments were received. Defendants have reviewed this interrogatory with Department of Education personnel listed below, who had responsibility for the William D. Ford Federal Direct Loan Program promissory note clearance process, and defendants have not ascertained any information indicating receipt of any comments on the notices for the Direct Loan Program promissory notes.

Department of Education personnel who have had responsibility for the Direct Loan Program promissory note clearance process are the following:

Katrina Ingalls (1994-2001/2002)

Current Position: Management Analyst
U.S. Department of Education, Regulatory Information Management Service
550 12th Street, N.W.
Washington, D.C. 20202

-14-

Nicki Meoli (1994-2003)

> Current Position: Management and Program Analyst
> U.S. Department of Education, Federal Student Aid
> 830 First Street, N.E.
> Washington, D.C. 20202

John Utz (2002/2003 - present)

> Current Position: Program Specialist, Policy Liaison and Implementation
> U.S. Department of Education, Federal Student Aid
> 830 First Street, N.E.
> Washington, D.C. 20202

In addition, all promissory notes are reviewed by Department of Education Office of

General Counsel attorneys. The attorneys who have had responsibility in this area are Ronald

Sann and Brian Siegel, who are currently employed by the U.S. Department of Education, and

their business address is U.S. Department of Education, 400 Maryland Avenue, S.W.,

Washington, D.C. 20202.

<u>Interrogatory 12</u>:

Identify the individual(s), including their employer(s), involved in creating the computer program that calculates interest capitalization for loans issued under the program(s) and subject to the repayment plan(s) identified in your answer to Interrogatory No. 1.

<u>Response</u>:

Defendants object to Interrogatory 12 on the grounds that it is not relevant to class certification and summary judgment motions, as required by the Court in its September 24, 2007 Scheduling Order.

Interrogatory 13:

Identify all documents that reflect or relate to communications between defendant(s), on the one hand, and the individuals and/or entities identified in your answer to Interrogatory No. 12, on the other hand, that address computer programming for interest capitalization on loans issued under the program(s) and subject to the repayment plan(s) identified in your answer to Interrogatory No. 1.

Response:

Defendants object to Interrogatory 13 on the grounds that it is not relevant to class certification and summary judgment motions, as required by the Court in its September 24, 2007 Scheduling Order.

-17-

Interrogatory 14:

Provide a complete payment history on Dr. Pfeiffer's loan for the period November 2001 to the present including (a) the date of each payment made by Dr. Pfeiffer was received; (b) the amount of each payment; (c) the amount of each payment applied to (i) accrued interest and (ii) principal balance; and (d) the outstanding principal balance on Dr. Pfeiffer's loan after each payment.

Response:

Defendants object to Interrogatory 14 on the grounds that it is not relevant to class certification and summary judgment motions, as required by the Court in its September 24, 2007 Scheduling Order.

Subject to and without waiving the foregoing objection, defendants respond as follows:

A complete payment history on Dr. Pfeiffer's loan for the period from November 2001 to the present is attached to these responses to plaintiff's first set of interrogatories.

-18-

PETER D. KEISLER
Assistant Attorney General

J. CHRISTOPHER KOHN
Director

ROBERT E. KIRSCHMAN, JR.
Deputy Director

JOHN WARSHAWSKY (D.C. Bar No. 417170)
Senior Trial Counsel
CHRISTIAN J. GROSTIC
Trial Attorney
Commercial Litigation Branch
Civil Division
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044-0875
Telephone: (202) 307-0010
Facsimile: (202) 514-9163

November 1, 2007

-19-

Certification

I, Cynthia Battle, state that I have reviewed the factual information included in the defendants' responses to Interrogatories 1, 2, 6, 7, 8, 9, 10, 11, and 14. I hereby declare, under penalty of perjury, that the factual information contained therein is true and correct, to the best of my knowledge, information, and belief.

Cynthia Battle

Date: November 1, 2007

## Payment History Sheet

**Borrower:**     **Borrower SSN:** PFEIFFER, BRENDA K     Rep Name     **Date:** 11/01/07     Page 3

| Transaction Date | Transaction | Fixed Payment Amount | Total Payment Received | Principal Paid | Interest Paid | Interest Accrued to Date | Interest Capitalization | Running Principal Balance | New Disbursement |
|---|---|---|---|---|---|---|---|---|---|
| 12/07/01 | Loan Disbursement | | | | | $0.00 | | $57,165.98 | $57,165.98 |
| 12/21/01 | Loan Disbursement | | | | | $0.00 | | $119,131.50 | $61,916.52 |
| 12/07/01 | Payment | | $700.00 | $546.92 | $153.08 | $153.08 | | $119,434.58 | |
| 01/01/02 | Grace End | | | | | $391.76 | | $119,434.58 | |
| 01/01/02 | Non-Amortization Start | | | | | $391.76 | | $119,434.58 | |
| 01/01/02 | Repayment Begins | | | | | $391.76 | | $119,434.58 | |
| 01/15/02 | Payment | $814.87 | $726.00 | $28.50 | $698.50 | $698.50 | | $119,806.08 | |
| 02/01/02 | Payment | $814.87 | $726.00 | $0.00 | $726.00 | $726.00 | | $119,806.08 | |
| 03/01/02 | Payment | $814.87 | $726.00 | $100.99 | $624.11 | $624.11 | | $119,508.20 | |
| 04/15/02 | Payment | $814.87 | $726.00 | $116.24 | $609.76 | $609.76 | | $119,389.96 | |
| 05/01/02 | Payment | $814.87 | $726.00 | $51.70 | $673.30 | $673.30 | | $119,337.26 | |
| 06/14/02 | Payment | $814.87 | $726.00 | $35.42 | $920.58 | $920.58 | | $119,241.84 | |
| 07/01/02 | Payment | $812.27 | $726.00 | $308.05 | $320.42 | $320.42 | | $118,912.80 | |
| 07/01/02 | Rate Chg/Neg-Am Capitalization | | | | | $302.58 | $583.76 | $119,010.90 | |
| 08/16/02 | Payment | $597.57 | $726.00 | $52.73 | $672.27 | $672.27 | | $119,159.29 | |
| 09/13/02 | Payment | $597.57 | $760.00 | $143.07 | $909.93 | $909.93 | | $119,016.22 | |
| 10/09/02 | Payment | $597.57 | $760.00 | $308.78 | $541.22 | $541.22 | | $118,807.44 | |
| 11/19/02 | Payment | $597.57 | $760.00 | $0.00 | $750.00 | $688.01 | | $118,807.44 | |
| 11/24/02 | Non-Amortization End | $597.57 | | $0.00 | | $288.09 | | $118,807.44 | |
| 12/16/02 | Payment | $597.57 | $750.00 | $50.00 | $750.00 | $701.08 | | $118,807.44 | |
| 01/14/03 | Payment | $876.70 | $875.70 | $257.92 | $837.78 | $837.78 | | $118,669.52 | |
| 02/18/03 | Payment | $876.70 | $975.70 | $120.91 | $754.79 | $754.79 | | $118,448.61 | |
| 03/06/03 | Payment | $876.70 | $975.70 | $272.52 | $605.18 | $605.18 | | $118,176.09 | |
| 04/15/03 | Payment | $876.70 | $875.70 | $273.95 | $601.75 | $601.75 | | $117,902.14 | |
| 05/16/03 | Payment | $876.70 | $876.00 | $211.38 | $664.62 | $664.62 | | $117,690.78 | |
| 06/09/03 | Payment | $876.70 | $900.00 | $226.60 | $665.40 | $665.40 | | $117,464.18 | |
| 07/01/03 | Interest Rate Change | | | | | $320.33 | | $117,464.18 | |
| 07/01/03 | Payment | $876.70 | $900.00 | $254.04 | $646.08 | $646.08 | | $117,184.82 | |
| 08/16/03 | Payment | $876.70 | $190.00 | $106.88 | $703.12 | $703.12 | | $116,897.94 | |
| 08/25/03 | Non-Amortization Start | | | | | $144.89 | | $116,897.91 | |
| 09/11/03 | Payment | $876.70 | $925.00 | $414.53 | $510.47 | $510.47 | | $116,683.41 | |
| 10/09/03 | Payment | $883.52 | $925.00 | $331.65 | $593.35 | $593.35 | | $116,281.76 | |
| 11/19/03 | Payment | $883.52 | $925.00 | $79.85 | $845.15 | $845.15 | | $116,201.91 | |
| 12/09/03 | Payment | $883.52 | $925.00 | $502.72 | $422.28 | $422.28 | | $115,699.19 | |
| 02/13/04 | Payment | $883.52 | $925.00 | $100.25 | $818.75 | $818.75 | | $115,454.94 | |
| 02/19/04 | Payment | $883.52 | $925.00 | $337.02 | $567.98 | $567.98 | | $115,228.92 | |
| 09/18/04 | Payment | $883.52 | $925.00 | $213.18 | $711.82 | $711.82 | | $115,013.74 | |
| 04/19/04 | Payment | $883.52 | $925.00 | $206.34 | $668.66 | $668.66 | | $110,787.40 | |

## Payment History Sheet

**Borrower:**     **Borrower SSN:** REDACTED     **Date:** 11/01/07     Page 2

| Transaction Date | Transaction | Fixed Payment Amount | Total Payment Received | Principal Paid | Interest Paid | Interest Accrued to Date | Interest Capitalization | Running Principal Balance | New Disbursement |
|---|---|---|---|---|---|---|---|---|---|
| 06/20/04 | Payment | $53.92 | $590.00 | $250.73 | $646.27 | $646.27 | | $110,005.87 | |

## Payment History Sheet

Borrower: REDACTED

Borrower SSN: _____   Date: 0   Rep Name   Page 1

| | Total Payment Received | Total Disbursed | Net Disbursed |
|---|---|---|---|
| | $116,013.38 | $968.98 | $116,181.50 |

| Transaction Date | Transaction | Total Payment Received | Principal Paid | Rebate | Interest Paid | Interest Accrued to Capitalization Date | Interest Capitalization Date | Running Principal Balance | New Disbursement |
|---|---|---|---|---|---|---|---|---|---|
| 10/05/07 | Accrues Through Date | | | | | $300.70 | | $92,971.41 | |
| 10/15/07 | Payment | $980.15 | $407.80 | | $407.80 | | | $92,971.41 | |
| 09/17/07 | Payment | $980.15 | $808.87 | | $606.87 | | | $93,413.88 | |
| 08/16/07 | Payment | $980.15 | $373.38 | | $529.13 | | | $94,027.14 | |
| 07/16/07 | Interest Rate Change | | | | | | | $94,376.64 | |
| 07/09/07 | Payment | $968.98 | $426.48 | | $209.28 | | | $94,376.64 | |
| 06/06/07 | Payment | $968.68 | $477.89 | $509.12 | | | | $95,123.68 | |
| 04/09/07 | Payment | $968.98 | $420.90 | $509.12 | | | | $96,001.41 | |
| 03/07/07 | Payment | $968.98 | $473.15 | $515.83 | | | | $96,022.37 | |
| 02/16/07 | Interest Rate Change | | | | | | | $96,716.64 | |
| 01/19/07 | Payment | $968.98 | $544.09 | $513.85 | | | | $96,716.44 | |
| 01/16/07 | Payment | $1,140.50 | $547.87 | $592.53 | | | | $98,287.16 | |
| 12/18/06 | Payment | $1,138.87 | $565.54 | $570.33 | | | | $98,741.18 | |
| 11/17/06 | Payment | $1,138.87 | $565.04 | $570.33 | | | | $99,248.62 | |
| 10/17/06 | Payment | $1,138.87 | $512.83 | $625.84 | | | | $99,748.61 | |
| 09/18/06 | Payment | $1,138.87 | $561.25 | $545.42 | | | | $100,191.35 | |
| 08/16/06 | Payment | $1,138.87 | $575.77 | $550.90 | | | | $100,752.40 | |
| 07/17/06 | Payment | $1,140.50 | $510.05 | $631.45 | | | | $102,020.18 | |
| 07/01/06 | Interest Rate Change | | | | | | | $102,102.42 | |
| 06/01/06 | Payment | $1,140.50 | $544.75 | $595.72 | | | | $104,117.74 | |
| 05/01/06 | Payment | $985.98 | $392.95 | $594.82 | | | | $104,111.74 | |
| 04/25/06 | Payment | $986.98 | $420.07 | $535.91 | | | | $104,843.79 | |
| 03/16/06 | Payment | $538.90 | $500.00 | $332.53 | | | | $104,316.82 | |
| 02/14/06 | Payment | $1,140.50 | $600.00 | $548.89 | | | | $104,748.61 | |
| 01/17/06 | Payment | $1,140.50 | $607.18 | $533.34 | | | | $109,823.69 | |
| 01/17/06 | Payment | $538.90 | $167.95 | $232.04 | | | | $109,191.51 | |
| 12/27/05 | Payment | $538.10 | $544.20 | $732.04 | | | | $108,048.42 | |
| 12/01/05 | Payment | $538.10 | | $566.80 | | | | $104,117.74 | |
| 12/01/05 | Neg Amortization End | | | | | | | $104,111.74 | |
| 11/14/05 | Payment | $538.10 | $344.20 | $505.00 | | | | $109,402.40 | |
| 10/17/05 | Payment | $86.59 | $86.59 | $814.50 | | | | $109,606.84 | |
| 09/30/05 | Payment | $900.00 | $391.62 | $518.38 | | | | $109,823.49 | |
| 09/11/05 | Payment | $900.00 | $359.95 | $560.05 | | | | $108,202.49 | |
| 08/01/05 | Payment | $900.00 | $663.38 | $291.64 | | | | $109,208.37 | |
| 07/01/05 | Payment | $525.00 | | $440.00 | | | $440.95 | $109,488.42 | |
| 07/01/05 | Rate Chg Add-on Capitalization | | | | | | | $109,202.40 | |
| 06/06/05 | Payment | $525.00 | $417.07 | $482.93 | | | | $109,202.40 | |
| 06/06/05 | Payment | $525.00 | $279.41 | $245.59 | | | | $109,488.42 | |
| 05/16/05 | Payment | $525.00 | $297.85 | $927.15 | | | | $107,181.59 | |
| 04/14/05 | Payment | $525.00 | $197.80 | $927.24 | | | | $107,479.78 | |
| 03/16/05 | Payment | $525.00 | $334.32 | $590.68 | | | | $107,478.78 | |
| 02/16/05 | Payment | $525.00 | $190.40 | $734.54 | | | | $108,211.13 | |
| 01/18/05 | Payment | $525.00 | $361.94 | $373.16 | | | | $109,401.59 | |
| 12/13/04 | Payment | $525.00 | $247.94 | $977.06 | | | | $109,763.43 | |
| 11/15/04 | Payment | $525.00 | $300.18 | $555.84 | | | | $109,301.37 | |
| 10/13/04 | Payment | $500.00 | $253.30 | $659.70 | | | | $109,576.63 | |
| 06/16/04 | Payment | $500.00 | $341.10 | $558.90 | | | | $109,530.83 | |
| 06/16/04 | Payment | $500.00 | $504.90 | $395.10 | | | | $109,371.93 | |
| 07/02/04 | Payment | $500.00 | $234.40 | $665.60 | | | | $110,476.83 | |
| 07/01/04 | Rate Chg Add-on Capitalization | | | | | $207.56 | $207.56 | $110,269.27 | |
| 02/01/04 | Payment | $500.00 | | $665.60 | | | | $110,269.27 | |

| Total Payment Received | Total Principal Paid | Total Interest Paid |
|---|---|---|
| $68,550.27 | $23,227.26 | $42,323.01 |

| Total Capitalization | Ending Balance |
|---|---|
| $1,017.27 | $93,971.51 |

## Payment History Sheet

Borrower: REDACTED
Borrower SSN:

Rep Name 0                                   Date: 10/31/07                                   Page 2

| Transaction Date | Transaction | Final Payment Amount | Total Payment Received | Principal Paid | Interest Paid | Interest Accrued to Date | Interest Capitalization | Running Principal Balance | New Disbursement |
|---|---|---|---|---|---|---|---|---|---|
| 09/15/07 | Loan Disbursement | | | | | $0.00 | | $0.00 | |
| 09/15/07 | Loan Disbursement | | | | | $0.00 | | $0.00 | |
| 09/15/07 | Loan Disbursement | | | | | $0.00 | | $0.00 | |
| 09/01/07 | Grace End | | | | | $0.00 | | $0.00 | |
| 08/01/07 | Repayment Begins | | | | | $0.00 | | $0.00 | |
| 06/01/07 | Payment | $547.08 | | $111.53 | $605.77 | $276.60 | | $90,828.00 | |
| 06/01/07 | Payment | $547.08 | $547.30 | | | $0.00 | | $90,828.00 | |
| 1/02/07 | Loan Disbursement | | | | | $275.60 | | $90,828.00 | |
| 1/02/07 | Payment | $547.08 | $547.09 | $0.00 | $547.09 | $328.60 | | $90,337.08 | |
| 1/02/07 | Loan Disbursement | | | | | $388.83 | | $90,337.08 | |
| 1/02/07 | Loan Disbursement | | | | | $150.04 | | $90,337.08 | |
| 1/25/07 | Payment | $547.08 | $654.43 | $0.00 | $654.43 | $302.83 | | $90,337.06 | $0.00 |
| 1/25/07 | Payment | $547.08 | $678.50 | $94.21 | $595.35 | $395.35 | | $90,337.06 | $0.00 |
| 1/25/07 | Payment | $547.08 | $678.20 | $5.23 | $673.97 | $673.97 | | $90,232.84 | |
| 01/02/08 | Non-Amortization Start | | | | | $239.13 | | $90,247.81 | |
| 02/17/08 | Payment | $572.20 | $675.20 | $0.00 | $672.20 | $717.40 | | $90,247.81 | |
| 07/01/08 | Payment | | | | | $2,361.29 | | $90,247.81 | |
| 12/7/08 | Risk Chr Adsn/Am Capitalization | | | | | $2,361.29 | $2,913.09 | $91,109.70 | |
| 01/01/09 | Payment | $0.00 | $100.00 | $0.00 | $100.00 | $3,736.17 | | $91,109.70 | |
| 01/06/09 | Payment | $0.00 | $100.00 | $0.00 | $100.00 | $4,482.48 | | $91,109.70 | |
| 02/02/09 | Payment | $0.00 | $100.00 | $0.00 | $100.00 | $4,998.81 | | $91,109.70 | |
| 02/02/09 | Payment | $0.00 | $100.00 | $0.00 | $100.00 | $5,427.15 | | $91,109.70 | |
| 04/01/09 | Payment | $0.00 | $100.00 | $0.00 | $100.00 | $5,176.25 | | $91,109.70 | |
| 05/06/09 | Payment | $0.00 | $100.00 | $0.00 | $100.00 | $6,227.78 | | $91,109.70 | |
| 05/04/09 | Payment | $0.00 | $100.00 | $0.00 | $100.00 | $6,727.43 | | $91,109.70 | |
| 07/01/09 | Risk Chr Adsn/Am Capitalization | $0.00 | $100.00 | $0.00 | $100.00 | $7,282.51 | | $105,882.46 | |

## Payment History Sheet

Borrower: REDACTED
Borrower SSN:

Rep Name 0                                   Date: 10/31/07                                   Page 1

| | Total Disbursed | Total Payment Received | Total Rebuilds & Rebates | Net Disbursed | | | |
|---|---|---|---|---|---|---|---|
| | $58,876.30 | | $2,622.72 | $94,148.59 | | | |

| Transaction Date | Transaction | Final Payment Amount | Total Payment Received | Principal Paid | Interest Paid | Interest Accrued to Date | Running Principal Balance |
|---|---|---|---|---|---|---|---|
| 07/02/09 | Payment | $0.00 | $100.00 | $0.00 | $100.00 | $1,236.70 | $105,882.46 |

| Date | Transaction | Amount | Total Payment Received | Total Principal Paid | Total Interest Paid | Total Capitalization | Ending Balance |
|---|---|---|---|---|---|---|---|
| 09/17/99 | Payment | $0.00 | $100.00 | $0.00 | $100.00 | $1,720.95 | $105,882.46 |
| 09/17/99 | Payment | $0.00 | $100.00 | $0.00 | $100.00 | $2,357.08 | $105,882.46 |
| 10/19/99 | Payment | $0.00 | $100.00 | $0.00 | $100.00 | $2,953.22 | $105,882.46 |
| 11/15/99 | Payment | $0.00 | $100.00 | $0.00 | $100.00 | $3,479.34 | $105,882.46 |
| 12/15/99 | Payment | $0.00 | $100.00 | $0.00 | $100.00 | $3,927.98 | $105,882.46 |
| 12/20/99 | Payment | $95.00 | $102.07 | $0.00 | $102.07 | $4,219.77 | $105,882.46 |
| 01/15/00 | Payment | $95.00 | $202.07 | $0.00 | $202.07 | $4,697.87 | $105,882.46 |
| 01/18/00 | Payment | $95.00 | $202.07 | $0.00 | $202.07 | $5,056.98 | $105,882.46 |
| 02/07/00 | Payment | $95.00 | $202.07 | $0.00 | $202.07 | $5,571.05 | $105,882.46 |
| 02/20/00 | Payment | $95.00 | $202.07 | $0.00 | $202.07 | $5,958.00 | $105,882.46 |
| 04/07/00 | Payment | $95.00 | $202.07 | $0.00 | $202.07 | $6,266.00 | $105,882.46 |
| 04/20/00 | Payment | $95.00 | $202.07 | $0.00 | $202.07 | $6,467.29 | $105,882.46 |
| 05/07/00 | Payment | $95.00 | $202.07 | $0.00 | $202.07 | $6,811.94 | $105,882.46 |
| 06/07/00 | Payment | $95.00 | $216.07 | $0.00 | $216.07 | $6,911.94 | $105,882.46 |
| 06/15/00 | Interest Rate Change | | | | | $7,054.84 | $105,882.46 |
| 07/07/00 | Payment | $215.00 | $0.00 | $216.00 | $7,907.47 | $105,882.46 | |
| 06/09/00 | Payment | $216.00 | $200.00 | $7,909.90 | $105,882.46 | | |
| 08/07/00 | Payment | $92.63 | $800.00 | $800.00 | $8,472.18 | $105,882.46 | |
| 10/18/00 | Payment | $92.63 | $800.00 | $800.00 | $9,396.95 | $105,882.46 | |
| 11/02/00 | Payment | $92.63 | $400.00 | $400.00 | $8,338.96 | $105,882.46 | |
| 12/07/00 | Payment | $202.07 | $500.00 | $500.00 | $8,558.94 | $105,882.46 | |
| 01/16/01 | Payment | $202.07 | $500.00 | $500.00 | $8,948.06 | $105,882.46 | |
| 02/26/01 | Payment | $202.07 | $450.00 | $500.00 | $9,042.61 | $105,882.46 | |
| 03/20/01 | Payment | $202.07 | $500.00 | $500.00 | $9,406.74 | $105,882.46 | |
| 04/09/01 | Payment | $292.07 | $500.00 | $500.00 | $9,555.47 | $105,882.46 | |
| 05/09/01 | Payment | $202.07 | $600.00 | $600.00 | $9,745.82 | $105,882.46 | |
| 06/01/01 | Payment | $202.07 | $400.00 | $400.00 | $9,962.48 | $105,882.46 | |
| 07/17/01 | Payment | $202.07 | $500.00 | $500.00 | $9,999.00 | $105,882.46 | |
| 07/17/01 | Interest Rate Change | | | | | $10,103.00 | $105,882.46 |
| 08/01/01 | Payment | $202.07 | $500.00 | $500.00 | $10,235.69 | $105,882.46 | |
| 09/01/01 | Payment | $200.23 | $500.00 | $500.00 | $10,345.50 | $105,882.46 | |
| 10/01/01 | Payment | $200.23 | $500.00 | $500.00 | $10,455.49 | $105,882.46 | |
| 11/19/01 | Payment | $200.23 | $700.00 | $700.00 | $10,044.43 | $105,882.46 | |
| 12/07/01 | Payment | $200.23 | $700.00 | $700.00 | $10,299.04 | $0.00 | |
| | Consolidation Pmnt | $420.18 | $116,181.50 | $105,882.46 | $10,299.04 | | $0.00 |
| | | | | | | $0.00 | $0.00 |
| | | | | | | $0.00 | $0.00 |
| | | | | | | $0.00 | $0.00 |
| | | | | | | $0.00 | $0.00 |
| | | | | | | $0.00 | $0.00 |

| Total Payment Received | Total Principal Paid | Total Interest Paid | Total Capitalization | Ending Balance |
|---|---|---|---|---|
| $131,420.77 | $105,983.43 | $25,437.34 | $9,434.85 | $0.00 |

<u>Certificate of Service</u>

I hereby certify that, on November 1, 2007, a copy of the foregoing DEFENDANTS'

RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES" was mailed, postage

prepaid and first class, to the following:

Steven M. Sprenger, Esq.
Sprenger & Lang
1400 Eye St. N.W., Suite 500
Washington, D.C. 20005

EXHIBIT #3
Pfeiffer v Spelling
C.A. #1:07cv00522 (EGS)



# Direct Loans

William D. Ford Federal Direct Loan Program

## Federal Direct Consolidation Loan
## Application and Promissory Note

**WARNING:** Any person who knowingly makes a false statement or misrepresentation on this form will be subject to penalties which may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. 1097.



OMB No. 1845-0053
Form Approved
Exp. Date

CLEARANCE DRAFT
08-02-2007

### Before You Begin

Read the instructions for completing this Federal Direct Consolidation Loan Application and Promissory Note. Print using blue or black ink or type. You must sign and date this form. If you cross out anything and write in new information, put your initials beside the change.

**NOTE: PAGES 1, 2, and 3 OF THIS FORM MUST BE SUBMITTED IN ORDER TO PROCESS YOUR LOAN REQUEST.**

### Section A: Borrower Information

| 1. Last Name        First Name        Middle Initial | 2. Social Security Number |
|---|---|

**3. Permanent Street Address** (if P.O. box or general delivery, see instructions)

_____

_____

_____

| City        State        Zip Code | 5. E-Mail Address (Optional) |
|---|---|

**4. Area Code/Telephone Number**

(   )

| 6. Former Name(s) | 7. Date of Birth (mm-dd-yyyy) | 8. Driver's License State and Number     State        Number |
|---|---|---|

| 9. Employer's Name | 10. Employer's Address |
|---|---|

| 11. Work Area Code/Telephone Number  (   ) | City        State        Zip Code |
|---|---|

### Section B: Reference Information

**12. References:** List two persons with different addresses who have known you for at least three years. Do not list individuals who live with you (for example, your spouse) or who live outside the United States.

|  | 1. | 2. |
|---|---|---|
| Name | _____ | _____ |
| Permanent Address | _____ | _____ |
| City, State, Zip Code | _____ | _____ |
| E-Mail Address (optional) | _____ | _____ |
| Area Code/Telephone Number | (   ) _____ | (   ) _____ |
| Relationship to Borrower | _____ | _____ |

### Section C1: Education Loan Indebtedness – Loans You Want to Consolidate (continued on page 2)

*Read the instructions before completing this section.* List each federal education loan that you want to consolidate, including any William D. Ford Federal Direct Loan (Direct Loan) Program loans that you want to include in your Direct Consolidation Loan. If you need more space to list additional loans, use the Additional Loan Listing Sheet included with this package. List each loan separately. Please print. **ONLY LIST LOANS THAT YOU WANT TO CONSOLIDATE IN THIS SECTION.**



PLAINTIFF'S DEPOSITION EXHIBIT

Pfeiffer–Gov't Production (Nov. 2007) --002056

**Borrower's Name (please print)** _____    **Social Security Number** _____

### Section C1: Education Loan Indebtedness – Loans You Want to Consolidate (continued from page 1)

| 15. Loan Type (if known) | 16. Name, Address, Phone, and Area Code of Outstanding Loan Holder (Servicer) | 18. Loan Account Number | 19. Estimated Payoff Amount |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**17. Grace Period End Date.** If any of the loans you want to consolidate are in a grace period, you can delay the processing of your Direct Consolidation Loan until the end of your grace period by entering your expected grace period end date in the space provided. If you leave this item blank, your Direct Consolidation Loan will be processed and any loans listed in Section C1 that are in a grace period will enter repayment immediately upon consolidation.

**Expected Grace Period End Date (month/year):**

### Section C2: Education Loan Indebtedness – Loans You Do Not Want to Consolidate

**Read the instructions before completing this section.** List all education loans that you are not consolidating, but want to have considered when calculating your maximum repayment period. Include any Direct Loan Program loans that you do not want to consolidate. If you need more space to list additional loans, use the Additional Loan Listing Sheet included with this package. List each loan separately. Please print. **ONLY LIST LOANS THAT YOU DO NOT WANT TO CONSOLIDATE IN THIS SECTION.**

| 18. Loan Type (if known) | 19. Name, Address, Phone, and Area Code of Outstanding Loan Holder (Servicer) | 20. Loan Account Number | 21. Current Balance |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

### Section D: Repayment Plan Selection

To understand your repayment plan options, carefully read the repayment plan information in the Borrower's Rights and Responsibilities Statement on pages 5-8 of this Application and Promissory Note (Note) and in any supplemental materials you receive with this Note. Then select a repayment plan by completing the Repayment Plan Selection form that accompanies this Note. Please note the following:

- If you select the Income Contingent Repayment (ICR) Plan, you must also complete the Income Contingent Repayment Plan Consent to Disclosure of Tax Information form that is included with this Note. Your selection of the ICR Plan cannot be processed without this form.
- If you want to consolidate a defaulted loan(s) and you have not made a satisfactory repayment arrangement with your current holder(s), you must select the ICR Plan. You must also select the ICR Plan if you are consolidating a delinquent Federal Consolidation Loan that the lender has submitted to the guaranty agency for default aversion, and you are not consolidating any additional eligible loans.

Pfeiffer–Gov't Production (Nov. 2007) –002057

Borrower's Name (please print) _____    Social Security Number _____

**Section E: Borrower Understandings, Certifications, and Authorizations**

**22. I understand that:**

**A.** My Direct Consolidation Loan will, to the extent used to pay off loans that I have selected for consolidation, count against the applicable aggregate loan limits under the Act. The term "the Act" is defined under "Governing Law" on page 4 of this Note.

**B.** The amount of my Direct Consolidation Loan is the sum of the balances of my outstanding eligible loans that I have chosen to consolidate. My outstanding balance on each loan to be consolidated includes unpaid principal, unpaid accrued interest, and late charges as defined by federal regulations and as certified by each holder. Collection costs may also be included. For a Direct Loan Program or Federal Family Education Loan (FFEL) Program loan that is in default, the U.S. Department of Education (ED) limits collection costs that may be included in the payoff balances of the loans to a maximum of 18.5 percent of the outstanding principal and interest. For any other defaulted federal education loans, all collection costs that are owed may be included in the payoff balances of the loans.

**C.** ED will provide me with information about the loans and payoff amounts that ED verifies with the holders of my loans before the actual payoffs occur. If I do not want to consolidate any of the loans that ED has verified, I must notify ED before the loans are paid off.

**D.** If the amount ED sends to my holders is more than the amount needed to pay off the balances of the selected loans, the holders will refund the excess to ED and it will be applied against the outstanding balance of my Direct Consolidation Loan. If the amount that ED sends to my holders is less than the amount needed to pay off the balances of the loans selected for consolidation, ED will include the remaining amount in my Direct Consolidation Loan.

**E.** Unless I am consolidating a delinquent Federal Consolidation Loan that the lender has submitted to the guaranty agency for default aversion or a defaulted Federal Consolidation Loan, I may consolidate an existing Federal Consolidation Loan or Direct Consolidation Loan only if I include at least one additional eligible loan in the consolidation.

**F.** If I am consolidating a delinquent Federal Consolidation Loan that the lender has submitted to the guaranty agency for default aversion or a defaulted Federal Consolidation loan, and I am not including another eligible loan, I must agree to repay my Direct Consolidation Loan under the Income Contingent Repayment Plan.

**23. Under penalty of perjury, I certify that:**

**A.** The information that I have provided on this Note is true, complete, and correct to the best of my knowledge and belief and is made in good faith.

**B.** I do not have any other application pending for a Federal Consolidation Loan with any FFEL Program lender.

**C.** All of the loans selected for consolidation have been used to finance my education or the education of my dependent student(s).

**D.** All of the loans selected for consolidation are in a grace period or in repayment (including loans in deferment or forbearance).

**E.** Unless I am consolidating a delinquent Federal Consolidation Loan that the lender has submitted to the guaranty agency for default aversion or a defaulted Federal Consolidation Loan, if none of the loans I am consolidating is a Direct Loan Program loan, I have sought and been unable to obtain a Federal Consolidation Loan from a FFEL Program lender, or I have been unable to obtain a Federal Consolidation Loan with income-sensitive repayment terms that are acceptable to me.

**F.** If I owe an overpayment on a Federal Perkins Loan, Federal Pell Grant, Federal Supplemental Educational Opportunity Grant, Academic Competitiveness Grant (ACG), National Science or Mathematics Access to Retain Talent (SMART) Grant, or Leveraging Educational Assistance Partnership Grant, I have made satisfactory arrangements with the holder to repay the amount owed.

**G.** If I am in default on any loan I am consolidating (except as provided above in Item 22.F.), I have either made a satisfactory repayment arrangement with the holder of that defaulted loan, or I will repay my Direct Consolidation Loan under the income contingent repayment plan.

**H.** If I have been convicted of, or pled *nolo contendere* or guilty to, a crime involving fraud in obtaining federal student aid funds under Title IV of the Higher Education Act of 1965, as amended (the Act), I have completed the repayment of those funds to ED, or to the loan holder in the case of a Title IV federal student loan.

**24. I make the following authorizations:**

**A.** I authorize ED to contact the holders of the loans selected for consolidation to determine the eligibility of the loans for consolidation and the payoff amounts. I further authorize release to ED or its agent of any information required to consolidate my education loans in accordance with the Act.

**B.** I authorize ED to issue the proceeds of my Direct Consolidation Loan to the holders of the selected loans to pay off the debts.

**C.** I authorize ED to investigate my credit record and report information about my loan status to persons and organizations permitted by law to receive that information.

**D.** I authorize my school(s) and ED to release information about my Direct Consolidation Loan to the references on the loan and to members of my immediate family, unless I submit written directions otherwise.

**E.** I authorize my school(s), ED, or their agents to verify my social security number with the Social Security Administration (SSA) and, if the number on my loan record is incorrect, then I authorize SSA to disclose my correct social security number to these parties.

**Section F: Promissory Note (continued on page 4) – to be completed and signed by the borrower.**

**25. Promise to Pay:**

I promise to pay to the U.S. Department of Education (ED) all sums disbursed under the terms of this Note to pay off my prior loan obligations, plus interest and other charges and fees that may become due as provided in this Note. If I do not make payments on this Note when due, I will also pay any reasonable collection costs, including but not limited to attorney's fees, court costs, and other fees.

If ED accepts my application, I understand that ED will on my behalf send funds to the holders of the loans that I want to consolidate to pay off those loans. I further understand that the amount of my Direct Consolidation Loan will equal the sum of the amounts that the holders of the loans verified as the payoff balances on the loans selected for consolidation. My signature on this Note serves as my authorization to pay off the balances of the loans selected for consolidation as provided by the holders of the loans.

The payoff amount may be greater than or less than the estimated total balance I have indicated in Section C1. Further, I understand that if any collection costs are owed on the loans selected for consolidation, these costs may be added to the principal balance of my Direct Consolidation Loan.

I will not sign this Note before reading the entire Note, even if I am told not to read it. I am entitled to an exact copy of this Note and the Borrower's Rights and Responsibilities Statement. My signature certifies that I have read, understand, and agree to the terms and conditions of this Note, including the Borrower Understandings, Certifications, and Authorizations in Section E, and the Borrower's Rights and Responsibilities Statement.

**I UNDERSTAND THAT THIS IS A LOAN THAT I MUST REPAY.**

**26. Borrower's Signature** _____    **Today's Date (mm-dd-yyyy)** _____

Pfeiffer–Gov't Production (Nov. 2007) –002058




## Promissory Note – continued from page 3

### Governing Law

The terms of this Federal Direct Consolidation Loan Application and Promissory Note (Note) will be interpreted in accordance with the Higher Education Act of 1965, as amended (20 U.S.C. 1070 et seq.), the U.S. Department of Education's (ED's) regulations, as they may be amended in accordance with their effective date, and other applicable federal laws and regulations (collectively referred to as the "Act"). Applicable state law, except as preempted by federal law, may provide for certain borrower rights, remedies, and defenses in addition to those stated in this Note.

### Disclosure of Loan Terms

This Note applies to a Federal Direct Consolidation Loan (Direct Consolidation Loan). Under this Note, the principal amount that I owe, and am required to repay, will be equal to all sums disbursed to pay off my prior loan obligations, plus any unpaid interest that is capitalized and added to the principal amount.

My Direct Consolidation Loan may have up to two separate loan identification numbers depending on the loans I choose to consolidate. These loan identification numbers will represent prior subsidized loans and prior unsubsidized loans. Each applicable loan identification number is represented by this Note.

When the loans that I am consolidating are paid off, a disclosure statement will be sent to me identifying the amount of my Direct Consolidation Loan, the associated loan identification numbers, and additional terms of the loan. Important additional information is also contained in the Borrower's Rights and Responsibilities Statement. The Borrower's Rights and Responsibilities Statement and any disclosure I receive in connection with the loan made under this Note are hereby incorporated into this Note.

### Interest

Interest will be calculated using a formula provided for by the Act. Unless ED notifies me in writing of a lower rate, the interest rate on my Direct Consolidation Loan will be based on the weighted average of the interest rates on the loans being consolidated, rounded to the nearest higher one-eighth of one percent, but will not exceed 8.25%. This is a fixed interest rate, which means that the rate will remain the same throughout the life of the loan.

Except for interest ED does not charge me during a deferment period on the subsidized portion of my Direct Consolidation Loan, I agree to pay interest on the principal amount of my Direct Consolidation Loan from the date of disbursement until the loan is paid in full or discharged. ED may add interest that accrues but is not paid when due to the unpaid principal balance of this loan, as provided under the Act. This is called capitalization.

### Late Charges and Collection Costs

ED may collect from me: (1) a late charge of not more than six cents for each dollar of each late payment if I fail to make any part of a required installment payment within 30 days after it becomes due; and (2) any other charges and fees that are permitted by the Act related to the collection of my Direct Consolidation Loan. If I default on my loan, I will pay reasonable collection costs, plus court costs and attorney fees.

### Repayment

I must repay the full amount of the Direct Consolidation Loan made under this Note, plus accrued interest. I will repay my loan in monthly installments during a repayment period that begins on the date of the first disbursement of the loan, unless it is in a deferment or forbearance period. Payments made by me or on my behalf will be applied first to late charges and collection costs that are due, then to interest that has not been paid, and finally to the principal amount of the loan.

ED will provide me with a choice of repayment plans. Information on these plans is included in the Borrower's Rights and Responsibilities Statement. I must select a repayment plan. If I do not select a repayment plan, ED will choose a plan for me in accordance with ED's regulations.

ED will provide me with a repayment schedule that identifies my payment amounts and due dates. My first payment will be due within 60 days of the first disbursement of my Direct Consolidation Loan unless it is in a deferment or forbearance period. If I am unable to make my scheduled loan payments, ED may allow me to temporarily stop making payments, reduce my payment amount, or

extend the time for making payments, as long as I intend to repay my loan. Allowing me to temporarily delay or reduce loan payments is called forbearance.

ED may adjust payment dates on my Direct Consolidation Loan or may grant me forbearance to eliminate a delinquency that remains even though I am making scheduled installment payments.

I may prepay any part of the unpaid balance on my loan at any time without penalty. After I have repaid my Direct Consolidation Loan in full, ED will send me a notice telling me that I have paid off my loan.

### Acceleration and Default

At ED's option, the entire unpaid balance of the Direct Consolidation Loan will become immediately due and payable (this is called "acceleration") if either of the following events occurs: (1) I make a false representation that results in my receiving a loan for which I am not eligible; or (2) I default on the loan.

The following events will constitute a default on my loan: (1) I fail to pay the entire unpaid balance of the loan after ED has exercised its option under the preceding paragraph; (2) I fail to make installment payments when due, provided my failure has persisted for at least 270 days; or (3) I fail to comply with other terms of the loan, and ED reasonably concludes that I no longer intend to honor my repayment obligation. If I default, ED may capitalize all outstanding interest into a new principal balance, and collection costs will become immediately due and payable.

If I default, the default will be reported to national credit bureaus and will significantly and adversely affect my credit rating. I understand that a default will have additional adverse consequences to me as disclosed in the Borrower's Rights and Responsibilities Statement. I also understand that if I default, ED may require me to repay the loan under an income contingent repayment plan in accordance with the Act.

### Legal Notices

Any notice required to be given to me will be effective if mailed by first class mail to the most recent address that ED has for me. I will immediately notify ED of a change of address or status, as specified in the Borrower's Rights and Responsibilities Statement.

If ED fails to enforce or insist on compliance with any term on this Note, this does not waive any right of ED. No provision of this Note may be modified or waived except in writing by ED. If any provision of this Note is determined to be unenforceable, the remaining provisions will remain in force.

Pfeiffer–Gov't Production (Nov. 2007) --002059



## Borrower's Rights and Responsibilities Statement

*Important Notice: This Borrower's Rights and Responsibilities Statement provides additional information about the terms and conditions of the loan you will receive under the accompanying Federal Direct Consolidation Loan (Direct Consolidation Loan) Application and Promissory Note (Note). Please keep a copy of the Note and this Borrower's Rights and Responsibilities Statement for your records.*

*In this document, the words "we," "us," and "our" refer to the U.S. Department of Education. The word "loan" refers to your Direct Consolidation Loan.*

**1. The William D. Ford Federal Direct Loan Program.** The William D. Ford Federal Direct Loan (Direct Loan) Program includes the following types of loans, known collectively as "Direct Loans":

- Federal Direct Stafford/Ford Loans (Direct Subsidized Loans)
- Federal Direct Unsubsidized Stafford/Ford Loans (Direct Unsubsidized Loans)
- Federal Direct PLUS Loans (Direct PLUS Loans)
- Federal Direct Consolidation Loans (Direct Consolidation Loans)

The Direct Loan Program is authorized by Title IV, Part D, of the Higher Education Act of 1965, as amended.

Direct Loans are made by the U.S. Department of Education. Our Direct Loan Servicing Center services, answers questions about, and processes payments on Direct Loans. We will provide you with the Direct Loan Servicing Center's address and telephone number.

**2. Laws that apply to this Note.** The terms and conditions of loans made under this Note are determined by the Higher Education Act of 1965, as amended (20 U.S.C. 1070 et seq.) and other applicable federal laws and regulations. These laws and regulations are referred to as "the Act" throughout this Borrower's Rights and Responsibilities Statement. State law, unless it is preempted by federal law, may provide you with certain rights, remedies, and defenses in addition to those stated in the Note and this Borrower's Rights and Responsibilities Statement.

**NOTE:** Any change to the Act applies to loans in accordance with the effective date of the change.

**3. Direct Consolidation Loan identification numbers.** Depending on the type(s) of federal education loan(s) that you choose to consolidate, you may have up to two individual loan identification numbers. However, you will have only one Direct Consolidation Loan and will receive only one bill.

**3a.** The subsidized portion of your loan ("Direct Subsidized Consolidation Loan") will have one loan identification number representing the amount of the following types of loans that you consolidate:

- Subsidized Federal Stafford Loans
- Direct Subsidized Loans
- Subsidized Federal Consolidation Loans
- Direct Subsidized Consolidation Loans
- Federal Insured Student Loans (FISL)
- Guaranteed Student Loans (GSL)

**3b.** The unsubsidized portion of your loan ("Direct Unsubsidized Consolidation Loan") will have one identification number representing the amount of the following types of loans that you consolidate:

- Unsubsidized and Nonsubsidized Federal Stafford Loans
- Direct Unsubsidized Loans
- Unsubsidized Federal Consolidation Loans
- Direct Unsubsidized Consolidation Loans
- Federal PLUS Loans (for parents or for graduate and professional students)
- Direct PLUS Loans (for parents or for graduate and professional students)
- Direct PLUS Consolidation Loans
- Federal Perkins Loans
- National Direct Student Loans (NDSL)
- National Defense Student Loans (NDSL)
- Federal Supplemental Loans for Students (SLS)
- Parent Loans for Undergraduate Students (PLUS)
- Auxiliary Loans to Assist Students (ALAS)
- Health Professions Student Loans (HPSL)
- Health Education Assistance Loans (HEAL)
- Nursing Student Loans (NSL)
- Loans for Disadvantaged Students (LDS)

**4. Adding eligible loans to your Direct Consolidation Loan.** You may add eligible loans to your Direct Consolidation Loan by submitting a request to us within 180 days of the date your Direct Consolidation Loan is made. (Your Direct Consolidation Loan is "made" on the date we pay off the first loan that you are consolidating.) After we pay off any loans that you add during the 180-day period, we will notify you of the new total amount of your Direct Consolidation Loan and of any adjustments that must be made to your monthly payment amount.

If you want to consolidate an additional eligible loan after the 180-day period, you must apply for a new Direct Consolidation Loan.

**5. Loans that may be consolidated.** *General.* Only the federal education loans listed in Items 3a. and 3b. of this Borrower's Rights and Responsibilities Statement may be consolidated into a Direct Consolidation Loan. You may only consolidate loans that are in a grace period or in repayment (including loans in deferment or forbearance). At least one of the loans that you consolidate must be a Direct Loan Program loan or a Federal Family Education Loan (FFEL) Program loan.

*Defaulted loans.* You may consolidate a loan that is in default if (a) you first make satisfactory repayment arrangements with the holder of the defaulted loan, or (b) you agree to repay your Direct Consolidation Loan under the Income Contingent Repayment Plan (see Item 10).

*Existing consolidation loans.* Generally, you may consolidate an existing Direct Consolidation Loan or Federal Consolidation Loan into a new Direct Consolidation Loan only if you include at least one additional eligible loan in the consolidation. However, you may include a Federal Consolidation Loan into a new Direct Consolidation Loan without including an additional loan if the Federal Consolidation Loan is delinquent and has been submitted by the lender to the guaranty agency for default aversion, or if the Federal Consolidation Loan is in default. In such cases, you must agree to repay the new Direct Consolidation Loan under the Income Contingent Repayment Plan.

**6. Information you must report to us.** Until your loan is repaid, you must notify the Direct Loan Servicing Center if you:

- Change your address or telephone number;
- Change your name (for example, maiden name to married name);
- Change your employer or your employer's address or telephone number changes; or
- Have any other change in status that would affect your loan (for example, if you received a deferment while you were unemployed, but have found a job and therefore no longer meet the eligibility requirements for the deferment)

**7. Interest rate.** The interest rate on your Direct Consolidation Loan will be the lesser of the weighted average of the interest rates on the loans being consolidated, rounded to the nearest higher one-eighth of one percent, OR 8.25%. We will send you a notice that tells you the interest rate on your loan.

The interest rate on a Direct Consolidation Loan is a fixed rate. This means that the interest rate will remain the same throughout the life of your loan.

**8. Payment of interest.** We charge interest on a Direct Consolidation Loan from the date the loan is made until it is paid in full or discharged, including during periods of deferment or forbearance. However, we do not charge interest on the subsidized portion of a Direct Consolidation Loan ("Direct Subsidized Consolidation Loan" – see Item 3a.) during deferment periods.

If you do not pay the interest as it is charged during the periods described above, we will add the interest to the unpaid principal amount of your loan at the end of the deferment or forbearance period. This is called "capitalization." Capitalization increases the unpaid principal balance of your loan, and we will then charge interest on the increased principal amount.

The chart below shows the difference in the total amount you would repay on a $15,000 Direct Unsubsidized Consolidation Loan if you pay the interest as it is charged during a 12-month deferment or forbearance period, compared to the amount you would repay if you do not pay the interest and it is capitalized.

Pfeiffer—Gov't Production (Nov. 2007) –002060



| | If you pay the interest as it is charged... | If you do not pay the interest and it is capitalized... |
|---|---|---|
| Loan Amount | $15,000 | $15,000 |
| Capitalized Interest for 12 months (at the maximum rate of 8.25%) | $0 | $1,238 |
| Principal to be Repaid | $15,000 | $16,238 |
| Monthly Payment (Standard Repayment Plan) | $146 | $158 |
| Number of Payments | 180 | 180 |
| Total Amount Repaid | $26,209 | $28,359 |

In this example, you would pay $12 less per month and $2,150 less altogether if you pay the interest as it is charged during a 12-month deferment or forbearance period.

You may be able to claim a federal income tax deduction for interest payments you make on Direct Loans. For further information, refer to IRS Publication 970, which is available at http://www.irs.ustreas.gov.

9. Repayment incentive programs. A repayment incentive is a benefit that we offer to encourage you to repay your loan on time. Under a repayment incentive program, the interest rate we charge on your loan may be reduced. Some repayment incentive programs require you to make a certain number of payments on time to keep the reduced interest rate. For Direct Consolidation Loans, the following repayment incentive program may be available to you:

*Interest Rate Reduction for Electronic Debit Account Repayment*

Under the Electronic Debit Account (EDA) repayment option, your bank automatically deducts your monthly loan payment from your checking or savings account and sends it to us. EDA helps to ensure that your payments are made on time. In addition, you receive a 0.25 percent interest rate reduction while you repay under the EDA option. We will include information about the EDA option in your first bill. You can also get this information on the Direct Loan Servicing Center's web site, or by calling the Direct Loan Servicing Center's toll-free telephone number (the web site address and telephone number are provided on all correspondence that the Direct Loan Servicing Center sends you).

The Direct Loan Servicing Center can provide you with more information on other repayment incentive programs that may be available.

Note: Another repayment incentive program, the up-front interest rebate, is available on Direct Subsidized Loans, Direct Unsubsidized Loans, and Direct PLUS Loans. The rebate is equal to a percentage of the loan amount, and is the same amount that would result if the interest rate on the loan were lowered by a specific percentage. To permanently keep an up-front interest rebate, a borrower must make each of the first 12 required monthly payments on time when the loan enters repayment. If you consolidate a Direct Loan on which you received an up-front interest rebate before you permanently earn the rebate (the correspondence you received about your loan will tell you if you received a rebate), you will have to make the first 12 required monthly payments on your Direct Consolidation Loan on time to keep the interest rebate. You will lose the rebate if you do not make all of your first 12 required monthly payments on time. If you lose the rebate, we will add the rebate amount back to the principal balance on your loan account. This will increase the amount that you must repay.

10. Repaying your loan. Your first payment will be due within 60 days of the first disbursement of your Direct Consolidation Loan unless your loan is in a

deferment or forbearance period. The Direct Loan Servicing Center will notify you of the date your first payment is due.

You must make payments on your loan even if you do not receive a bill or repayment notice. Billing information is sent to you as a convenience, and you are obligated to make payments even if you do not receive a bill or notice.

You may choose one of the following repayment plans to repay your loan:

- **Standard Repayment Plan** – Under this plan, you will make fixed monthly payments and repay your loan in full within 10 to 30 years (not including periods of deferment or forbearance) from the date the loan entered repayment, depending on the amount of your Direct Consolidation Loan and the amount of your other student loan debt as listed in Section C2 of your Note (see the chart below). Your payments must be at least $50 a month and will be more, if necessary, to repay the loan within the required time period.

- **Graduated Repayment Plan** – Under this plan, your payments will be lower at first and will then increase over time, usually every two years. You will repay your loan in full within 10 to 30 years (not including periods of deferment or forbearance) from the date the loan entered repayment, depending on the total amount of your Direct Consolidation Loan and the amount of your other student loan debt as listed in Section C2 of your Note (see the chart below). No single payment under this plan will be more than three times greater than any other payment.

| Maximum Repayment Periods Under the Standard and Graduated Repayment Plans | |
|---|---|
| **Total Education Loan Indebtedness** | **Maximum Repayment Period** |
| Less than $7,500 | 10 years |
| $7,500 to $9,999 | 12 years |
| $10,000 to $19,999 | 15 years |
| $20,000 to $39,999 | 20 years |
| $40,000 to $59,999 | 25 years |
| $60,000 or more | 30 years |

- **Extended Repayment Plan** – You may choose this plan only if (1) you had no outstanding balance on a Direct Loan Program loan as of October 7, 1998, or on the date you obtained a Direct Loan Program loan on or after October 7, 1998, and (2) you have an outstanding balance on Direct Loan Program Loans that exceeds $30,000. Under this plan, you may choose to make either fixed or graduated monthly payments and will repay your loan in full over a repayment period not to exceed 25 years (not including periods of deferment or forbearance) from the date your loan entered repayment. If you choose to make fixed monthly payments, your payments must be at least $50 a month and will be more, if necessary, to repay the loan within the required time period. If you choose to make graduated monthly payments, your payments will start out lower and will then increase over time, generally every two years. Under a graduated repayment schedule, your monthly payment must at least be equal to the amount of interest that accrues each month, and no single payment will be more than three times greater than any other payment.

- **Income Contingent Repayment Plan** – Under this plan, your monthly payment amount will be based on your adjusted gross income (and that of your spouse if you are married), your family size, and the total amount of your Direct Loans. Until we obtain the information needed to calculate your monthly payment amount, your payment will equal the amount of interest that has accrued on your loan unless you request a forbearance. As your income changes, your payments may change. If you do not repay your loan after 25 years under this plan, the unpaid portion will be forgiven. You may have to pay income tax on any amount forgiven.

If you can show to our satisfaction that the terms and conditions of these repayment plans are not adequate to meet your exceptional circumstances, we may provide you with an alternative repayment plan.

If you do not choose a repayment plan, we will choose a plan for you in accordance with the Act.

You may change repayment plans at any time after you have begun repaying your loan. There is no penalty if you make loan payments before they are due, or pay more than the amount due each month.

Pfeiffer–Gov't Production (Nov. 2007) –002061



We apply your payments and prepayments in the following order: late charges and collection costs first, outstanding interest second, and outstanding principal last.

When you have repaid your loan in full, the Direct Loan Servicing Center will send you a notice telling you that you have paid off your loan. You should keep this notice in a safe place.

**11. Late charges and collection costs.** If you do not make any part of a payment within 30 days after it is due, we may require you to pay a late charge. This charge will not be more than six cents for each dollar of each late payment. If you do not make payments as scheduled, we may also require you to pay other charges and fees involved in collecting your loan.

**12. Demand for immediate repayment.** The entire unpaid amount of your loan becomes due and payable (on your Note this is called "acceleration") if you:

- Make a false statement that causes you to receive a loan that you are not eligible to receive; or
- Default on your loan.

**13. Defaulting on your loan.** Default (failing to repay your loan) is defined in detail in the "Promissory Note" section on page 4 of your Note. If you default:

- We will require you to immediately repay the entire unpaid amount of your loan.
- We may sue you, take all or part of your federal tax refund or other federal payments, and/or garnish your wages so that your employer is required to send us part of your wages to pay off your loan.
- We will require you to pay reasonable collection fees and costs, plus court costs and attorney fees.
- You will lose eligibility for other federal student aid and assistance under most federal benefit programs.
- You will lose eligibility for loan deferments.
- We will also report your default to national credit bureaus (see Item 14).

**14. Credit bureau notification.** We will report information about your loan to one or more national credit bureaus. This information will include the disbursement dates, amount, and repayment status of your loan (for example, whether you are current or delinquent in making payments).

If you default on a loan, we will also report this to national credit bureaus. We will notify you at least 30 days in advance that we plan to report default information to a credit bureau unless you resume making payments on the loan within 30 days. You will be given a chance to ask for a review of the debt before we report it.

If a credit bureau contacts us regarding objections you have raised about the accuracy or completeness of any information we have reported, we are required to provide the credit bureau with a prompt response.

**15. Deferment and forbearance (postponing payments).** If you meet certain requirements, you may receive a deferment that allows you to temporarily stop making payments on your loan. If you cannot make your scheduled loan payments, but do not qualify for a deferment, we may give you a forbearance. A forbearance allows you to temporarily stop making payments on your loan, temporarily make smaller payments, or extend the time for making payments.

**Deferment**

You may receive a deferment while you are:

- Enrolled at least half-time at an eligible school;
- In a full-time course of study in a graduate fellowship program;
- In an approved full-time rehabilitation program for individuals with disabilities;
- Unemployed (for a maximum of three years; you must be conscientiously seeking, but unable to find, full-time employment); or
- Experiencing an economic hardship (including Peace Corps service), as determined under the Act (for a maximum of three years).

If all of the Title IV loans that were paid off by your Direct Consolidation Loan were first disbursed on or after July 1, 2001, a deferment is also available for up to three years while you are serving on active duty during a war or other military operation or national emergency, or performing qualifying National Guard duty during a war or other military operation or national emergency.

You may be eligible to receive additional deferments if, at the time you received your first Direct Loan, you had an outstanding balance on a loan made under the Federal Family Education Loan (FFEL) Program before July 1, 1993. If you meet this requirement, you may receive a deferment while you are:

- Temporarily totally disabled, or unable to work because you are required to care for a spouse or dependent who is disabled (for a maximum of three years);
- On active duty in the U.S. Armed Forces, on active duty in the National Oceanic and Atmospheric Administration (NOAA), or serving full-time as an officer in the Commissioned Corps of the Public Health Service (for a combined maximum of three years);
- Serving in the Peace Corps (for a maximum of three years);
- A full-time paid volunteer for a tax-exempt organization or an ACTION program (for a maximum of three years);
- In a medical internship or residency program (for a maximum of two years);
- Teaching in a designated teacher shortage area (for a maximum of three years);
- On parental leave (for a maximum of six months);
- A working mother entering or re-entering the workforce (for a maximum of one year); or
- While the student for whom you borrowed a PLUS loan is dependent and is enrolled at least half-time at an eligible school, or is in an approved full-time rehabilitation training program for individuals with disabilities.

You may receive a deferment based on your enrollment in school on at least a half-time basis if (1) you submit a deferment request form to the Direct Loan Servicing Center along with documentation of your eligibility for the deferment, or (2) the Direct Loan Servicing Center receives information from the school you are attending that indicates you are enrolled at least half-time. If the Direct Loan Servicing Center processes a deferment based on information received from your school, you will be notified of the deferment and will have the option of canceling the deferment and continuing to make payments on your loan.

For all other deferments, you must submit a deferment request form to the Direct Loan Servicing Center, along with documentation of your eligibility for the deferment. The Direct Loan Servicing Center can provide you with a deferment request form that explains the requirements for the type of deferment you are requesting. You may also obtain deferment request forms and information on deferment eligibility requirements from the Direct Loan Servicing Center's web site at www.dl.ed.gov.

If you are in default on your loan, you are not eligible for a deferment.

You are responsible for paying the interest on a Direct Unsubsidized Consolidation Loan during a deferment. You are not responsible for paying the interest on a Direct Subsidized Consolidation Loan during a deferment period.

**Forbearance**

We will give you a forbearance if: You are serving in a medical or dental internship or residency program, and you meet specific requirements;

- You are serving in a national service position for which you receive a national service education award under the National and Community Service Act of 1990 (AmeriCorps);
- You qualify for partial repayment of your loans under the Student Loan Repayment Program, as administered by the Department of Defense.
- You are performing service that would qualify you for loan forgiveness under the teacher loan forgiveness program that is available to certain Direct Loan and FFEL program borrowers; or
- The total amount you owe each month for all of the student loans you received under Title IV of the Act is 20 percent or more of your total monthly gross income (for a maximum of three years).

In addition, we may give you a forbearance if you are temporarily unable to make your scheduled loan payments for reasons including, but not limited to, financial hardship or illness.

To request a forbearance, contact the Direct Loan Servicing Center. The Direct Loan Servicing Center can provide you with a forbearance request form that explains the requirements for the type of forbearance you are requesting. You may also obtain forbearance request forms and information on forbearance eligibility requirements from the Direct Loan Servicing Center's web site at www.dl.ed.gov.

Under certain circumstances, we may also give you a forbearance without requiring you to submit a request or documentation. These circumstances include, but are not limited to, the following:

- Periods necessary for us to determine your eligibility for a loan discharge;

Pfeiffer—Gov't Production (Nov. 2007) --002062



- A period of up to 60 days in order for us to collect and process documentation related to your request for a deferment, forbearance, change in repayment plan, or consolidation loan (we do not capitalize interest charged during this period); or
- Periods when you are involved in a military mobilization, or a local or national emergency.

You are responsible for paying the interest on your entire Direct Consolidation Loan during a forbearance period.

**16. Discharge (having your loan forgiven).** We will discharge (forgive) your Direct Consolidation Loan if:

- The Direct Loan Servicing Center receives an original or certified copy of a death certificate as evidence of your death. In exceptional circumstances, we may discharge your loan based on other reliable documentation of your death. We will also discharge the portion of a Direct Consolidation Loan that repaid one or more Direct PLUS Loans or Federal PLUS Loans obtained on behalf of a student who dies.
- Your loan is discharged in bankruptcy. However, federal student loans are not automatically discharged if you file for bankruptcy. To have your loan discharged in bankruptcy, you must prove to the bankruptcy court, in an adversary proceeding, that repaying the loan would cause undue hardship.
- We determine that you are totally and permanently disabled (as defined in the Act), based on a physician's certification, and you meet additional requirements during a 3-year conditional discharge period. During that period, your earnings from work must not exceed the poverty line amount for a family of two, and you must not receive any additional loans under the Direct Loan, FFEL, or Federal Perkins Loan programs. You may not receive a discharge due to total and permanent disability based on a condition that existed before you received any of the loans that you consolidated, unless a doctor certifies that the condition substantially deteriorated after the loan was made.

In certain cases, we may also discharge all or a portion of your Direct Consolidation Loan if:

- One or more Direct Loan Program, FFEL Program, or Federal Perkins Loan Program loans that you consolidated was used to pay for a program of study that you (or the dependent student for whom you borrowed a PLUS loan) were unable to complete because the school closed;
- Your eligibility (or the eligibility of the dependent student for whom you borrowed a PLUS loan) for one or more of the Direct Loan Program or FFEL Program loans that you consolidated was falsely certified by the school;
- Your eligibility for one or more of the Direct Loan Program or FFEL Program loans that you consolidated was falsely certified as a result of a crime of identity theft; or
- The school did not pay a required refund of one or more Direct Loan Program or FFEL Program loans that you consolidated.

We may forgive a portion of your Direct Consolidation Loan that repaid Direct Subsidized or Direct Unsubsidized Loans you received after October 1, 1998, or subsidized or unsubsidized Federal Stafford Loans you received under the FFEL program after October 1, 1998 if you teach full time for five consecutive years in certain low-income elementary and/or secondary schools and meet certain other qualifications, and if you did not owe a Direct Loan or FFEL program loan as of October 1, 1998, or as of the date you obtain a loan after October 1, 1998.

To request a loan discharge based on one of the conditions described above (except for discharges due to death or bankruptcy), you must complete an application that you may obtain from the Direct Loan Servicing Center or from the Direct Loan Servicing Center's web site at www.dl.ed.gov.

In some cases, you may assert, as a defense against collection of your loan, that the school did something wrong or failed to do something that it should have done. You can make such a defense against repayment only if the school's act or omission directly relates to your loan or to the educational services that the loan was intended to pay for, and if what the school did or did not do would give rise to a legal cause of action against the school under applicable state law. If you believe that you have a defense against repayment of your loan, contact the Direct Loan Servicing Center.

We do not guarantee the quality of the academic programs provided by schools that participate in federal student financial aid programs. You must repay your loan even if you do not complete your education, are unable to obtain employment in your field of study, or are dissatisfied with, or do not receive, the education you paid for with the loan.

**17. Department of Defense and other federal agency loan repayment.** Under certain circumstances, military personnel may have educational loans repaid by the Secretary of Defense. This benefit is offered as part of a recruitment program that does not apply to individuals based on their previous military service or to those who are not eligible for enlistment in the U.S. Armed Forces. For more information, contact your local military service recruitment office.

Other agencies of the federal government may also offer student loan repayment programs as an incentive to recruit and retain employees. Contact the agency's human resources department for more information.

*END OF BORROWER'S RIGHTS AND RESPONSIBILITIES STATEMENT*

Pfeiffer—Gov't Production (Nov. 2007) —002063



## IMPORTANT NOTICES

### Gramm-Leach-Bliley Act Notice

In 1999, Congress enacted the Gramm-Leach-Bliley Act (Public Law 106-102). This Act requires that lenders provide certain information to their customers regarding the collection and use of nonpublic personal information.

We disclose nonpublic personal information to third parties only as necessary to process and service your loan and as permitted by the Privacy Act of 1974. See the Privacy Act Notice below. We do not sell or otherwise make available any information about you to any third parties for marketing purposes.

We protect the security and confidentiality of nonpublic personal information by implementing the following policies and practices. All physical access to the sites where nonpublic personal information is maintained is controlled and monitored by security personnel. Our computer systems offer a high degree of resistance to tampering and circumvention. These systems limit data access to our staff and contract staff on a "need-to-know" basis, and control individual users' ability to access and alter records within the systems. All users of these systems are given a unique user ID with personal identifiers. All interactions by individual users with the systems are recorded.

### Privacy Act Notice

The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you:

The authority for collecting the requested information from and about you is §451 et seq. of the Higher Education Act (HEA) of 1965, as amended (20 U.S.C. 1087a et seq.) and the authorities for collecting and using your Social Security Number (SSN) are §484(a)(4) of the HEA (20 U.S.C. 1091(a)(4)) and 31 U.S.C. 7701(b). Participating in the William D. Ford Federal Direct Loan (Direct Loan) Program and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate.

The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the Direct Loan Program, to permit the servicing of your loan(s), and, if it becomes necessary, to locate you and to collect and report on your loan(s) if your loan(s) become delinquent or in default. We also use your SSN as an account identifier and to permit you to access your account information electronically.

The information in your file may be disclosed, on a case by case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loan(s), to enforce the terms of the loan(s), to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions. To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state agencies. To provide a standardized method for educational institutions to efficiently submit student enrollment status, disclosures may be made to guaranty agencies or to financial and educational institutions. To counsel you in repayment efforts, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies.

In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary

actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.

### Financial Privacy Act Notice

Under the Right to Financial Privacy Act of 1978 (12 U.S.C. 3401-3421), ED will have access to financial records in your student loan file maintained in compliance with the administration of the Direct Loan Program.

### Paperwork Reduction Notice

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a currently valid OMB control number. The valid OMB control number for this information collection is 1845-0053. The time required to complete this information collection is estimated to average 1.0 hour (60 minutes) per response, including the time to review instructions, search existing data resources, gather and maintain the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: U.S. Department of Education, Washington, DC 20202-4700.

If you have any questions regarding the status of your individual submission of this form, write directly to:

U.S. Department of Education
Consolidation Department
P.O. Box 242800
Louisville, KY 40224-2800

Pfeiffer--Gov't Production (Nov. 2007) --002064

EXHIBIT #4
Pfeiffer v Spelling
C.A. #1:07cv00522 (EGS)



## Federal Direct Consolidation Loan
## Promissory Note Endorser Addendum

**WARNING:** Any person who knowingly makes a false statement or misrepresentation on this form shall be subject to penalties which may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. 1097.

OMB No. 1845-0053
Form Approved
Exp. Date 01/31/2005

### Section A - Direct Borrower Information (Completed by U.S. Department of Education)

| 1. Name (Last, First, Middle Initial) | 2. Social Security Number | 3. Date of Birth |
|---|---|---|

4. Permanent Address (Street, City, State, Zip Code)

| 5. Home Area Code/Telephone Number | 6. Direct PLUS Consolidation Loan Amount |
|---|---|

### Section B - Endorser Information

| 7. Name (Last, First, Middle Initial) | 8. Social Security Number | 9. Date of Birth |
|---|---|---|

| 10. Permanent Address (Street, City, State, Zip Code) | 11. Fax Number (Optional) |
|---|---|

| 12. Home Area Code/Telephone Number ( ) | 13. Driver's License Number (list state abbreviation first) ( ) | 14. E-Mail Address (Optional) |
|---|---|---|

15. U.S. Citizenship Status (Check One)       Alien Registration Number

1 ☐ U.S. Citizen or National    2 ☐ Permanent Resident or Other Eligible Noncitizen    3 ☐ Neither 1 nor 2

| 16. Employer's Name | 17. Employer's Area Code/Telephone Number ( ) |
|---|---|

18. Employer's Address (Street, City, State, Zip Code)

19. References: (See instructions before completing this section.)

Name          1. _____    2. _____

Permanent Address  _____       _____

City, State, Zip Code  _____       _____

Area Code/Telephone Number ( ) _____    ( ) _____

### Section C - Endorser's Certification

In the event that the borrower identified in Section A does not repay the Federal Direct Consolidation Loan (Direct Consolidation Loan) for which I am the endorser, I promise to pay the U.S. Department of Education (ED) all sums (hereafter "loan" or "loans") disbursed for the purpose of paying off a parent PLUS loan(s) or a parent PLUS consolidation loan(s) under the Federal Direct Consolidation Loan Promissory Note plus interest and other fees that may become due, as provided in this Federal Direct Consolidation Loan Promissory Note Endorser Addendum (addendum). If I fail to make payments on this addendum when due, I will also pay collection costs including but not limited to attorney's fees and court costs.

I understand that this is an addendum to the Federal Direct Consolidation Loan Promissory Note. I will not sign this addendum before reading it, even if I am advised

not to read it. I am entitled to an exact copy of this addendum and a statement of the Borrower's Rights and Responsibilities. My signature certifies that I have read, understand, and agree to the terms and conditions of this addendum.

Under penalty of perjury, I certify that the information contained on this addendum is true and accurate. I authorize ED to investigate my credit record and report information concerning my credit to the proper persons and organizations.

**I UNDERSTAND THAT THIS IS A FEDERAL LOAN THAT I MUST REPAY IN THE EVENT THE BORROWER IDENTIFIED IN SECTION A DOES NOT REPAY THE LOAN.**

| 20. Loan Identification Number | |
|---|---|
| 21. Signature of Endorser | Date |



**Page 1**

Pfeiffer--Gov't Production (Nov. 2007) --001870

Borrower's Name_____

Borrower's Social Security Number_____

| 25. Loan Holder/Servicer's Name, Address, and Area Code/Telephone Number | 26. Loan Type | 27. B=Borrower S=Spouse J=Joint | 28. Account Number | 29. Current Balance | 30. To Be Consolidated? Yes No |
|---|---|---|---|---|---|
| ( ) | | | | | |
| ( ) | | | | | |
| ( ) | | | | | |
| ( ) | | | | | |
| ( ) | | | | | |
| ( ) | | | | | |
| ( ) | | | | | |
| ( ) | | | | | |

**Page 2**

Pfeiffer--Gov't Production (Nov. 2007) --001873

Borrower's Name_____

Borrower's Social Security Number_____

**Section C: Repayment Plan Selection**

Carefully read the repayment plan information in "Direct Consolidation Loans" that accompanies this application and promissory note to understand your repayment plan options. Then, complete this section to select your repayment plan. Remember--

- All student loans must be repaid under the same repayment plan. Parent PLUS loans may be repaid under a different repayment plan.
- If you select the Income Contingent Repayment Plan, you must complete the "Repayment Plan Selection" and "Income Contingent Repayment Plan Consent to Disclosure of Tax Information" forms that accompany this application and promissory note. Your selection cannot be processed without these forms.
- If you want to consolidate a defaulted student loan(s) and you have not made a satisfactory repayment arrangement with your current holder(s), you must select the Income Contingent Repayment Plan.

31. Place an "X" in the box that corresponds to your repayment plan selection for each loan type. Note that Direct PLUS Consolidation Loans cannot be repaid under the Income Contingent Repayment Plan.

|  | Income Contingent | Standard | Extended | Graduated |
|---|---|---|---|---|
| **STUDENT LOANS** *Direct Subsidized and Unsubsidized Consolidation Loans* | ☐ | ☐ | ☐ | ☐ |
| **PARENT LOANS** *Direct PLUS Consolidation Loans* | Not Available | ☐ | ☐ | ☐ |

**Section D: Promissory Note (Continued on reverse side)**

**Promise to Pay:**

I promise to pay to the U.S. Department of Education (ED) all sums (hereafter "loan" or "loans") disbursed under the terms of this Promissory Note (note) to discharge my prior loan obligations, plus interest, and other fees that may become due as provided in this note. If I fail to make payments on this note when due, I will also pay collection costs including but not limited to attorney's fees and court costs. If ED accepts my application, I understand that ED will on my behalf send funds to the holder(s) of the loan(s) selected for consolidation in order to pay off this loan(s). I further understand that the amount of this loan will equal the sum of the amount(s) that the holder(s) of the loan(s) verified as the payoff balance(s) on that loan(s) selected for consolidation. My signature on this note will serve as my authorization to pay off the balance(s) of the loan(s) selected for consolidation as provided by the holder(s) of such loan(s).

This amount may be more or less than the estimated total balance I have indicated in Section D. Further, I understand that if any collection costs are owed on the loans selected for consolidation, these costs may be added to the principal balance of the consolidation loan.

I understand that this is a Promissory Note. I will not sign this note before reading it, including the text on the reverse side, even if I am advised not to read the note. I am entitled to an exact copy of this note and a statement of the Borrower's Rights and Responsibilities. My signature certifies that I have read, understand, and agree, to the terms and conditions of this note, including the Borrower Certification and Authorization printed on the reverse side and the accompanying Borrower's Rights and Responsibilities.

If consolidating jointly with my spouse, we agree to the same terms and conditions contained in the Borrower Certification and Authorization. In addition, we confirm that we are legally married to each other and understand and agree that we are and will continue to be held jointly and severally liable for the entire amount of the debt represented by the Federal Direct Consolidation Loan without regard to the amounts of our individual loan obligations that are consolidated and without regard to any change that may occur in our marital status. We understand that this means that one of us may be required to pay the entire amount due if the other is unable or refuses to pay. We understand that the Federal Direct Consolidation Loan we are applying for will be cancelled only if both of us qualify for cancellation. We further understand that we may postpone repayment of the loan only if we provide ED with written requests that confirm Federal Direct Consolidation Loan Program deferment or forbearance eligibility for both of us at the same time.

**I UNDERSTAND THAT THIS IS A FEDERAL LOAN THAT I MUST REPAY.**

32. Signature of Borrower _____ Date _____

Signature of Spouse (if consolidating jointly) _____ Date _____

Pfeiffer--Gov't Production (Nov. 2007) --001872

## Promissory Note (continued)

### Governing Law and Notices

This Promissory Note (note) applies to Federal Direct Consolidation Loans (Direct Consolidation Loans). In this note, the Higher Education Act of 1965, as amended, 20 U.S.C. 1070 et seq., and applicable U.S. Department of Education (ED) regulations are referred to as "the Act." The terms of this note will be interpreted according to the Act and other applicable federal statutes and regulations. Applicable state law, except as preempted by federal law, may provide for certain borrower rights, remedies, and defenses in addition to those stated in this note.

### Disclosure of Terms

When the loan(s) that I am consolidating is paid off, I will be sent a Disclosure Statement and Repayment Schedule (disclosure). The disclosure will identify my Direct Consolidation Loan amount and additional terms of my loan. If I have questions about the information disclosed, I will contact ED. If the information in this note conflicts with the information in the disclosure, the disclosure will be controlling.

Important additional terms of this loan are disclosed in the statement of Borrower's Rights and Responsibilities accompanying this note.

I understand that my Direct Consolidation Loan may consist of up to three separate loan identification numbers depending on the loan(s) I choose to consolidate. These loan identification numbers will represent prior subsidized loans, prior unsubsidized loans, or prior parent PLUS loans. The Borrower's Rights and Responsibilities identifies which eligible loans are included in each of these categories. Each applicable loan identification number is represented by this note.

### Interest

Except for interest ED does not charge me during an in-school, grace, or deferment period, I agree to pay interest on the principal amount of my Direct Consolidation Loan from the date of disbursement until the loan is paid in full or discharged. ED may add interest that accrues but is not paid when due to the unpaid principal balance of this loan, as provided under the Act. This is called capitalization.

Interest will be calculated according to the applicable formulas provided for by the Act.

The interest rate on my Direct Consolidation Loan will be based on the weighted average of the interest rates on the loans being consolidated, rounded to the nearest higher one-eighth of one percent, but shall not exceed 8.25%. This is a fixed interest rate, which means that the rate will remain the same throughout the life of the loan.

### Late Charges and Collection Costs

If I fail to make any part of an installment payment within 30 days after it becomes due, ED may collect from me a late charge that will not exceed six cents for each dollar of each late installment. If I default on the loan, I will pay reasonable collection fees and costs, plus court costs and attorney's fees associated with collection of the debt.

### Grace Period

My Direct Consolidation Loan will receive a grace period if I meet all of the following conditions: (1) I have at least one William D. Ford Federal Direct Loan (Direct Loan) Program loan or attend a Direct Loan school, (2) at least one Direct Loan or Federal Family Education Loan (FFEL) Program loan that I am consolidating is in an in-school period, and (3) my application for a Direct Consolidation Loan is received by ED prior to the end of my in-school period. A six-month grace period begins the day after I cease to be enrolled at least half time at an eligible school. (If my enrollment status changes to less than half time after I apply but before the first disbursement of my Direct Consolidation Loan, I will not have to make payments on my Direct Consolidation Loan for the number of months remaining in my grace period at the time the first disbursement is made.)

### Repayment

Unless my Consolidation Loan is in an in-school or grace period when it is disbursed, I must select a repayment plan. If I do not select a repayment plan, ED will choose a plan for me in accordance with ED's regulations. My first payment will be due within 60 days of the first disbursement of my Direct Consolidation Loan unless it is in an in-school, grace, or deferment period. A repayment schedule will be furnished to me and will establish repayment terms, including my payment amount and the length of my repayment period. Payments will be scheduled in monthly installments. The amount of my monthly payment may be adjusted to reflect changes in the variable interest rate. ED may adjust my repayment schedule if ED learns that any of the loans listed herein is not eligible to be consolidated. My repayment period will be up to 30 years in length, depending on the amount of my student loan indebtedness and my repayment plan. Any period for which ED has granted a deferment or forbearance will not be included in determining my repayment period.

I may prepay all or any part of the unpaid balance on my loan at any time without penalty. I agree to accept written notification of such pay off in lieu of receiving the original note.

### Acceleration and Default

At the option of ED, the entire unpaid balance shall become immediately due and payable when either of the following events occurs: (i) I make false representation that results in my receiving a loan for which I am not eligible, or (ii) I default on the loan.

The following events shall constitute a default on a loan: (i) I fail to pay the entire unpaid balance after ED has exercised its option under the preceding paragraph; or (ii) I fail to make installment payments when due, or fail to comply with other terms of the loan, and ED reasonably concludes I no longer intend to honor my repayment obligation. My failure must have persisted for at least 270 days. If I default, ED will capitalize all outstanding interest into a new principal balance.

If I default, this will be reported to national credit bureau organizations and will significantly and adversely affect my credit rating. I acknowledge that a default shall have additional adverse consequences to me as disclosed in the Borrower's Rights and Responsibilities.

Following default, the loan may at ED's option, be subject to income contingent repayment in accordance with the Act.

Any notice required to be given to me shall be effective when mailed by first class mail to the latest address that ED has for me. I will immediately notify ED of any change of my address. Failure by ED to enforce or insist on compliance with any term on this note shall not waive any right of ED. No provision of this note may be changed or waived except in writing by ED. If any provision of this note is determined to be unenforceable, the remaining provisions shall remain in force.

### Borrower Certification and Authorization

I declare under penalty of perjury that the following is true and correct:

(1)  I certify that the information provided by me and my spouse, if applicable, in this note is true, complete, and correct to the best of my knowledge and belief and is made in good faith.

(2)  I certify that I do not now owe a refund on a Federal Pell Grant, Basic Educational Opportunity Grant, Federal Supplemental Educational Opportunity Grant, or a State Student Incentive Grant, or if I owe a refund, I have made satisfactory arrangements with the holder to repay the amount owed. I further certify that I am not now in default on any loan I am consolidating or, if I am in default, I have either made a satisfactory repayment arrangement with the holder of that defaulted loan, or I will repay under the income contingent repayment plan. I understand that income contingent repayment is not available for the parent PLUS loan portion of my Direct Consolidation Loan.

(3)  I certify that all of the loans selected have been used to finance my education, my spouse's education, or my child's education.

(4)  I certify that I do not have any other application pending for a Federal Consolidation Loan with any other lender. If my student loans are in a grace or repayment period and if none of the loans I am consolidating is a Direct Loan Program loan, I further certify that I have sought and been unable to obtain a Federal Consolidation Loan from a FFEL Program lender, or a lender would not provide me with a Federal Consolidation Loan with income-sensitive repayment terms acceptable to me. If I have parent PLUS loans and none of the loans I am consolidating is a Direct Loan Program loan, I further certify that I have sought and been unable to obtain a Federal Consolidation Loan from a FFEL Program lender. If, however, I am consolidating jointly with my spouse, only one borrower, my spouse or I, must have sought a Federal Consolidation Loan from a FFEL Program lender.

(5)  I understand that this loan shall, to the extent used to discharge loans that I have selected, count against the applicable aggregate loan limits under the Act.

(6)  I understand that the amount of my Direct Consolidation Loan is the sum of the balance(s) of my outstanding eligible loan(s) that I have chosen to consolidate. My outstanding balance on each loan to be consolidated includes unpaid principal, unpaid accrued interest, and late charges as defined by federal regulations and as certified by each holder. Collection costs may also be included. For a Direct Loan or FFEL Program loan that is in default, ED limits collection costs that may be charged to the borrower to no more than those currently authorized under the FFEL Program and may impose reasonable limits on collection costs paid to the holder. If the amount ED advances to my holder(s) exceeds the amount needed to pay off the balance(s) of the selected loan(s), I understand that the holder will refund the excess to ED for application against the outstanding balance of this loan. If the amount that ED advances to my holder(s) is less than the amount needed to pay off the balance(s) of the loan(s) selected for consolidation, ED will include the remaining amount in this loan unless I pay the remaining balance myself.

(7)  I authorize ED to contact the holder(s) identified on my application to determine the eligibility and/or payoff amount for the loan(s) I have identified. I further authorize release to ED or its agent any information required to consolidate my education loan(s) pursuant to the Act.

(8)  I authorize ED to issue the proceeds of my Direct Consolidation Loan to the holder(s) of the loan(s) so selected to discharge the debt.

(9)  I authorize ED to investigate the credit record and report information concerning my loan status to proper persons and organizations authorized to receive this information.

(10)  I authorize the release of information pertinent to this loan: (i) by my school(s) and ED, to members of my immediate family unless I submit written direction otherwise; and (ii) by and amongst my school(s), ED, and their agents.

(11)  I authorize my school(s), ED, and their agents, to verify my social security number with the Social Security Administration (SSA) and, if the number on my loan record is incorrect, then I authorize SSA to disclose my correct social security number to these parties.

Pfeiffer—Gov't Production (Nov. 2007) —001871

# Direct Loans
William D. Ford Federal Direct Loan Program

## Federal Direct Consolidation Loan
### Additional Loan Listing Sheet

**WARNING:** Any person who knowingly makes a false statement or misrepresentation on this form shall be subject to penalties which may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. 1097.

OMB No. 1845-0053
Form Approved
Exp. Date 1/31/2005

Borrower's Name _____

Borrower's Social Security Number _____

**Section D: Education Loan Indebtedness (continued)**

Use this form only if you need additional space to list loans in Section D. Refer to the instructions for Items 25-30 when completing this form. Be sure to attach this form to your application and promissory note when you submit it.

| 25. Loan Holder/Servicer's Name, Address, and Area Code/Telephone Number | 26. Loan Type | 27. B=Borrower S=Spouse J=Joint | 28. Account Number | 29. Current Balance | 30. To Be Consolidated? Yes | No |
|---|---|---|---|---|---|---|
| ( ) | | | | | | |
| ( ) | | | | | | |
| ( ) | | | | | | |
| ( ) | | | | | | |
| ( ) | | | | | | |

Pfeiffer--Gov't Production (Nov. 2007) --001875

EXHIBIT #5
Pfeiffer v Spelling
C.A. #1:07cv00522 (EGS)



# Direct Loans
William D. Ford Federal Direct Loan Program

## Federal Direct Consolidation Loan
## Promissory Note

**WARNING:** Any person who knowingly makes a false statement or misrepresentation on this form shall be subject to penalties which may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. 1097.

OMB No. 1840-0693
Form Approved
Exp. Date 1/31/99

### Section A: Borrower Information (Completed by U.S. Department of Education)

If any of the preprinted personal information is incorrect, check here ☐, put a line through any incorrect information, enter it correctly below, and initial the correction.

Borrower's SSN

Spouse's SSN (if applicable)

Borrower's Name _____

Spouse's Name (if applicable) _____

Permanent Street Address _____

City, State, Zip Code _____

Home Area Code / Telephone Number ( ) _____

### Section B: Loans Consolidated

| Loan Identification Number | Loan Type | Amount |
|---|---|---|
| XXXXXXXXXX | Direct Subsidized Consolidation Loan | $ XXXX.XX |
| XXXXXXXXXX | Direct Unsubsidized Consolidation Loan | $ XXXX.XX |
| XXXXXXXXXX | Direct PLUS Consolidation Loan | $ XXXX.XX |
| **TOTAL** | **Direct Consolidation Loan** | $ XXXX.XX |

### Section C: Promissory Note (Continued on reverse side)     To be completed and signed by borrower and spouse, if applicable.

**Promise to Pay:**

I promise to pay to the U.S. Department of Education (ED) all sums (hereafter "loan" or "loans") disbursed under the terms of this Promissory Note to discharge my prior loan obligations, plus interest, and other fees that may become due as provided in this Promissory Note. If I fail to make payments on this Promissory Note when due, I will also pay collection costs including attorney's fees and court costs. I understand that ED will on my behalf send funds to the holder(s) of the loan(s) in order to pay off this loan(s). I further understand that the amount of this loan equals the sum of the amount(s) that the holder(s) of the loan(s) verified as the payoff balance(s) on that loan(s) selected for consolidation. My signature on this Promissory Note will serve as my authorization to pay off the balance(s) of the loan(s) selected for consolidation as provided by the holder(s) of such loan(s).

I understand that the total amount of this loan may exceed the amounts listed above under Loans Consolidated if I do not continue to make monthly payments to my current loan holder(s) until the time I am notified that my Federal Direct Consolidation Loan has been made or because of collection costs or additional interest that may accrue after the date this Promissory Note was prepared. I understand that I am obligated to repay these additional amounts under the terms of this Promissory Note.

I understand that this is a Promissory Note. I will not sign this Promissory Note before reading it, including the text on the reverse side, even if I am advised not to read the Promissory Note. I am entitled to an exact copy of this Promissory Note and a statement of the Borrower's Rights and Responsibilities. My signature certifies that I have read, understand, and agree, to the terms and conditions of this Promissory Note, including the Borrower Certification and Authorization printed on the reverse side and the accompanying Borrower's Rights and Responsibilities.

If consolidating jointly with my spouse, we agree to the same terms and conditions contained in the Borrower Certification and Authorization. In addition, we confirm that we are legally married to each other and understand and agree that we are and will continue to be held jointly and severally liable for the entire amount of the debt represented by the Federal Direct Consolidation Loan without regard to the amounts of our individual loan obligations that are consolidated and without regard to any change that may occur in our marital status. We understand that this means that one of us may be required to pay the entire amount due if the other is unable or refuses to pay. We understand that the Federal Direct Consolidation Loan we are applying for will be cancelled only if both of us qualify for cancellation. We further understand that we may postpone repayment of the loan only if we provide ED with a written request that confirms Federal Direct Consolidation Loan Program deferment or forbearance eligibility for both of us.

## I UNDERSTAND THAT THIS IS A FEDERAL LOAN THAT I MUST REPAY.

Signature of Borrower _____     Date _____

Signature of Spouse (if consolidating jointly) _____     Date _____

PLAINTIFF'S DEPOSITION EXHIBIT

## Promissory Note (continued)

**Governing Law and Notices**

This promissory note (note) applies to Federal Direct Consolidation Loans (Direct Consolidation Loans). In this note, the Higher Education Act of 1965, as amended, 20 U.S.C. 1070 et seq., and applicable U.S. Department of Education (ED) regulations are referred to as "the Act." The terms of this note will be interpreted according to the Act and other applicable federal statutes and regulations. Applicable state law, except as preempted by federal law, may provide for certain borrower rights, remedies, and defenses in addition to those stated in this note.

**Disclosure of Terms**

When the loan(s) that I am consolidating is paid off, I will be sent a Disclosure Statement and Repayment Schedule (disclosure). The disclosure will identify my Direct Consolidation Loan amount and additional terms of my loan. If I have questions about the information disclosed, I will contact ED. If the information in this note conflicts with the information in the disclosure, the disclosure will be controlling. The information in the disclosure statement will be different from this note if the loan(s) being consolidated is not paid off on the anticipated disbursement date.

Important additional terms of this loan are disclosed in the statement of Borrower's Rights and Responsibilities accompanying this note.

I understand that my Direct Consolidation Loan may consist of up to three separate loan identification numbers depending on the loans I choose to consolidate. These loan identification numbers will represent prior subsidized loans, prior unsubsidized loans, and prior PLUS loans. The Borrower's Rights and Responsibilities identifies which eligible loans are included in each of these categories. Each applicable loan identification number is represented by this note.

Except for interest ED does not charge me during an authorized deferment or grace period, I agree to pay interest on the principal amount of my Direct Consolidation Loan from the date of disbursement until the loan is paid in full or discharged.

ED may add interest that accrues but is not paid when due to the unpaid principal balance of this loan. This is called capitalization.

**Interest**

If my Direct Consolidation Loan includes a loan identification number that represents previous Federal PLUS loans, the interest rate for that portion of the loan during any 12-month period beginning on July 1 and ending on June 30, is determined on the preceding June 1 and is equal to the bond equivalent rate of 52-week Treasury bills auctioned at the final auction held prior to such June 1 plus 3.1 percentage points, but shall not exceed 9 percent.

If my Direct Consolidation Loan includes loan identification numbers that represent previous loans other than Federal PLUS loans, and I am in repayment, the interest rate for that portion of the loan during any 12-month period beginning on July 1 and ending on June 30, is determined on the preceding June 1 and is equal to the bond equivalent rate of 91-day Treasury bills auctioned at the final auction held prior to such June 1 plus 3.1 percentage points, but shall not exceed 8.25 percent.

If my Direct Consolidation Loan includes loan identification numbers that represent previous loans other than Federal PLUS loans, and I am in an authorized period of deferment, the interest rate for that portion of the loan during any 12-month period beginning on July 1 and ending on June 30, is determined on the preceding June 1 and is equal to the bond equivalent rate of 91-day Treasury bills auctioned at the final auction held prior to such June 1 plus 2.5 percentage points, but shall not exceed 8.25 percent.

If my Direct Consolidation Loan includes loan identification numbers that represent previous loans other than Federal PLUS loans and a loan in an in-school period, and I am not yet in repayment, the interest rate for that portion of the loan during any 12-month period beginning on July 1 and ending on June 30, is determined on the preceding June 1 and is equal to the bond equivalent rate of 91-day Treasury bills auctioned at the final auction held prior to such June 1 plus 2.5 percentage points, but shall not exceed 8.25 percent.

**Late Charges and Collection Costs**

If I fail to make any part of an installment payment within 30 days after it becomes due, ED may collect from me a late charge that will not exceed six cents for each dollar of each late installment. If I default on the loan, I will pay reasonable collection fees and costs, plus court costs and attorney's fees associated with collection of the debt.

**Grace Period**

My Direct Consolidation Loan will receive a grace period if at least one William D. Ford Federal Direct Loan (Direct Loan) Program or Federal Family Education Loan (FFEL) Program loan that I am consolidating is in an in-school period and my application for a Direct Consolidation Loan is received by ED prior to the end of my in-school period. A six-month grace period begins the day after I cease to be enrolled at least half time at an eligible school.

**Repayment**

Unless I am in school when my Direct Consolidation Loan is disbursed, I will be asked to select a repayment plan. If I do not select a repayment plan, ED will choose a plan for me in accordance with ED's regulations. My first payment will be due within 60 days of the first disbursement of my Direct Consolidation Loan unless I am eligible for a deferment or my Direct Consolidation Loan includes at least one Direct Loan or FFEL Program loan for which I am in an in-school period. A repayment schedule will be furnished to me and will establish repayment terms, including my payment amount and the length of the repayment period. Payments will be scheduled in monthly installments. ED may adjust my repayment schedule if ED learns that any of the loans listed herein is not eligible to be consolidated. My repayment period will be up to 30 years in length, depending on the amount of my student loan indebtedness and my repayment plan. Any period for which ED has granted a deferment or forbearance will not be included in determining the repayment period.

I may prepay all or any part of the unpaid balance on my loan at any time without penalty.

**Acceleration and Default**

At the option of ED, the entire unpaid balance shall become immediately due and payable when any one of the following events occurs: (i) I make false representation that results in my receiving a loan for which I am not eligible, or (ii) I default on the loan.

The following events shall constitute a default on a loan: (i) I fail to pay the entire unpaid balance after ED has exercised its option under the preceding paragraph; or (ii) I fail to make installment payments when due, or fail to comply with other terms of the loan, and ED reasonably concludes I no longer intend to honor my repayment obligation. My failure must have persisted for at least 180 days. If I default, ED will capitalize all outstanding interest into a new principal balance.

If I default, this will be reported to national credit bureau organizations and will significantly and adversely affect my credit rating. I acknowledge that a default shall have additional adverse consequences to me as disclosed in the statement of Borrower's Rights and Responsibilities.

Following default, the loan may at ED's option, be subject to income contingent repayment in accordance with the Act.

Any notice required to be given to me will be effective when mailed by first class mail to the latest address that ED has for me. Failure by ED to enforce or insist on compliance with any term on this note shall not waive any right of ED. No provision of this note may be changed or waived except in writing by ED. If any provision of this note is determined to be unenforceable, the remaining provisions shall remain in force.

**Borrower Certification and Authorization**

I declare under penalty of perjury that the following is true and correct:

(1) I certify that the information provided by me and my spouse, if applicable, in this note is true, complete, and correct to the best of my knowledge and belief and is made in good faith.

(2) I certify that the loan proceeds will be used solely to discharge my outstanding eligible education loan debts.

(3) I certify that I do not now owe a refund on a Federal Pell Grant, Basic Educational Opportunity Grant, Federal Supplemental Educational Opportunity Grant, or a State Student Incentive Grant. I further certify that I am not now in default on any loan that was received under the Federal Perkins Loan Program (including NDSL loans), the FFEL Program, or the Direct Loan Program, or, if I am in default, I have either made satisfactory repayment arrangements with the holder of that defaulted loan, or I am consolidating all of these loans and will repay under the income contingent repayment plan. I understand that income contingent repayment is not available for Federal Direct PLUS Consolidation Loans (Direct PLUS Consolidation Loans).

(4) I certify that all of the loans selected have been used to finance my education, my spouse's education, or my child's education.

(5) I certify that I do not have any other application pending for a Federal Consolidation Loan with any other lender. If I am not in school and if none of the loans I am consolidating is a Direct Loan Program loan, I further certify that I have sought and been unable to obtain a Federal Consolidation Loan from a FFEL Program lender, or a lender would not provide me with a Federal Consolidation Loan with income-sensitive repayment terms acceptable to me, and I am eligible for the income contingent repayment plan. If, however, I am consolidating jointly with my spouse, only one borrower, my spouse or I, must have sought a Federal Consolidation Loan from a FFEL Program lender.

(6) I understand that this loan shall, to the extent used to discharge loans that I have selected, count against the applicable aggregate loan limits under the Act.

(7) I understand that the amount of my Direct Consolidation Loan is the sum of the balance(s) of my outstanding eligible loan(s) that I have chosen to consolidate. My outstanding balance on each loan to be consolidated includes unpaid principal, unpaid accrued interest, and late charges as defined by federal regulations and as certified by each holder. Collection costs may also be included. For a Direct Loan or FFEL Program loan that is in default, ED limits collection costs that may be charged to the borrower to no more than those currently authorized under the FFEL Program and may impose reasonable limits on collection costs paid to the holder. If the amount ED advances to my holder(s) exceeds the amount needed to pay off the balance(s) of the selected loan(s), I understand that the holder will refund the excess to ED for application against the outstanding balance of this loan. If the amount that ED advances to my holder(s) is less than the amount needed to pay off the balance(s) of the loan(s) selected for consolidation, ED will include the remaining amount in this loan unless I pay the remaining balance myself.

(8) I authorize ED to issue the proceeds of my Direct Consolidation Loan to the holder(s) of the loan(s) so selected to discharge the debt.

(9) I authorize ED to investigate my credit record and report information concerning my loan status to proper persons and organizations authorized to receive this information.

(10) I authorize the release of information pertinent to this loan: (i) by my school(s) and ED, to members of my immediate family unless I submit written direction otherwise; and (ii) by and amongst my school(s), ED, and their agents.

(11) I authorize my school(s), ED, and their agents, to verify my social security number with the Social Security Administration (SSA) and, if the number on my loan record is incorrect, then I authorize SSA to disclose my correct social security number to these parties.

EXHIBIT #6
Pfeiffer v Spelling
C.A. #1:07cv00522 (EGS)

# Direct Loans
William D. Ford Federal Direct Loan Program

## Federal Direct Consolidation Loan
### Application and Promissory Note

WARNING: Any person who knowingly makes a false statement or misrepresentation on this form shall be subject to penalties which may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. 1097.

OMB No. 1845-0053
Form Approved
Exp. Date 1/31/2005

This form should be printed in blue or black ink or typewritten and must be signed and dated by the applicant(s). If you cross out anything and write in new information, put your initials beside the change.

| | |
|---|---|
| 1. Last Name        First Name        Middle Initial | 2. Social Security Number |
| 3. Permanent Street Address (if P.O. box, see instructions) | 4. Home Area Code/Telephone Number ( ) |
| City        State        Zip Code | 5. Fax Number (Optional) ( ) |
| | 6. E-Mail Address (Optional) |
| 7. Former Name(s) | 8. Date of Birth | 9. Driver's License Number (put state abbreviation first) ( ) |
| 10. Employer's Name | 11. Employer's Address |
| 12. Employer's Area Code/Telephone Number ( ) | City        State        Zip Code |

13. If you are married, does your spouse have an eligible loan(s) (see instructions) that you want to consolidate with your loan(s)?    Yes ☐    No ☐
If yes, complete Section C, include your spouse's loan(s) in Section D, and have your spouse sign and date Item 32 in Section F.

14. References: Enter the requested information for two relatives or acquaintances who do not live with you and who have known you for at least three years. References may not live outside the United States.

Name                    1._____    2._____

Permanent Address       _____        _____

City, State, Zip Code   _____        _____

Area Code/Telephone Number ( )    _____    ( )    _____

| | |
|---|---|
| 15. Last Name        First Name        Middle Initial | 16. Social Security Number |
| 17. Date of Birth | 18. Driver's License Number (put state abbreviation first) ( ) | 19. Fax Number (Optional) ( ) |
| 20. Former Name(s) | 21. E-Mail Address (Optional) |
| 22. Employer's Name | 23. Employer's Address |
| 24. Employer's Area Code and Telephone Number ( ) | City        State        Zip Code |



Page 1

Pfeiffer—Gov't Production (Nov. 2007) –001583

**Borrower's Name**_____

**Borrower's Social Security Number**_____

| 25. Loan Holder/Servicer's Name, Address, and Area Code/Telephone Number | 26. Loan Type | 27. B=Borrower S=Spouse J=Joint | 28. Account Number | 29. Current Balance | 30. To Be Consolidated? Yes    No | |
|---|---|---|---|---|---|---|
| (    ) | | | | | | |
| (    ) | | | | | | |
| (    ) | | | | | | |
| (    ) | | | | | | |
| (    ) | | | | | | |
| (    ) | | | | | | |
| (    ) | | | | | | |
| (    ) | | | | | | |

Borrower's Name_____

Borrower's Social Security Number_____

Section E: Repayment Plan Selection

Carefully read the repayment plan information in "Direct Consolidation Loans" that accompanies this application and promissory note to understand your repayment plan options. Then, complete this section to select your repayment plan. Remember--

- All student loans must be repaid under the same repayment plan. Parent PLUS loans may be repaid under a different repayment plan.
- If you select the Income Contingent Repayment Plan, you must complete the "Repayment Plan Selection" and "Income Contingent Repayment Plan Consent to Disclosure of Tax Information" forms that accompany this application and promissory note. Your selection cannot be processed without these forms.
- **If you want to consolidate a defaulted student loan(s) and you have not made a satisfactory repayment arrangement with your current holder(s), you must select the Income Contingent Repayment Plan.**

31. Place an "X" in the box that corresponds to your repayment plan selection for each loan type. Note that Direct PLUS Consolidation Loans cannot be repaid under the Income Contingent Repayment Plan.

| | Income Contingent | Standard | Extended | Graduated |
|---|---|---|---|---|
| **STUDENT LOANS** *Direct Subsidized and Unsubsidized Consolidation Loans* | ☐ | ☐ | ☐ | ☐ |
| **PARENT LOANS**   *Direct PLUS Consolidation Loans* | Not Available | ☐ | ☐ | ☐ |

Section F: Promissory Note

**Promise to Pay:**

I promise to pay to the U.S. Department of Education (ED) all sums (hereafter "loan" or "loans") disbursed under the terms of this Promissory Note (note) to discharge my prior loan obligations, plus interest, and other fees that may become due as provided in this note. If I fail to make payments on this note when due, I will also pay collection costs including but not limited to attorney's fees and court costs. If ED accepts my application, I understand that ED will on my behalf send funds to the holder(s) of the loan(s) selected for consolidation in order to pay off this loan(s). I further understand that the amount of this loan will equal the sum of the amount(s) that the holder(s) of the loan(s) verified as the payoff balance(s) on that loan(s) selected for consolidation. My signature on this note will serve as my authorization to pay off the balance(s) of the loan(s) selected for consolidation as provided by the holder(s) of such loan(s).

This amount may be more or less than the estimated total balance I have indicated in Section D. Further, I understand that if any collection costs are owed on the loans selected for consolidation, these costs may be added to the principal balance of the consolidation loan.

I understand that this is a Promissory Note. I will not sign this note before reading it, including the text on the reverse side, even if I am advised not to read the note. I am entitled to an exact copy of this note and a statement of the Borrower's Rights and Responsibilities. My signature certifies that I have read, understand, and agree, to the terms and conditions of this note, including the Borrower Certification and Authorization printed on the reverse side and the accompanying Borrower's Rights and Responsibilities.

If consolidating jointly with my spouse, we agree to the same terms and conditions contained in the Borrower Certification and Authorization. In addition, we confirm that we are legally married to each other and understand and agree that we are and will continue to be held jointly and severally liable for the entire amount of the debt represented by the Federal Direct Consolidation Loan without regard to the amounts of our individual loan obligations that are consolidated and without regard to any change that may occur in our marital status. We understand that this means that one of us may be required to pay the entire amount due if the other is unable or refuses to pay. We understand that the Federal Direct Consolidation Loan we are applying for will be cancelled only if both of us qualify for cancellation. We further understand that we may postpone repayment of the loan only if we provide ED with written requests that confirm Federal Direct Consolidation Loan Program deferment or forbearance eligibility for both of us at the same time.

**I UNDERSTAND THAT THIS IS A FEDERAL LOAN THAT I MUST REPAY.**

32. Signature of Borrower _____Date _____

Signature of Spouse (if consolidating jointly) _____Date _____

## Promissory Note (continued)

### Governing Law and Notices

This Promissory Note (note) applies to Federal Direct Consolidation Loans (Direct Consolidation Loans). In this note, the Higher Education Act of 1965, as amended, 20 U.S.C. 1070 et seq., and applicable U.S. Department of Education (ED) regulations are referred to as "the Act." The terms of this note will be interpreted according to the Act and other applicable federal statutes and regulations. Applicable state law, except as preempted by federal law, may provide for certain borrower rights, remedies, and defenses in addition to those stated in this note.

### Disclosure of Terms

When the loan(s) that I am consolidating is paid off, I will be sent a Disclosure Statement and Repayment Schedule (disclosure). The disclosure will identify my Direct Consolidation Loan amount and additional terms of my loan. If I have questions about the information disclosed, I will contact ED. If the information in this note conflicts with the information in the disclosure, the disclosure will be controlling.

Important additional terms of this loan are disclosed in the statement of Borrower's Rights and Responsibilities accompanying this note.

I understand that my Direct Consolidation Loan may consist of up to three separate loan identification numbers depending on the loan(s) I choose to consolidate. These loan identification numbers will represent prior subsidized loans, prior unsubsidized loans, and prior parent PLUS loans. The Borrower's Rights and Responsibilities identifies which eligible loans are included in each of these categories. Each applicable loan identification number is represented by this note.

### Interest

Except for interest ED does not charge me during an in-school, grace, or deferment period, I agree to pay interest on the principal amount of my Direct Consolidation Loan from the date of disbursement until the loan is paid in full or discharged. ED may add interest that accrues but is not paid when due to the unpaid principal balance of this loan, as provided under the Act. This is called capitalization.

Interest will be calculated according to the applicable formulas provided for by the Act.

The interest rate on my Direct Consolidation Loan will be based on the weighted average of the interest rates on the loans being consolidated, rounded to the nearest higher one-eighth of one percent, but shall not exceed 8.25%. This is a fixed interest rate, which means that the rate will remain the same throughout the life of the loan.

### Late Charges and Collection Costs

If I fail to make any part of an installment payment within 30 days after it becomes due, ED may collect from me a late charge that will not exceed six cents for each dollar of each late installment. If I default on the loan, I will pay reasonable collection fees and costs, plus court costs and attorney's fees associated with collection of the debt.

### Grace Period

My Direct Consolidation Loan will receive a grace period if I meet all of the following conditions: (1) I have at least one William D. Ford Federal Direct Loan (Direct Loan) Program loan or attend a Direct Loan school, (2) at least one Direct Loan or Federal Family Education Loan (FFEL) Program loan that I am consolidating is in an in-school period, and (3) my application for a Direct Consolidation Loan is received by ED prior to the end of my in-school period. A six-month grace period begins the day after I cease to be enrolled at least half time at an eligible school. (If my enrollment status changes to less than half time after I apply but before the first disbursement of my Direct Consolidation Loan, I will not have to make payments on my Direct Consolidation Loan for the number of months remaining in my grace period at the time the first disbursement is made.)

### Repayment

Unless my Direct Consolidation Loan is in an in-school or grace period when it is disbursed, I must select a repayment plan. If I do not select a repayment plan, ED will choose a plan for me in accordance with ED's regulations. My first payment will be due within 60 days of the first disbursement of my Direct Consolidation Loan unless it is in an in-school, grace, or deferment period. A repayment schedule will be furnished to me and will establish repayment terms, including my payment amount and the length of my repayment period. Payments will be scheduled in monthly installments. The amount of my monthly payment may be adjusted to reflect changes in the variable interest rate. ED may adjust my repayment schedule if ED learns that any of the loans listed herein is not eligible to be consolidated. My repayment period will be up to 30 years in length, depending on the amount of my student loan indebtedness and my repayment plan. Any period for which ED has granted a deferment or forbearance will not be included in determining my repayment period.

I may prepay all or any part of the unpaid balance on my loan at any time without penalty. I agree to accept written notification of such pay off in lieu of receiving the original note.

### Acceleration and Default

At the option of ED, the entire unpaid balance shall become immediately due and payable when either of the following events occurs: (i) I make false representation that results in my receiving a loan for which I am not eligible, or (ii) I default on the loan.

The following events shall constitute a default on a loan: (i) I fail to pay the entire unpaid balance after ED has exercised its option under the preceding paragraph; or (ii) I fail to make installment payments when due, or fail to comply with other terms of the loan, and ED reasonably concludes I no longer intend to honor my repayment obligation. My failure must have persisted for at least 270 days. If I default, ED will capitalize all outstanding interest into a new principal balance.

If I default, this will be reported to national credit bureau organizations and will significantly and adversely affect my credit rating. I acknowledge that a default shall have additional adverse consequences to me as disclosed in the Borrower's Rights and Responsibilities.

Following default, the loan may at ED's option, be subject to income contingent repayment in accordance with the Act.

Any notice required to be given to me will be effective when mailed by first class mail to the latest address that ED has for me. I will immediately notify ED of any change in my address. Failure by ED to enforce or insist on compliance with any term on this note shall not waive any right of ED. No provision of this note may be changed or waived except in writing by ED. If any provision of this note is determined to be unenforceable, the remaining provisions shall remain in force.

### Borrower Certification and Authorization

I declare under penalty of perjury that the following is true and correct:

(1) I certify that the information provided by me and my spouse, if applicable, in this note is true, complete, and correct to the best of my knowledge and belief and is made in good faith.

(2) I certify that I do not owe a refund on a Federal Pell Grant, Basic Educational Opportunity Grant, Federal Supplemental Educational Opportunity Grant, or a State Student Incentive Grant, or if I owe a refund, I have made satisfactory arrangements with the holder to repay the amount owed. I further certify that I am not now in default on any loan I am consolidating or, if I am in default, I have either made a satisfactory repayment arrangement with the holder of that defaulted loan, or I will repay under the income contingent repayment plan. I understand that income contingent repayment is not available for the parent PLUS loan portion of my Direct Consolidation Loan.

(3) I certify that all of the loans selected have been used to finance my education, my spouse's education, or my child's education.

(4) I certify that I do not have any other application pending for a Federal Consolidation Loan with any other lender. If my student loans are in a grace or repayment period and if none of the loans I am consolidating is a Direct Loan Program loan, I further certify that I have sought and been unable to obtain a Federal Consolidation Loan from a FFEL Program lender, or a lender would not provide me with a Federal Consolidation Loan with income-sensitive repayment terms acceptable to me. For a parent PLUS loans and none of the loans I am consolidating is a Direct Loan Program loan, I further certify that I have sought and been unable to obtain a Federal Consolidation Loan from a FFEL Program lender. If, however, I am consolidating jointly with my spouse, only one borrower, my spouse or I, must have sought a Federal Consolidation Loan from a FFEL Program lender.

(5) I understand that this loan shall, to the extent used to discharge loans that I have selected, count against the applicable aggregate loan limits under the Act.

(6) I understand that the amount of my Direct Consolidation Loan is the sum of the balance(s) of my outstanding eligible loan(s) that I have chosen to consolidate. My outstanding balance on each loan to be consolidated includes unpaid principal, unpaid accrued interest, and late charges as defined by federal regulations and as certified by each holder. Collection costs may also be included. For a Direct Loan or FFEL Program loan that is in default, ED limits collection costs that may be charged to the borrower to no more than those currently authorized under the FFEL Program and may impose reasonable limits on collection costs paid to the holder. If the amount ED advances to my holder(s) exceeds the amount needed to pay off the balance(s) of the selected loan(s), I understand that the holder will refund the excess to ED for application against the outstanding balance of this loan. If the amount that ED advances to my holder(s) is less than the amount needed to pay off the balance(s) of the loan(s) selected for consolidation, ED will include the remaining amount in this loan unless I pay the remaining balance myself.

(7) I authorize ED to contact the holder(s) identified on my application to determine the eligibility and/or payoff amount for the loan(s) I have identified. I further authorize release to ED or its agent any information required to consolidate my education loan(s) pursuant to the Act.

(8) I authorize ED to issue the proceeds of my Direct Consolidation Loan to the holder(s) of the loan(s) so selected to discharge the debt.

(9) I authorize ED to investigate my credit record and report information concerning my loan status to proper persons and organizations authorized to receive this information.

(10) I authorize the release of information pertinent to this loan: (i) by my school(s) and ED, to members of my immediate family unless I submit written direction otherwise; and (ii) by and amongst my school(s), ED, and their agents.

(11) I authorize my school(s), ED, and their agents, to verify my social security number with the Social Security Administration (SSA) and, if the number on my loan record is incorrect, then I authorize SSA to disclose my correct social security number to these parties.

Pfeiffer—Gov't Production (Nov. 2007) --001586

EXHIBIT #7
Pfeiffer v Spelling
C.A. #1:07cv00522 (EGS)

# Direct Loans
William D. Ford Federal Direct Loan Program

## Federal Direct Consolidation Loan
## Application and Promissory Note

**WARNING:** Any person who knowingly makes a false statement or misrepresentation on this form shall be subject to penalties which may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. 1097.

| OMB No. 1840-0693 |
| --- |
| Form Approved |
| Exp. Date 3/31/99 |

### Before You Begin

This form should be printed in blue or black ink or typewritten and must be signed and dated by the applicant(s). If you cross out anything and write in new information, put your initials beside the change.

### Section A: Borrower Information

| 1. Last Name | First Name | Middle Initial | 2. Social Security Number |
| --- | --- | --- | --- |

| 3. Permanent Street Address (if P.O. box, see instructions) | 4. Home Area Code/Telephone Number ( ) |
| --- | --- |

| City | State | Zip Code | 5. Fax Number (Optional) ( ) |
| --- | --- | --- | --- |

| 6. Former Name(s) | 7. Date of Birth | 8. Driver's License Number (put state abbreviation first) ( ) |
| --- | --- | --- |

| 9. Employer's Name | 10. Employer's Address |
| --- | --- |

| 11. Employer's Area Code/Telephone Number ( ) | City | State | Zip Code |
| --- | --- | --- | --- |

12. If you are married, does your spouse have an eligible loan(s) (see instructions) that you want to consolidate with your loan(s)?  Yes ☐  No ☐
    If yes, complete Section C, include your spouse's loan(s) in Section D, and have your spouse sign and date Item 30 in Section F.

### Section B: Reference Information

13. References: Enter the requested information for two relatives or acquaintances who do not live with you and who have known you for at least three years. References may not live outside the United States.

| | 1. | 2. |
| --- | --- | --- |
| Name | _____ | _____ |
| Permanent Address | _____ | _____ |
| City, State, Zip Code | _____ | _____ |
| Area Code/Telephone Number | ( ) _____ | ( ) _____ |

### Section C: Spouse Information      To be completed only if you responded "Yes" to Item 12.

| 14. Last Name | First Name | Middle Initial | 15. Social Security Number |
| --- | --- | --- | --- |

| 16. Date of Birth | 17. Driver's License Number (put state abbreviation first) ( ) |
| --- | --- |

| 18. Former Name(s) | 19. Fax Number (Optional) ( ) |
| --- | --- |

| 20. Employer's Name | 21. Employer's Address |
| --- | --- |

| 22. Employer's Area Code and Telephone Number ( ) | City | State | Zip Code |
| --- | --- | --- | --- |

PLAINTIFF'S DEPOSITION
EXHIBIT

Pfeiffer—Gov't Production (Nov. 2007) —001579

Borrower's Name_____

Borrower's Social Security Number_____

| 23. Loan Holder/Servicer's Name, Address, and Area Code/Telephone Number | 24. Loan Type | 25. B=Borrower S=Spouse J=Joint | 26. Account Number | 27. Current Balance | 28. To Be Consolidated? Yes | No |
|---|---|---|---|---|---|---|
| (          ) | | | | | | |
| (          ) | | | | | | |
| (          ) | | | | | | |
| (          ) | | | | | | |
| (          ) | | | | | | |
| (          ) | | | | | | |
| (          ) | | | | | | |
| (          ) | | | | | | |

Pfeiffer–Govt Production (Nov. 2007) –001580

Borrower's Name _____

Borrower's Social Security Number _____

## Section E: Repayment Plan Selection

Carefully read the repayment plan information in "Direct Consolidation Loans" that accompanies this application and promissory note to understand your repayment plan options. Then, complete this section to select your repayment plan. Remember--

- All student loans must be repaid under the same repayment plan. Parent PLUS loans may be repaid under a different repayment plan.
- If you select the Income Contingent Repayment Plan, you must complete the "Repayment Plan Selection" and "Income Contingent Repayment Plan Consent to Disclosure of Tax Information" forms that accompany this application and promissory note. Your selection cannot be processed without these forms.
- **If you want to consolidate a defaulted student loan(s) and you have not made a satisfactory repayment arrangement with your current holder(s), you must select the Income Contingent Repayment Plan.**

29. Place an "X" in the box that corresponds to your repayment plan selection for each loan type. Note that Direct PLUS Consolidation Loans cannot be repaid under the Income Contingent Repayment Plan.

|  | Income Contingent | Standard | Extended | Graduated |
|---|---|---|---|---|
| **STUDENT LOANS** *Direct Subsidized and Unsubsidized Consolidation Loans* | ☐ | ☐ | ☐ | ☐ |
| **PARENT LOANS** *Direct PLUS Consolidation Loans* | Not Available | ☐ | ☐ | ☐ |

## Section F: Promissory Note (Continued on reverse side)    *To be completed and signed by borrower and spouse, if applicable*

**Promise to Pay:**

I promise to pay to the U.S. Department of Education (ED) all sums (hereafter "loan" or "loans") disbursed under the terms of this Promissory Note (note) to discharge my prior loan obligations, plus interest, and other fees that may become due as provided in this note. If I fail to make payments on this note when due, I will also pay collection costs including but not limited to attorney's fees and court costs. If ED accepts my application, I understand that ED will on my behalf send funds to the holder(s) of the loan(s) selected for consolidation in order to pay off this loan(s). I further understand that the amount of this loan will equal the sum of the amount(s) that the holder(s) of the loan(s) verified as the payoff balance(s) on that loan(s) selected for consolidation. My signature on this note will serve as my authorization to pay off the balance(s) of the loan(s) selected for consolidation as provided by the holder(s) of such loan(s).

This amount may be more or less than the estimated total balance I have indicated in Section D. Further, I understand that if any collection costs are owed on the loans selected for consolidation, these costs may be added to the principal balance of the consolidation loan.

I understand that this is a Promissory Note. I will not sign this note before reading it, including the text on the reverse side, even if I am advised not to read the note. I am entitled to an exact copy of this note and a statement of the Borrower's Rights and Responsibilities. My signature certifies that I have read, understand, and agree, to the terms and conditions of this note, including the Borrower Certification and Authorization printed on the reverse side and the accompanying Borrower's Rights and Responsibilities.

If consolidating jointly with my spouse, we agree to the same terms and conditions contained in the Borrower Certification and Authorization. In addition, we confirm that we are legally married to each other and understand and agree that we are and will continue to be held jointly and severally liable for the entire amount of the debt represented by the Federal Direct Consolidation Loan without regard to the amounts of our individual loan obligations that are consolidated and without regard to any change that may occur in our marital status. We understand that this means that one of us may be required to pay the entire amount due if the other is unable or refuses to pay. We understand that the Federal Direct Consolidation Loan we are applying for will be cancelled only if both of us qualify for cancellation. We further understand that we may postpone repayment of the loan only if we provide ED with written requests that confirm Federal Direct Consolidation Loan Program deferment or forbearance eligibility for both of us at the same time.

# I UNDERSTAND THAT THIS IS A FEDERAL LOAN THAT I MUST REPAY.

30. Signature of Borrower _____ Date _____

Signature of Spouse (if consolidating jointly) _____ Date _____

Pfeiffer--Gov't Production (Nov. 2007) --001581

## Promissory Note (continued)

### Governing Law and Notices

This Promissory Note (note) applies to Federal Direct Consolidation Loans (Direct Consolidation Loans). In this note, the Higher Education Act of 1965, as amended, 20 U.S.C. 1070 et seq., and applicable U.S. Department of Education (ED) regulations are referred to as "the Act." The terms of this note will be interpreted according to the Act and other applicable federal statutes and regulations. Applicable state law, except as preempted by federal law, may provide for certain borrower rights, remedies, and defenses in addition to those stated in this note.

### Disclosure of Terms

When the loan(s) that I am consolidating is paid off, I will be sent a Disclosure Statement and Repayment Schedule (disclosure). The disclosure will identify my Direct Consolidation Loan amount and additional terms of my loan. If I have questions about the information disclosed, I will contact ED. If the information in this note conflicts with the information in the disclosure, the disclosure will be controlling.

Important additional terms of this loan are disclosed in the statement of Borrower's Rights and Responsibilities accompanying this note.

I understand that my Direct Consolidation Loan may consist of up to three separate loan identification numbers depending on the loan(s) I choose to consolidate. These loan identification numbers will represent prior subsidized loans, prior unsubsidized loans, and prior parent PLUS loans. The Borrower's Rights and Responsibilities identifies which eligible loans are included in each of these categories. Each applicable loan identification number is represented by this note.

### Interest

Except for interest ED does not charge me during an in-school, grace, or deferment period, I agree to pay interest on the principal amount of my Direct Consolidation Loan from the date of disbursement until the loan is paid in full or discharged. ED may add interest that accrues but is not paid when due to the unpaid principal balance of this loan. This is called capitalization.

Interest will be calculated according to the applicable formulas provided for by the Act.

If my Direct Consolidation Loan includes previous parent PLUS loans, the interest rate for that portion of the loan during any 12-month period beginning on July 1 and ending on June 30, is determined on the preceding June 1 and is equal to the bond equivalent rate of 91-day Treasury bills auctioned at the final auction held prior to such June 1 plus 3.1 percentage points, but shall not exceed 9 percent.

If my Direct Consolidation Loan includes previous loans other than parent PLUS loans, and I am in repayment, the interest rate for that portion of the loan during any 12-month period beginning on July 1 and ending on June 30, is determined on the preceding June 1 and is equal to the bond equivalent rate of 91-day Treasury bills auctioned at the final auction held prior to such June 1 plus 2.3 percentage points, but shall not exceed 8.25 percent.

If my Direct Consolidation Loan includes previous loans other than parent PLUS loans, and I am in an in-school, grace, or deferment period, the interest rate for that portion of the loan during any 12-month period beginning on July 1 and ending on June 30, is determined on the preceding June 1 and is equal to the bond equivalent rate of 91-day Treasury bills auctioned at the final auction held prior to such June 1 plus 1.7 percentage points, but shall not exceed 8.25 percent.

### Late Charges and Collection Costs

If I fail to make any part of an installment payment within 30 days after it becomes due, ED may collect from me a late charge that will not exceed six cents for each dollar of each late installment. If I default on the loan, I will pay reasonable collection fees and costs, plus court costs and attorney's fees associated with collection of the debt.

### Grace Period

My Direct Consolidation Loan will receive a grace period if I meet all of the following conditions: (1) I have at least one other William D. Ford Federal Direct Loan (Direct Loan) Program loan or attend a Direct Loan school, (2) at least one Direct Loan or Federal Family Education Loan (FFEL) Program loan that I am consolidating is in an in-school period, and (3) my application for a Direct Consolidation Loan is received by ED prior to the end of my in-school period. A six-month grace period begins the day after I cease to be enrolled at least half time at an eligible school. (If my enrollment status changes to less than half time after I apply but before the first disbursement of my Direct Consolidation Loan, I will not have to make payments on my Direct Consolidation Loan for the number of months remaining in my grace period at the time the first disbursement is made.)

### Repayment

Unless my Direct Consolidation Loan is in an in-school or grace period when it is disbursed, I must select a repayment plan. If I do not select a repayment plan, ED will choose a plan for me in accordance with ED's regulations. My first payment will be due within 60 days of the first disbursement of my Direct Consolidation Loan unless it is in an in-school, grace, or deferment period. A repayment schedule will be furnished to me and will establish repayment terms, including my payment amount and the length of my repayment period. Payments will be scheduled in monthly installments. The amount of my monthly payment may be adjusted to reflect changes in the variable interest rate. ED may adjust my repayment schedule if ED learns that any of the loans listed herein is not eligible to be consolidated. My repayment period will be up to 30 years in length, depending on the amount of my student loan indebtedness and my repayment plan. Any period for which ED has granted a deferment or forbearance will not be included in determining my repayment period.

I may prepay all or any part of the unpaid balance on my loan at any time without penalty. I agree to accept written notification of such pay off in lieu of receiving the original note.

### Acceleration and Default

At the option of ED, the entire unpaid balance shall become immediately due and payable when either of the following events occurs: (i) I make false representation that results in my receiving a loan for which I am not eligible, or (ii) I default on the loan.

The following events shall constitute a default on a loan: (i) I fail to pay the entire unpaid balance after ED has exercised its option under the preceding paragraph; or (ii) I fail to make installment payments when due, or fail to comply with other terms of the loan, and ED reasonably concludes I no longer intend to honor my repayment obligation. My failure must have persisted for at least 180 days. If I default, ED will capitalize all outstanding interest into a new principal balance.

If I default, this will be reported to national credit bureau organizations and will significantly and adversely affect my credit rating. I acknowledge that a default shall have additional adverse consequences to me as disclosed in the Borrower's Rights and Responsibilities.

Following default, the loan may at ED's option, be subject to income contingent repayment in accordance with the Act.

Any notice required to be given to me will be effective when mailed by first class mail to the latest address that ED has for me. I will immediately notify ED of any change of my address. Failure by ED to enforce or insist on compliance with any term on this note shall not waive any right of ED. No provision of this note may be changed or waived except in writing by ED. If any provision of this note is determined to be unenforceable, the remaining provisions shall remain in force.

### Borrower Certification and Authorization

I declare under penalty of perjury that the following is true and correct:

(1) I certify that the information provided by me and my spouse, if applicable, in this note is true, complete, and correct to the best of my knowledge and belief and is made in good faith.

(2) I certify that I do not now owe a refund on a Federal Pell Grant, Basic Educational Opportunity Grant, Federal Supplemental Educational Opportunity Grant, or a State Student Incentive Grant, or if I owe a refund, I have made satisfactory arrangements with the holder to repay the amount owed. I further certify that I am not now in default on any loan I am consolidating or, if I am in default, I have either made a satisfactory repayment arrangement with the holder of that defaulted loan, or I will repay under the income contingent repayment plan. I understand that income contingent repayment is not available for the parent PLUS loan portion of my Direct Consolidation Loan.

(3) I certify that all of the loans selected have been used to finance my education, my spouse's education, or my child's education.

(4) I certify that I do not have any other application pending for a Federal Consolidation Loan with any other lender. If my student loans are in a grace or repayment period and if none of the loans I am consolidating is a Direct Loan Program loan, I further certify that I have sought and been unable to obtain a Federal Consolidation Loan from a FFEL Program lender, or a lender would not provide me with a Federal Consolidation Loan with income-sensitive repayment terms acceptable to me. If I have parent PLUS loans and none of the loans I am consolidating is a Direct Loan Program loan, I further certify that I have sought and been unable to obtain a Federal Consolidation Loan from a FFEL Program lender. If, however, I am consolidating jointly with my spouse, only one borrower, my spouse or I, must have sought a Federal Consolidation Loan from a FFEL Program lender.

(5) I understand that this loan shall, to the extent used to discharge loans that I have selected, count against the applicable aggregate loan limits under the Act.

(6) I understand that the amount of my Direct Consolidation Loan is the sum of the balance(s) of my outstanding eligible loan(s) that I have chosen to consolidate. My outstanding balance on each loan to be consolidated includes unpaid principal, unpaid accrued interest, and late charges as defined by federal regulations and as certified by each holder. Collection costs may also be included. For a Direct Loan or FFEL Program loan that is in default, ED limits collection costs that may be charged to the borrower to no more than those currently authorized under the FFEL Program and may impose reasonable limits on collection costs paid to the holder. If the amount ED advances to my holder(s) exceeds the amount needed to pay off the balance(s) of the selected loan(s), I understand that the holder will refund the excess to ED for application against the outstanding balance of this loan. If the amount that ED advances to my holder(s) is less than the amount needed to pay off the balance(s) of the loan(s) selected for consolidation, ED will include the remaining amount in this loan unless I pay the remaining balance myself.

(7) I authorize ED to contact the holder(s) identified on my application to determine the eligibility and/or payoff amount for the loan(s) I have identified. I further authorize release to ED or its agent any information required to consolidate my education loan(s) pursuant to the Act.

(8) I authorize ED to issue the proceeds of my Direct Consolidation Loan to the holder(s) of the loan(s) so selected to discharge the debt.

(9) I authorize ED to investigate my credit record and report information concerning my loan status to proper persons and organizations authorized to receive this information.

(10) I authorize the release of information pertinent to this loan: (i) by my school(s) and ED, to members of my immediate family unless I submit written direction otherwise; and (ii) by and amongst my school(s), ED, and their agents.

(11) I authorize my school(s), ED, and their agents, to verify my social security number with the Social Security Administration (SSA) and, if the number on my loan record is incorrect, then I authorize SSA to disclose my correct social security number to these parties.

EXHIBIT #8
Pfeiffer v Spelling
C.A. #1 07cv00522 (EGS)

 **William D. Ford Federal Direct Loan Program**
Federal Direct Consolidation Loan

OMB No. 1840-0693
Form Approved
Exp. Date 6/30/96

**Application Materials**

Thank you for your interest in the Federal Direct Consolidation Loan Program (Direct Consolidation Loan Program).  Enclosed you will find the following materials that you will need to apply for a Federal Direct Consolidation Loan (Direct Consolidation Loan):

- Instructions for Completing the Application and Promissory Note
- Application and Promissory Note
- Supplemental Loan Listing Sheet
- Authorization to Release Information
- Statement of Borrower's Rights and Responsibilities
- Return Envelope

Please review the instructions and other materials carefully, then complete the Application and Promissory Note, the Authorization to Release Information, and, if necessary, the Supplemental Loan Listing Sheet.  (We have provided two copies of the Application and Promissory Note and the Supplemental Loan Listing Sheet, so that you have a practice copy if necessary.)  Make a copy of these items for your records and return the originals to the U.S. Department of Education (ED) in the return envelope provided.

If you obtain a Direct Consolidation Loan, the Application and Promissory Note you complete will serve as the promissory note.  You may be assigned up to three individual loan identification numbers, depending on the loans that you are consolidating.  There will be separate loan identification numbers for the amount of the consolidation that repays subsidized loans, unsubsidized loans, and PLUS loans.  Although you may be assigned up to three separate consolidation loan identification numbers, you will only receive a single bill.

Once you have returned your application and related materials, your current loan holder(s) will be contacted to verify eligibility and obtain a payoff balance for your loan(s).  If you are consolidating a PLUS loan(s), a credit check will also be performed.  A check will be mailed to the holder(s) upon receipt of this information.  When the loan(s) has been paid off, you will be notified by ED.

Please note that this process normally takes 8 to 10 weeks, but can vary depending on how quickly your current loan holder(s) verifies your loan balance(s).  Processing will take longer if your application is incomplete, so be certain to complete all items accurately.

If you have questions about the Direct Consolidation Loan Program or need help completing any of the forms, contact the Direct Loan Servicing Center at the following address or phone numbers:

U.S. Department of Education          1 (800) 848-0982
Consolidations Department
Direct Loan Servicing Center          TDD —1 (800) 848-0983
P.O. Box 4640
Utica, NY 13504-4640

**IMPORTANT:  IF YOU ARE NOT CONSOLIDATING AT LEAST ONE DIRECT LOAN PROGRAM LOAN,** when you sign the promissory note you are certifying that you—

- **Have been unable to obtain a Federal Consolidation Loan from a FFEL Program lender**

*OR*

- **Have been unable to obtain a Federal Consolidation Loan with income-sensitive repayment terms that are acceptable to you**

If you have questions about your eligibility, contact the Direct Loan Servicing Center.



## William D. Ford Federal Direct Loan Program
Federal Direct Consolidation Loan

**Instructions for Completir
Application and Promissory Note**

### Sections A, B, and C: Borrower, Spouse, and Reference Information

*Please print neatly or type. Read the instructions carefully.*

*This form should be legibly completed in blue or black ink or typewritten and must be signed by the applicant(s). Two copies of the Application and Promissory Note and the Supplemental Loan Listing Sheet have been provided, so that you have a practice copy if necessary.*

**Note:** *Incorrect or incomplete information may cause your application to be delayed.*

**Items 1 - 8:** Enter all borrower information.

**Note:** If you have a Post Office box and a street address, you must list both in Item 3.

**Item 9:** Indicate whether you want to consolidate your loan(s) with your spouse's loan(s). See the instructions for Section D below for a list of "eligible" loans.

**Items 10-15:** Complete this section only if you answered "yes" to Item 9. Enter the requested spouse information.

**Item 16:** Enter the requested reference information for two adults who do not share a common address and who have known you for at least three years. References may not live with you or live outside the United States. If you are consolidating jointly, both references should be relatives or acquaintances who are likely to know how to contact you and your spouse.

### Section D: Education Loan Indebtedness

**Subsidized Loans:**
A   Subsidized Federal Stafford Loans
B   Guaranteed Student Loans (GSL)
C   Federal Insured Student Loans (FISL)
D   Federal Direct Stafford/Ford Loans
E   Federal Direct Subsidized Consolidation Loans
F   Federal Perkins Loans
M   National Direct Student Loans (NDSL)
N   National Defense Student Loans (NDSL)
O   Subsidized Federal Consolidation Loans

**Unsubsidized Loans:**
G   Unsubsidized Federal Stafford Loans (including Non-Subsidized Stafford Loans made prior to 10/1/92)
H   Federal Supplemental Loans for Students (SLS)
J   Unsubsidized Federal Consolidation Loans
K   Federal Direct Unsubsidized Consolidation Loans
L   Federal Direct Unsubsidized Stafford/Ford Loans
P   Auxiliary Loans to Assist Students (ALAS)
Q   Health Professions Student Loans (HPSL)

R   Health Education Assistance Loans (HEAL)
S   Federal PLUS Loans
T   Parent Loans for Undergraduate Students (PLUS)
U   Federal Direct PLUS Loans
V   Federal Direct PLUS Consolidation Loans
Y   Nursing Student Loans (NSL)
Z   Loans for Disadvantaged Students (LDS)
W   Other education loans that are ineligible for consolidation

If you are unsure of the correct information on your loans, call your holder or servicer or check your most recent correspondence from them.

**Step 1:** Begin by listing (according to instructions for Items 17-22) any eligible loan(s) from the above list that you or your spouse wish to consolidate. If you are in default on any loan(s) being consolidated, you must have made satisfactory arrangements to repay the loan or agree to repay your Federal Direct Consolidation Loan (Direct Consolidation Loan) under the Income Contingent Repayment Plan. If you are currently in school, you may consolidate only William D. Ford Federal Direct Loan (Direct Loan) Program and Federal Family Education Loan (FFEL) Program loans. The codes for these loans are: A, B, C, D, E, G, H, J, K, L, O, S, T, U, and V. (See above list.)

> NOTE: The loans listed in Steps 2 and 3 will not be included in your Direct Consolidation Loan but will be used to calculate your maximum repayment term. The amount of these loans may not exceed the total amount of the loan(s) that you are consolidating (listed in Step 1). You may not be in default as you list in Steps 2 and 3, unless you have made satisfactory repayment arrangements with the holder(s) of the loan(s). Contact the holder(s) of your loan(s) for more information about making satisfactory repayment arrangements.

**Step 2:** List any other outstanding education loan(s) that is eligible for consolidation, but that you do NOT want to consolidate, if you wish to have it considered in the calculation of your maximum repayment term.

**Step 3:** List any other outstanding education loan(s) that is not eligible for consolidation, if you wish to have it considered in the calculation of your maximum repayment term. This loan(s) must be from an institution that makes loans (such as banks, schools, or state agencies) under a public or private loan program to finance postsecondary education. A personal loan(s) from family or friends may not be listed.

**Item 17:** Enter the code (as noted in bold print in the list above) of the loan program from which you borrowed.

**Item 18:** Contact your holder or servicer to obtain the address to which a loan payoff verification certificate should be sent. Enter the appropriate name, address, and telephone number. If the loan is a Federal Perkins Loan, enter the name of the school that made the loan.

**Item 19:** Enter a "B" if the loan is yours, "S" if it is your spouse's, or "J" if it is jointly held (e.g., PLUS loans made to both parents as co-makers).

**Item 20:** Enter "Yes" if the loan has never entered repayment because you are in school. Enter "No" if the loan has entered repayment.

> NOTE: Your Direct Consolidation Loan will receive a six-month grace period if you are in an in-school period on at least one Direct Loan Program or FFEL Program loan that you are consolidating and your application is received prior to the end of your in-school period.

**Item 21:** Enter the account number for each loan. This is listed on your monthly billing statement or coupon.

**Item 22:** Enter the estimated current account balance (payoff amount) as of today's date. Include any unpaid interest and late fees. Collection costs may also be included.

**Item 23:** Indicate whether you wish to include each eligible loan in your Direct Consolidation Loan by checking "Yes" or "No."

> NOTE: If you need additional space to list all of your loans, complete the enclosed Supplemental Loan Listing Sheet and return it with your Application and Promissory Note.

*Please read the Promise to Pay, Borrower Certification and Authorization, and statement of Borrower's Rights and Responsibilities carefully before completing this section.*

*Do not make any changes to this section. Changes will void the terms and agreements of the Promissory Note. This is a legally binding contract.*

**Item 24:** Sign and date the Promissory Note in blue or black ink.

**Item 25:** If you and your spouse are jointly consolidating your loans, your spouse must also sign and date the Promissory Note.

**Note:** Signature(s) and date(s) are required. If you or your spouse (if consolidating jointly) fail to sign and date the Promissory Note, your application will not be processed.

Review all information on your Direct Consolidation Loan Application and Promissory Note. When it is complete, forward it to the Direct Loan Servicing Center. Keep a copy for your records. Remember to continue making your regularly scheduled education loan payments until your consolidation is complete. You will receive a Repayment Schedule and Disclosure Statement when the included loans are paid off. It will provide information about your new Direct Consolidation Loan and instructions on where to send your monthly payments.

Pfeiffer, Scott Declaration (Nov. 2007)  001540



# William D. Ford Federal Direct Loan Program
## Federal Direct Consolidation Loan

OMB No. 1840-0693
Form Approved
Exp. Date 6/30/96

WARNING: Any person who knowingly makes a false statement or misrepresentation on this form shall be subject to penalties which may include fines, imprisonment or both, under the U.S. Criminal Code and 20 U.S.C. 1097.

## Application and Promissory Note

### Section A: Borrower Information

1. Last Name | First Name | Middle Initial
2. Social Security Number
3. Permanent Street Address (if P.O. Box, see instructions)
4. Former Name
5. Home Area Code/Telephone Number ( )
City | State | Zip Code
6. Driver's License Number (list state abbreviation first)
7. Date of Birth
8. Employer's Name | Employer's Address | Employer's Area Code/Telephone Number ( )
City | State | Zip Code
9. Does your spouse have "eligible" loans (see instructions) that you want to consolidate with your loans? If yes, have your spouse complete Section B and include your spouse's loans in Section D. ☐ Yes ☐ No

### Section B: Spouse Information

*To be completed only if you responded "yes" to Item #9.*

10. Last Name | First Name | Middle Initial
11. Social Security Number
12. Former Name
13. Driver's License Number (List state abbreviation first)
14. Date of Birth (Month, Day, Year)
15. Employer's Name | Employer's Address | Employer's Area Code/Telephone Number ( )
City | State | Zip Code

### Section C: Reference Information

*See instructions before completing this section.*

16. References:

| | 1. | 2. |
|---|---|---|
| Name | | |
| Permanent Address | | |
| City, State, Zip Code | | |
| Area Code/Telephone Number | ( ) | ( ) |

### Section D: Education Loan Indebtedness

*See instructions before completing this section.*

| 17. Loan Type | 18. Holder/Servicer's Name, Address, and Area Code/Telephone Number | 19. B = Borrower S = Spouse J = Joint | 20. In-School Period Yes | 20. In-School Period No | 21. Account Number | 22. Current Balance | 23. To Be Consolidated Yes | 23. To Be Consolidated No |
|---|---|---|---|---|---|---|---|---|
| | ( ) | | | | | | | |
| | ( ) | | | | | | | |
| | ( ) | | | | | | | |

### Section E: Promissory Note *(Continued on reverse side)*

*To be completed by borrower and spouse, if applicable.*

**Promise to Pay:**

I promise to pay to the U.S. Department of Education (ED) all sums (hereafter "loan" or "loans") disbursed under the terms of this Promissory Note to discharge my prior loan obligations, plus interest and other fees that may become due as provided in this Promissory Note. If I fail to make payments on this Promissory Note when due, I will also pay collection costs including attorney's fees and court costs. If ED accepts this application, it is my understanding that ED will on my behalf send funds to the holder(s) who currently holds the loan(s) selected for consolidation in order to pay off this loan(s). I further understand that the amount of this loan will equal the sum of the amounts that the holders of the loans selected for consolidation verify are the payoff balances on those loans. My signature on this Promissory Note will serve as my authorization to pay off the balance(s) of the loan(s) selected for consolidation as provided by the holder(s) of such loan(s). This amount may be more or less than the estimated total balance I have indicated above. If the verified total balance on the loan(s) to be consolidated exceeds my estimate by $1,000 or more, ED will notify me before originating my loan.

I understand that this is a Promissory Note. I will not sign this Promissory Note before reading it, including the text on the reverse side, even if I am advised not to read the Promissory Note. I am entitled to an exact copy of this Promissory Note and a statement of the Borrower's Rights and Responsibilities. My signature certifies that I have read, understand, and agree, to the terms and conditions of this Promissory Note, including the Borrower Certification and Authorization printed on the reverse side and the accompanying Borrower's Rights and Responsibilities.

If applying for a loan with my spouse, we agree to the same terms and conditions contained in the Borrower Certification and Authorization. In addition, we confirm that we are legally married to each other and understand and agree that we are and will continue to be held jointly and severally liable for the entire amount of the debt represented by the Federal Direct Consolidation Loan (Direct Consolidation Loan) without regard to the amounts of our individual loan obligations that are consolidated and without regard to any change that may occur in our marital status. We understand that this means that one of us may be required to pay the entire amount due if the other is unable or refuses to pay. We understand that the Federal Direct Consolidation Loan we are applying for will be cancelled only if both of us qualify for cancellation. We further understand that we may postpone repayment of the loan only if we provide ED with a written request that confirms Federal Direct Consolidation Loan Program deferment or forbearance eligibility for both of us.

I UNDERSTAND THAT THIS IS A FEDERAL LOAN THAT I MUST REPAY.

24. Signature of Borrower ______________________ Date ____________

25. Signature of Spouse (only if Section B is completed) ______________________ Date ____________

### U.S. Department of Education Use Only

| Loan Identification Number #1 | Loan Identification Number #2 | Loan Identification Number #3 |
|---|---|---|
| | | |

# Promissory Note (continued)

**Governing Law and Notices**

This promissory note (note) applies to Federal Direct Consolidation Loans (Direct Consolidation Loans). In this note, the Higher Education Act of 1965, as amended, 20 U.S.C. 1070 et seq., and applicable U.S. Department of Education (ED) regulations are referred to as "the Act." The terms of this note will be interpreted according to the Act and other applicable federal statutes and regulations. Applicable state law, except as preempted by federal law, may provide for certain borrower rights, remedies, and defenses in addition to those stated in this note.

**Disclosure of Terms**

When the loan(s) that I am consolidating are discharged, I will be sent a Disclosure Statement and Repayment Schedule (Disclosure). The Disclosure will identify my Direct Consolidation Loan amount and other additional terms of my loan. If I have questions about the information disclosed, I will contact ED. If the information in this note conflicts with the information in the Disclosure, the Disclosure will be controlling.

Important additional terms of this loan are disclosed in the statement of Borrower's Rights and Responsibilities accompanying this note.

I understand that my Direct Consolidation Loan may consist of up to three separate loan identification numbers depending on the loans I choose to consolidate. These loan identification numbers will represent prior subsidized loans, prior unsubsidized loans, and prior PLUS loans. The Borrower's Rights and Responsibilities identifies which eligible loans is included in each of these categories. Each applicable loan identification number is represented by this note.

Except for interest ED does not charge me during an authorized deferment, I agree to pay interest on the principal amount of my Direct Consolidation Loan from the date of disbursement until the loan is paid in full or discharged.

ED may add interest that accrues but is not paid when due to the unpaid principal balance of this loan. This is called capitalization.

**Interest**

If my Direct Consolidation Loan includes a loan identification number that represents previous Federal PLUS loans (see the Borrower's Rights and Responsibilities for a complete listing of loans included under each loan identification number), the interest rate for that portion of the loan during any 12-month period beginning on July 1 and ending on June 30, is determined on the preceding June 1 and is equal to the bond equivalent rate of 52-week Treasury bills auctioned at the final auction held prior to such June 1 plus 3.1 percentage points, but shall not exceed 9 percent.

If my consolidation loan includes loan identification numbers that represent previous loans other than Federal PLUS loans, and I am in repayment, the interest rate for that portion of the loan during any 12-month period beginning on July 1 and ending on June 30, is determined on the preceding June 1 and is equal to the bond equivalent rate of 91-day Treasury bills auctioned at the final auction held prior to such June 1 plus 3.1 percentage points, but shall not exceed 8.25 percent.

If my Direct Consolidation Loan includes loan identification numbers that represent previous loans other than Federal PLUS loans, and I am not yet in repayment or am in an authorized period of deferment, the interest rate for that portion of the loan during any 12-month period beginning on July 1 and ending on June 30, is determined on the preceding June 1 and is equal to the bond equivalent rate of 91-day Treasury bills auctioned at the final auction held prior to such June 1 plus 2.5 percentage points, but shall not exceed 8.25 percent.

**Late Charges and Collection Costs**

If I fail to make any part of an installment payment within 30 days after it becomes due, ED may collect from me a late charge that will not exceed six cents for each dollar of each late installment. If I default on the loan, I will pay reasonable collection fees and costs, plus court costs and attorney's fees associated with collection of the debt.

**Grace Period**

My Direct Consolidation Loan will receive a grace period only if I am in an in-school period on at least one William D. Ford Federal Direct Loan (Direct Loan) Program or Federal Family Education Loan (FFEL) Program loan that I am consolidating and my application for a Direct Consolidation Loan is received by ED prior to the end of my in-school period. A six-month grace period begins the day after I cease to be enrolled at least half-time at an eligible school.

**Repayment**

Unless I am in school when my Direct Consolidation Loan is disbursed, I will be asked to select a repayment plan. If I do not select a repayment plan, ED will choose the standard repayment plan for me. My first payment will be due within 60 days of the first disbursement of my Direct Consolidation Loan unless I am eligible for a deferment or my Direct Consolidation Loan includes at least one Direct Loan or FFEL Program loan for which I am in an in-school period at the time of my consolidation. A repayment schedule will be furnished to me and will establish repayment terms, including my payment amount, number of payments, and the length of the repayment period, based on information I have furnished in the application for this Direct Consolidation Loan. Payments will be scheduled in monthly installments. ED may adjust my repayment schedule if ED learns that any of the loans listed herein are not eligible to be consolidated. My repayment period will be up to 30 years in length, depending on the amount of my student loan indebtedness and my repayment plan. Any period for which ED has granted a deferment or forbearance will not be included in determining the repayment period.

I may prepay all or any part of the unpaid balance on my loan at any time without penalty.

**Acceleration and Default**

At the option of ED, the entire unpaid balance shall become immediately due and payable when any one of the following events occurs: (i) I make false representation that results in my receiving a loan for which I am not eligible, or (ii) I default on the loan.

The following events shall constitute a default on a loan: (i) I fail to pay the entire unpaid balance after ED has exercised its option under the preceding paragraph; or (ii) I fail to make installment payments when due, or fail to comply with other terms of the loan, and ED reasonably concludes I no longer intend to honor my repayment obligation. My failure must have persisted for at least 180 days. If I default, ED will capitalize all outstanding interest into a new principal balance.

If I default, this will be reported to national credit bureau organizations and will significantly and adversely affect my credit rating. I acknowledge that a default shall have additional adverse consequences to me as disclosed in the statement of Borrower's Rights and Responsibilities.

Following default, the loan may at ED's option be subject to income contingent repayment in accordance with the Act.

Any notice required to be given to me will be effective when mailed by first class mail to the latest address that ED has for me. Failure by ED to enforce or insist on compliance with any term on this note shall not waive any right of ED. No provision of this note may be changed or waived except in writing by ED. If any provision of this note is determined to be unenforceable, the remaining provisions shall remain in force.

**Borrower Certification and Authorization**

I declare under penalty of perjury that the following is true and correct:

(1) I certify that the information provided by me and my spouse, if applicable, in this application/note is true, complete, and correct to the best of my knowledge and belief and is made in good faith.

(2) I certify that the loan proceeds will be used solely to discharge my outstanding eligible education loan debts.

(3) I certify that I do not now owe a refund on a Federal Pell Grant, Basic Educational Opportunity Grant, Federal Supplemental Educational Opportunity Grant, or a State Student Incentive Grant. I further certify that I am not now in default on any loan that was received under the Federal Perkins Loan Program (including NDSL Loans), the FFEL Program, or the Direct Loan Program, or, if I am in default, I have either made satisfactory repayment arrangements, or I am consolidating all of these loans and will repay under the income contingent repayment plan. I understand that income-contingent repayment is not available for Federal Direct PLUS Consolidation Loans (Direct PLUS Consolidation Loans).

(4) I certify that all of the loans selected have been used to finance my education, my spouse's education, or my child's education.

(5) I certify that I do not have any other application pending for a Federal Consolidation Loan with any other lender. If none of the loans I am consolidating is a Direct Loan Program loan, I further certify that I have sought and been unable to obtain a Federal Consolidation Loan from a FFEL Program lender, or a lender would not provide me with a Federal Consolidation Loan with income-sensitive repayment terms acceptable to me, and I am eligible for the income contingent repayment plan. If, however, I am applying jointly with my spouse, only one borrower, my spouse or I, must seek a Federal Consolidation Loan from a FFEL Program lender.

(6) I understand that the loan shall, to the extent used to discharge loans that I have selected, count against the applicable aggregate loan limits under the Act.

(7) I understand that the amount of my Direct Consolidation Loan will be the sum of the balances of my outstanding eligible loans that I have chosen to consolidate. My outstanding balance on each loan to be consolidated will include unpaid principal, unpaid accrued interest, and late charges as defined by federal regulations and as certified by each holder. Collection costs may also be included. For a loan that is in default, ED limits collection costs that may be charged to the borrower to no more than those currently authorized under the FFEL Program and may impose reasonable limits on collection costs paid to the holder. If the amount ED advances to my holder(s) exceeds the amount needed to pay off the balance(s) of the selected loan(s), I understand that the holder will refund the excess to ED for application against the outstanding balance of this loan. If the amount that ED advances to my holder(s) is less than the amount needed to pay off the balance(s) of the loan(s) selected for consolidation, ED will include the remaining amount in this loan unless I pay the remaining balance myself.

(8) I authorize ED to issue the proceeds of my Direct Consolidation Loan to the holder(s) of the loan(s) so selected to discharge the debt.

(9) I authorize ED to investigate my credit record and report information concerning my loan status to proper persons and organizations authorized to receive this information.

(10) I authorize ED to contact the holder(s) identified on my application to determine the eligibility and/or payoff amount for the loan(s) I have identified. I further authorize the holder(s) to release that information.

(11) I authorize the release of information pertinent to this loan: (i) by my school(s) and ED, to members of my immediate family unless I submit written direction otherwise; and (ii) by and amongst my school(s), ED, and their agents.

(12) I authorize my school(s), ED, and their agents, to verify my social security number with the Social Security Administration (SSA) and, if the number on my loan record is incorrect, then I authorize SSA to disclose my correct social security number to these parties.

EXHIBIT # 9
Pfeiffer v Spelling
C.A. #1:07cv00522 (EGS)



# Application and Promissory Note
## Federal Direct Consolidation Loan

| OMB No. 1840-0693 |
| Form Approved |
| Exp. Date 06/30/95 |

**WARNING:** Any person who knowingly makes a false statement or misrepresentation on this form is subject to penalties which may include fines, imprisonment, or both under the U.S. Criminal Code and 20 U.S.C. 1097.

## Section A. Borrower Information

| 1. Last Name | First Name | MI | 2. Social Security Number |
|---|---|---|---|

| 3. Permanent Street Address (if P.O. Box, see instructions) | 4. Former Name | 5. Home Telephone Number ( ) |
|---|---|---|

| City | State | Zip Code | 6. Driver's License Number (List state abrv. first) | 7. Date of Birth (Month, Day, Year) |
|---|---|---|---|---|

| 8. Employer Name | Employer Address | Telephone Number ( ) |
|---|---|---|

| City | State | Zip Code | 9. Does your spouse have "eligible" loans (see instructions) that you want to consolidate with your loans? If yes, have your spouse complete Section B and include your spouse's loans in Section D. | ☐ Yes  ☐ No |
|---|---|---|---|---|

## Section B. Spouse Information     *Do not complete unless you responded "yes" to item #9.*

| 10. Last Name | First Name | MI | 11. Social Security Number |
|---|---|---|---|

| 12. Former Name | 13. Driver's License Number (List state abrv. first) | 14. Date of Birth (Month, Day, Year) |
|---|---|---|

| 15. Employer Name | Employer Address | Telephone Number ( ) |
|---|---|---|

| City | State | Zip Code |
|---|---|---|

## Section C. Reference Information

16. References: You must list two persons, with different U.S. addresses, who have known you for at least three years. Do not include individuals who live with you (e.g., spouse) or live outside the United States. Both references must be completed fully and should be acquaintances of both you and your spouse if you are consolidating jointly.

| Name | 1. | 2. |
|---|---|---|
| Permanent Address | | |
| City, State, Zip Code | | |
| Area Code/Telephone | ( ) | ( ) |

## Section D. Education Loan Indebtedness     *See instructions before completing this section.*

List the education loans that you want to consolidate and the loans that you are not consolidating but want considered in calculating your maximum repayment period. If you need to list additional loans, attach the enclosed Supplemental Loan Listing Sheet. Do not include your spouse's loans unless you responded "yes" to item #9 and completed Section B.

| 17. Loan Type (e.g., A, B, etc. See Instructions) | 18. Lender/Servicer Name and Address | 19. B = Borrower S = Spouse J = Joint | 20. Account Number | 21. Current Balance | 22. To Be Consolidated Yes | No |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

## Section E. Promissory Note (Continued on reverse side.)     To be completed by borrower and spouse, if applicable.

**Promise to Pay:**

I promise to pay to the U.S. Department of Education (ED) all sums (hereafter "loan" or "loans") disbursed under the terms of this Promissory Note to discharge my prior loan obligations, plus interest and other fees which may become due as provided in this Promissory Note. If I fail to make payments on this Promissory Note when due, I will also pay collection costs including attorney's fees and court costs. If ED accepts this application, it is my understanding that ED will on my behalf send funds to the holders who currently hold the loans selected for consolidation in order to payoff those loans. I further understand that the amount of this loan will equal the sum of the amounts which the holders of the loans selected for consolidation verify are the payoff balances on those loans. My signature on this Promissory Note will serve as my authorization to pay off the balances of the loans selected for consolidation as provided by the holders of such loans.

I understand that this is a Promissory Note. I will not sign this Promissory Note before reading it, including the writing on the reverse side, even if I am advised not to read the Promissory Note. I am entitled to an exact copy of this Promissory Note and a Statement of the Borrower's Rights and Responsibilities. My signature certifies I have read, understand, and agree, to the terms and conditions of this Application and Promissory Note, including the Borrower Certification and Authorization printed on the reverse side and the accompanying Borrower's Rights and Responsibilities.

If applying for a loan with my spouse, we agree to the same terms and conditions contained in the Borrower Certification and Authorization. In addition, we confirm that we are legally married to each other and we understand and agree that we are and will continue to be held jointly and severally liable for the entire amount of the debt represented by the Federal Direct Consolidation Loan without regard to the amounts of our individual loan obligations that are consolidated and without regard to any changes that may occur in our marital status. We understand that this means that one of us may be required to pay the entire amount due if the other is unable or refuses to pay. We understand that the Federal Direct Consolidation Loan we are applying for will be cancelled only if both of us either die or become totally and permanently disabled. We further understand that we may postpone repayment of the loan only if we provide ED a written request that confirms Federal Direct Consolidation Loan Program deferment or forbearance eligibility for both of us.

**I UNDERSTAND THAT THIS IS A FEDERAL LOAN THAT I MUST REPAY.**

| 23. Borrower's Signature | Date (Month/Day/Year) |
|---|---|

| 24. Spouse's Signature (only if Section B is completed) | Date (Month/Day/Year) |
|---|---|

## U.S. Department of Education Use Only

| Loan Identification Number #1 | Loan Identification Number #2 | Loan Identification Number #3 |
|---|---|---|

PLAINTIFF'S DEPOSITION EXHIBIT
Battle

# Promissory Note (continued)

### Governing Law and Notices

This Promissory Note applies to Federal Direct Consolidation Loans. In this Note, the Higher Education Act of 1965, as amended, 20 U.S.C. 1070 et seq., and applicable U.S. Department of Education (ED) regulations are referred to as "the Act." The terms of this Note will be interpreted according to the Act and other applicable federal statutes and regulations. Applicable state law, except as preempted by federal law, may provide for certain borrower rights, remedies, and defenses in addition to those stated in this Note.

### Disclosure of Terms

When the loans which I am consolidating are discharged, I will be sent a Disclosure Statement and Repayment Schedule ("Disclosure"). The Disclosure will identify my Federal Direct Consolidation Loan amount and other additional terms of my loan. If I have questions about the information disclosed, I will contact ED. If the information in this Promissory Note conflicts with the information in the Disclosure, the Disclosure will be controlling.

Important additional terms of this loan are disclosed in the statement of Borrower's Rights and Responsibilities accompanying this Note.

I understand that my consolidation loan may consist of up to three separate loan identification numbers depending on the loans I choose to consolidate. These loan identification numbers will represent prior subsidized loans, prior unsubsidized loans, and prior PLUS loans. The Borrower's Rights and Responsibilities identifies which eligible loans will be included in each of these categories. Each applicable loan identification number will be represented by this Promissory Note.

Except for interest charges ED does not charge me during an authorized deferment, I agree to pay interest on the principal amount of my consolidation loan from the date of disbursement until the loan is paid in full or discharged.

ED may add interest that accrues but is not paid when due to the unpaid principal balance of this loan. This is called capitalization.

### Interest

If my consolidation loan includes a loan identification number which represents previous Federal PLUS loans (see the Borrower's Rights and Responsibilities for a complete listing), the interest rate for that portion of the loan during any 12-month period beginning on July 1 and ending on June 30, is determined on the preceding June 1 and is equal to the bond equivalent rate of 52-week Treasury bills auctioned at the final auction held prior to such June 1; plus 3.1 percentage points, but shall not exceed 9 percent.

If my consolidation loan includes loan identification numbers which represent eligible previous loans other than Federal PLUS loans, the interest rate for that portion of the loan during any 12-month period beginning on July 1 and ending on June 30, is determined on the preceding June 1 and is equal to the bond equivalent rate of 91-day Treasury bills auctioned at the final auction held prior to such June 1; plus 3.1 percentage points, but shall not exceed 8.25 percent.

### Late Charges and Collection Costs

If I fail to make any part of an installment payment within 10 days after it becomes due, ED may collect from me a late charge not to exceed 6% of each late installment. If I default on the loan, I will pay reasonable collection fees and costs, plus court costs and attorney's fees associated with collection of the debt.

### Repayment

When my consolidation loan is disbursed I will be asked to select a repayment plan. If I do not select a repayment plan, ED will assign me to the Standard Repayment Plan. My first payment will be due within 60 days of the first disbursement of my consolidation loan unless I am eligible for a deferment. A repayment schedule will be furnished to me and will establish repayment terms, including my payment amount, number of payments, and the length of the repayment period, based on information I have furnished in this Application/Promissory Note. Payments will be scheduled in monthly installments. ED may adjust my repayment schedule if ED learns that any of the loans listed herein are not eligible to be consolidated. My repayment period will be up to 30 years in length, depending on the amount of my student loan indebtedness and my repayment preference. Any period for which ED has granted a deferment or forbearance will not be included in determining the repayment period.

I may prepay all or any part of the unpaid balance on my loan at any time without penalty.

### Acceleration and Default

At the option of ED, the entire unpaid balance shall become immediately due and payable when any one of the following events occurs: (i) I make false representation that results in my receiving a loan for which I am not eligible, or (ii) I default on the loan.

The following events shall constitute a default on a loan: (i) I fail to pay the entire unpaid balance after ED has exercised its option under the preceding paragraph; or (ii) I fail to make installment payments when due, or fail to comply with other terms of the loan, and ED reasonably concludes I no longer intend to honor my repayment obligation. My failure must have persisted for at least 180 days for payments due monthly or 240 days for payments due less frequently than monthly. If I default, ED will capitalize all outstanding interest into a new principal balance.

If I default, this will be reported to national credit bureau organizations and will significantly and adversely affect my credit rating. I acknowledge that a default shall have additional adverse consequences to me as disclosed in the statement of Borrower's Rights and Responsibilities.

Following default, the loan may at ED's option be subject to income-contingent repayment (including potential collection of amounts in excess of the principal and interest) in accordance with the Act.

Any notice required to be given to me will be effective when mailed by first class mail to the latest address that ED has for me. Failure by ED to enforce or insist on compliance with any term on this Note shall not waive any right of ED. No provision of this Note may be changed or waived except in writing by ED. If any provision of this Note is determined to be unenforceable, the remaining provisions shall remain in force.

### Borrower Certification and Authorization

I declare under penalty of perjury that the following is true and correct:

(1)  I certify that the information provided by me and my spouse in this Note and Application is true, complete, and correct to the best of my knowledge and belief and is made in good faith.

(2)  I certify that the loan proceeds will be used solely to discharge my outstanding eligible education loan debts.

(3)  I certify that I do not now owe a refund on a Federal Pell Grant, Basic Educational Opportunity Grant, Supplemental Educational Opportunity Grant, or a State Student Incentive Grant. I further certify that I am not now in default on any loan which was received under the Federal Perkins Loan Program (including NDSL Loans), the Federal Family Education Loan Program (FFELP), or the Federal Direct Student Loan (Direct Loan) Program, or, if I am in default, I have either made satisfactory repayment arrangements, or I am consolidating all of these loans and will accept an income contingent repayment plan. I understand that income contingent repayment is not available for Federal Direct PLUS Consolidation Loans. FFELP and Direct Loan Program are defined in the statement of Borrower's Rights and Responsibilities.

(4)  I certify that the loans I am consolidating are now in grace period or in repayment status. All of the loans selected have been used to finance my education, my spouse's education or my child's education.

(5)  I certify that I do not have any other application pending for a Federal Consolidation Loan with any other lender. For one of the loans I am consolidating are Direct Loan Program loans, I further certify that I have sought and been unable to obtain a Federal Consolidation Loan from any of the holder(s) of my loan(s), or the holder(s) could not provide me with an income-sensitive repayment schedule satisfactory to me, and I am eligible for the income contingent repayment plan. If, however, I am applying jointly with my spouse, only one borrower, my spouse or I, must seek a loan from the current holder(s).

(6)  I understand that this loan shall, to the extent used to discharge loans which I have selected, count against the applicable aggregate loan limits under the Act.

(7)  I understand that the amount of my Federal Direct Consolidation Loan will be the sum of the balances of my outstanding eligible loans which I have chosen to consolidate. My outstanding balance on each loan to be consolidated will include unpaid principal, unpaid accrued interest, and late charges as defined by federal regulations and as certified by each holder. Collection costs may also be included. For a loan that is in default, ED limits collection costs that may be charged to the borrower to no more than those currently authorized under the FFEL Program, and may impose reasonable limits on collection costs paid to the holder. If the amount ED advances to my holder(s) exceeds the amount needed to pay off the balance(s) of the selected loan(s),

I understand that the holder will refund the excess to ED for application against the outstanding balance of this loan. If the amount that ED advances to my holder(s) is less than the amount needed to pay off the balance(s) of the loan(s) selected for consolidation ED will include the remaining amount in this loan balance that I am responsible for paying myself.

(8)  I authorize ED to issue the proceeds of my Federal Direct Consolidation loan to each holder of the loans so selected to discharge the debt.

(9)  I authorize ED to investigate my credit record and report information concerning my loan status to proper persons and organizations.

(10)  I authorize ED to contact the holder(s) identified on my application to determine the eligibility and/or payoff amount for the loan(s) I have identified. I further authorize those holder(s) to release that information.

(11)  I authorize the release of information pertinent to this loan: (i) by my schools and ED, to members of my immediate family unless I submit written direction otherwise; and (ii) by and amongst my schools, ED, and their agents.

(12)  I authorize my schools, ED, and their agents, to verify my social security number with the Social Security Administration (SSA) and, if the number on my loan record is incorrect, then I authorize SSA to disclose my correct social security number(s) to these parties.

Pfeiffer - Gov't Production (Nov. 2007) - 001540

**FEDERAL DIRECT CONSOLIDATION LOAN PROGRAM**

# GLOSSARY

EXHIBIT #10
Pfeiffer v Spelling
C.A. #1:07cv00522 (EGS)

**Borrower** Individual who signed and agreed to the terms in the promissory note and is responsible for repaying a loan.

**Cancellation** Some student loan programs allow for all or part of the total loan principal and accrued interest to be cancelled in certain circumstances. A cancelled loan may also be referred to as a "discharged loan."

**Capitalized Interest** Rather than paying interest on a periodic basis as it accrues, a borrower may choose to let that interest accumulate and be added to the loan principal. It then becomes *capitalized interest*. Capitalizing interest increases the principal amount of the loan and, therefore, the total cost of the loan.

**Consolidation** When a borrower combines loans by taking out one new loan to repay all the old loans.

**Default** Failure to repay a loan or meet other terms of a signed promissory note.

**Deferment** A temporary postponement of loan payments.

**Direct Loan Servicing Center** The U.S. Department of Education's agent contracted to service and collect Direct Loan Program loans.

**Forbearance** An arrangement to postpone or reduce a borrower's monthly loan repayment amount for a limited and specified period. The borrower is charged interest during a forbearance.

**Grace Period** A six-month period after a student borrower graduates or drops below half-time enrollment during which he or she is not required to make payments on a loan.

**Half Time** A student is considered half time when carrying at least one half the academic workload of a full-time student as determined by the school.

**Holder** An entity that holds a loan promissory note and has the right to collect from the borrower.

**In-School Period** A period prior to a loan entering the grace or repayment periods, and during which a borrower is enrolled at least half time at an eligible school.

**Interest** A loan expense charged by the lender and paid by the borrower for the use of borrowed money. The expense is calculated as a percentage of the unpaid principal amount (loan amount).

**Loan(s)** Money borrowed that must be repaid.

**Loan Origination Center** The U.S. Department of Education's agent contracted to make and disburse Direct Loan Program loans.

**Loan Principal** Total money borrowed.

**Prepayment** Any amount paid on a loan by the borrower before it is required to be paid under the terms of the promissory note. There is never a penalty for prepaying principal or interest on Direct Loan Program loans.

PLAINTIFF'S DEPOSITION EXHIBIT

P00405

## FEDERAL DIRECT CONSOLIDATION LOAN PROGRAM

**Promissory Note** A legally binding contract between a lender and a borrower. The promissory note contains the terms and conditions of the loan, including how and when the loan must be repaid.



**Repayment** (also "repayment period") Making payments on a loan. The "repayment period" is the period during which payments are required to be made.

**Repayment Plan(s)** In the Direct Loan Program, borrowers may select from four plans that will determine the length of their repayment period and the amount of their monthly payments. The plans are the Standard Repayment Plan, Extended Repayment Plan, Graduated Repayment Plan, and Income Contingent Repayment (ICR) Plan.

**Servicer** An entity designated to track and collect a loan on behalf of a loan holder.

**Subsidized Loan** A loan on which the borrower is not charged interest during certain prescribed times. In the case of Direct Subsidized Consolidation Loans, the subsidy is provided by the federal government not charging interest during specified periods.

**Unsubsidized Loan** A loan on which interest begins to accrue as soon as the loan is made. The interest may be paid or capitalized.

**Variable Interest** Rate of interest on a loan that is tied to a stated index and changes periodically as the index changes.

**William D. Ford Federal Direct Loan Program** (also referred to as "Direct Loan Program") A federal program that provides loans to student and parent borrowers. The loans are Federal Direct Stafford/Ford Loans, Federal Direct Unsubsidized Stafford/Ford Loans, Federal Direct PLUS Loans, and Federal Direct Consolidation Loans. Funds are provided by the federal government, through participating schools or the Loan Origination Center, to eligible students/borrowers.

EXHIBIT # 11
Pfeiffer v Spelling
C.A. #1:07cv00522 (EGS)    P.01/04

APR-12-2006   11:06          EDS



**DEPARTMENT OF EDUCATION**
Loan Origination Center
Loan Consolidation 800-557-7392
Fax:    800-557-7396
TDD:  800-557-7395

# FAX

Date: 4/12/06

Number of pages including cover sheet   3

| To: | From: |
|---|---|
| REDACTED | Direct Loan Origination Center |
| | Loan Consolidation |
| Phone: | Post Office Box |
| Fax Phone: | Montgomery, AL  36103 |
| | Phone: (334)206- |
| | Fax Phone: (334)206-7672 |

**REMARKS:**
comment   ☒ Urgent   ☐ For your review   ☐ Reply ASAP   ☐ Please

PLAINTIFF'S DEPOSITION
EXHIBIT

P00483

APR-12-2006  11:06          EDS                                    P.02/04

Borrower's Name _____

**Page 3**

Borrower's Social Security Number _____ REDACTED

# Direct Loans

## FEDERAL DIRECT CONSOLIDATION LOAN

### SECTION E
### CERTIFICATION, AUTHORIZATION, AND RELEASE

(1) I certify that the information I (and my spouse, if applicable) am providing in this application is true, complete, and correct to the best of my knowledge and belief and is made in good faith.

(2) I certify that all of the loans selected have been used to finance my education, my spouse's education, or my child's education.

(3) I certify that I do not have an application pending for a Federal Consolidation Loan with any other lender.

(4) If I am not in school and if none of the loans I am consolidating is a William D. Ford Federal Direct Loan Program (Direct Loan Program) loan, I (or my spouse, if applicable) certify that I have sought and been unable to obtain a Federal Consolidation Loan from a Federal Family Education Loan (FFEL) Program lender, or, if I am consolidating student loans, that a lender would not provide me with a Federal Consolidation Loan with income-sensitive repayment terms acceptable to me.

(5) I certify that I do not now owe a refund on a Federal Pell Grant, Basic Educational Opportunity Grant, Federal Supplemental Educational Opportunity Grant, or State Student Incentive Grant. I further certify that I am not now in default on any loan that was received under the Federal Perkins Loan Program (including NDSL Loans), the FFEL Program, or the Direct Loan Program, or, if I am in default, I have either made satisfactory repayment arrangements with the holder of that defaulted loan, or I am consolidating all of these loans and will repay under the Income Contingent Repayment Plan. I understand that income contingent repayment is not available for Federal Direct PLUS Consolidation Loans.

(6) I understand that the amount of my Federal Direct Consolidation Loan will be the sum of the balance(s) of my outstanding eligible loan(s) that I have chosen to

consolidate. My outstanding balance on each loan to be consolidated will include unpaid principal, unpaid accrued interest, and late charges as defined by federal regulations and as certified by the holder. Collection costs may also be included. For a Direct Loan or FFEL Program loan that is in default, the U.S. Department of Education (ED) limits collection costs that may be charged to the borrower to no more than those currently authorized under the FFEL Program and may impose reasonable limits on collection costs paid to the holder. If the amount ED advances to my holder(s) exceeds the amount needed to pay off the balance(s) of the selected loan(s), I understand that the holder will refund the excess to ED for application against the outstanding balance of this loan. If the amount that ED advances to my holder(s) is less than the amount needed to pay off the balance(s) of the loan(s) selected for consolidation, ED will include the remaining amount in this loan unless I pay the remaining balance myself.

(7) I authorize ED to investigate my credit record and report information concerning my loan status to proper persons and organizations authorized to receive this information.

(8) I authorize ED to contact the loan holder(s) identified on my application to determine the eligibility and/or payoff amount for the loan(s) I have identified.

(9) I authorize my school(s), ED, and their agents, to verify my social security number with the Social Security Administration (SSA) and, if the social security number on my loan record is incorrect, then I authorize SSA to disclose my correct social security number to these parties.

(10) I hereby authorize release to ED or its agent any information required to consolidate my education loan(s) pursuant to the Higher Education Act of 1965, as amended. A copy of this authorization may be deemed an original release.

28.

REDACTED          Signature of Borrower                    1-4-97
                                                            Date

Signature of Spouse (if consolidating jointly)              Date

Borrower's Name __BRENDA KAY PFEIFFER__        NOV 2 3 2001

Borrower's Social Security Number __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__

## Section E: Repayment Plan Selection

Carefully read the repayment plan information in "Direct Consolidation Loans" that accompanies this application and promissory note to understand your repayment plan options. Then, complete this section to select your repayment plan. Remember—

- All student loans must be repaid under the same repayment plan. Parent PLUS loans may be repaid under a different repayment plan.
- If you select the Income Contingent Repayment Plan, you must complete the "Repayment Plan Selection" and "Income Contingent Repayment Plan Consent to Disclosure of Tax Information" forms that accompany this application and promissory note. Your selection cannot be processed without these forms.
- If you want to consolidate a defaulted student loan(s) and you have not made a satisfactory repayment arrangement with your current holder(s), you must select the Income Contingent Repayment Plan.

31. Place an "X" in the box that corresponds to your repayment plan selection for each loan type. Note that Direct PLUS Consolidation Loans cannot be repaid under the Income Contingent Repayment Plan.

|  | Income Contingent | Standard | Extended | Graduated |
|---|---|---|---|---|
| STUDENT LOANS Direct Subsidized and Unsubsidized Consolidation Loans | ☐ | ☐ | ☐ | ☐ |
| PARENT LOANS Direct PLUS Consolidation Loans | Not Available | ☐ | ☐ | ☐ |

## Section F: Promissory Note (Continued on reverse side)

To be completed and signed by borrower and spouse, if applicable.

Promise to Pay:

I promise to pay to the U.S. Department of Education (ED) all sums (hereafter "loan" or "loans") disbursed under the terms of this Promissory Note (note) to discharge my prior loan obligations, plus interest, and other fees that may become due as provided in this note. If I fail to make payments on this note when due, I will also pay collection costs including but not limited to attorney's fees and court costs. If ED accepts my application, I understand that ED will on my behalf send funds to the holder(s) of the loan(s) selected for consolidation in order to pay off this loan(s). I further understand that the amount of this loan will equal the sum of the amount(s) that the holder(s) of the loan(s) verified as the payoff balance(s) on that loan(s) selected for consolidation. My signature on this note will serve as my authorization to pay off the balance(s) of the loan(s) selected for consolidation as provided by the holder(s) of such loan(s).

This amount may be more or less than the estimated total balance I have indicated in Section D. Further, I understand that if any collection costs are owed on the loans selected for consolidation, these costs may be added to the principal balance of the consolidation loan.

I understand that this is a Promissory Note. I will not sign this note before reading it, including the text on the reverse side, even if I am advised not to read the note. I am entitled to an exact copy of this note and a statement of the Borrower's Rights and Responsibilities. My signature certifies that I have read, understand, and agree, to the terms and conditions of this note, including the Borrower Certification and Authorization printed on the reverse side and the accompanying Borrower's Rights and Responsibilities.

If consolidating jointly with my spouse, we agree to the same terms and conditions contained in the Borrower Certification and Authorization. In addition, we confirm that we are legally married to each other and understand and agree that we are and will continue to be held jointly and severally liable for the entire amount of the debt represented by the Federal Direct Consolidation Loan without regard to the amounts of our individual loan obligations that are consolidated and without regard to any change that may occur in our marital status. We understand that this means that one of us may be required to pay the entire amount due if the other is unable or refuses to pay. We understand that the Federal Direct Consolidation Loan we are applying for will be cancelled only if both of us qualify for cancellation. We further understand that we may postpone repayment of the loan only if we provide ED with written requests that confirm Federal Direct Consolidation Loan Program deferment or forbearance eligibility for both of us at the same time.

**I UNDERSTAND THAT THIS IS A FEDERAL LOAN THAT I MUST REPAY.**

32. Signature of Borrower _____    Date __11/19/01__

Signature of Spouse (if consolidating jointly) _____    Date _____

## Promissory Note (continued)

### Governing Law and Notices

This Promissory Note (note) applies to Federal Direct Consolidation Loans (Direct Consolidation Loans). In this note, the Higher Education Act of 1965, as amended, 20 U.S.C. 1070 et seq., and applicable U.S. Department of Education (ED) regulations are referred to as "the Act." The terms of this note will be interpreted according to the Act and other applicable federal statutes and regulations. Applicable state law, except as preempted by federal law, may provide for certain borrower rights, remedies, and defenses in addition to those stated in this note.

### Disclosure of Terms

When the loan(s) that I am consolidating is paid off, I will be sent a Disclosure Statement and Repayment Schedule (disclosure). The disclosure will identify my Direct Consolidation loan amount and additional terms of my loan. If I have questions about the information disclosed, I will contact ED. If the information in this note conflicts with the information in the disclosure, the disclosure will be controlling.

Important additional terms of this loan are disclosed in the statement of Borrower's Rights and Responsibilities accompanying this note.

I understand that my Direct Consolidation Loan may consist of up to three separate loan identification numbers depending on the loan(s) I choose to consolidate. These loan identification numbers represent prior subsidized loans, prior unsubsidized loans, and prior parent PLUS loans. The Borrower's Rights and Responsibilities identifies which eligible loans are included in each of these categories. Each applicable loan identification number is represented by this note.

### Interest

Except for interest ED does not charge me during an in-school, grace, or deferment period, I agree to pay interest on the principal amount of my Direct Consolidation Loan from the date of disbursement until the loan is paid in full or discharged. ED may add interest that accrues but is not paid when due to the unpaid principal balance of this loan, as provided under the Act. This is called capitalization.

Interest will be calculated according to the applicable formulas provided for by the Act.

The interest rate on my Direct Consolidation Loan will be based on the weighted average of the interest rates on the loans being consolidated, rounded to the nearest higher one-eighth of one percent, but shall not exceed 8.25%. This is a fixed interest rate, which means that the rate will remain the same throughout the life of the loan.

### Late Charges and Collection Costs

If I fail to make any part of an installment payment within 30 days after it becomes due, ED may collect from me a late charge that will not exceed six cents for each dollar of each late installment. If I default on the loan, I will pay reasonable collection fees and costs, plus court costs and attorney's fees associated with collection of the debt.

### Grace Period

My Direct Consolidation Loan will receive a grace period if I meet all of the following conditions: (1) I have at least one William D. Ford Federal Direct Loan (Direct Loan) Program loan or attend a Direct Loan school, (2) at least one Direct Loan or Federal Family Education Loan (FFEL) Program loan that I am consolidating is in an in-school period, and (3) my application for a Direct Consolidation Loan is received by ED prior to the end of my in-school period. A six-month grace period begins the day after I cease to be enrolled at least half time at an eligible school. (If my enrollment status changes to less than half time after I apply but before the first disbursement of my Direct Consolidation Loan, I will not have to make payments on my Direct Consolidation Loan for the number of months remaining in my grace period at the time the first disbursement is made.)

### Repayment

Unless my Direct Consolidation Loan is in an in-school or grace period when it is disbursed, I must select a repayment plan. If I do not select a repayment plan, ED will choose a plan for me in accordance with ED's regulations. My first payment will be due within 60 days of the first disbursement of my Direct Consolidation Loan unless it is in an in-school, grace, or deferment period. A repayment schedule will be furnished to me and will establish repayment terms, including my payment amount and the length of my repayment period. Payments will be scheduled in monthly installments. The amount of my monthly payment may be adjusted to reflect changes in the variable interest rate. ED may adjust my repayment schedule and ED hopes that any of the loans listed herein is not eligible to be consolidated. My repayment period will be up to 30 years in length, depending on the amount of my student loan indebtedness and my repayment plan. Any period for which ED has granted a deferment or forbearance will not be included in determining my repayment period.

I may prepay all or any part of the unpaid balance on my loan at any time without penalty. I agree to accept written notification of such pay off in lieu of receiving the original note.

### Acceleration and Default

At the option of ED, the entire unpaid balance will become immediately due and payable when either of the following events occurs: (i) I make a false representation that results in my receiving a loan for which I am not eligible, or (ii) I default on the loan.

The following events shall constitute a default on a loan: (i) I fail to pay the entire unpaid balance after ED has exercised its option under the preceding paragraph; or (ii) I fail to make installment payments when due, or fail to comply with other terms of the loan, and ED reasonably concludes I no longer intend to honor my repayment obligation. My failure must have persisted for at least 270 days. If I default, ED will capitalize all outstanding interest into a new principal balance.

If I default, this will be reported to national credit bureau organizations and will significantly and adversely affect my credit rating. I acknowledge that a default shall have additional adverse consequences to me as disclosed in the Borrower's Rights and Responsibilities.

Following default, the loan may at ED's option, be subject to income contingent repayment in accordance with the Act.

Any notice required to be given to me will be effective when mailed by first class mail to the latest address that ED has for me. I will immediately notify ED of any change of my address. Failure by ED to enforce or insist on compliance with any term on this note shall not waive any right of ED. No provision of this note may be changed or waived except in writing by ED. If any provision of this note is determined to be unenforceable, the remaining provisions shall remain in force.

### Borrower Certification and Authorization

I declare under penalty of perjury that the following is true and correct:

(1) I certify that the information provided by me and my spouse, if applicable, in this note is true, complete, and correct to the best of my knowledge and belief and is made in good faith.

(2) I certify that I do not now owe a refund on a Federal Pell Grant, Basic Educational Opportunity Grant, Federal Supplemental Educational Opportunity Grant, or a State Student Incentive Grant, or if I owe a refund, I have made satisfactory arrangements with the holder to repay the amount owed. I further certify that I am not now in default on any loan I am consolidating or, if I am in default, I have either made a satisfactory repayment arrangement with the holder of that defaulted loan, or I will repay under the income contingent repayment plan. I understand that income contingent repayment is not available for the parent PLUS loan portion of my Direct Consolidation Loan.

(3) I certify that all of the loans selected have been used to finance my education, my spouse's education, or my child's education.

(4) I certify that I do not have any other application pending for a Federal Consolidation Loan with any other lender. If my student loans are in a grace or repayment period and if none of the loans I am consolidating is a Direct Loan Program loan, I further certify that I have sought and been unable to obtain a Federal Consolidation Loan from a FFEL Program lender, or a lender would not provide me with a Federal Consolidation Loan with income-sensitive repayment terms acceptable to me. If I have parent PLUS loans and none of the loans I am consolidating is a Direct Loan Program loan, I further certify that I have sought and been unable to obtain a Federal Consolidation Loan from a FFEL Program lender. If, however, I am consolidating jointly with my spouse, only one borrower, my spouse or I, must have sought a Federal Consolidation Loan from a FFEL Program lender.

(5) I understand that this loan shall, to the extent used to discharge loans that I have selected, count against the applicable aggregate loan limits under the Act.

(6) I understand that the amount of my Direct Consolidation Loan is the sum of the balance(s) of my outstanding eligible loan(s) that I have chosen to consolidate. My outstanding balance on each loan to be consolidated includes unpaid principal, unpaid accrued interest, and late charges as defined by federal regulations and as certified by each holder. Collection costs may also be included. For a Direct Loan or FFEL Program loan that is in default, ED limits collection costs that may be charged to the borrower to no more than those currently authorized under the FFEL Program and may impose reasonable limits on collection costs paid to the holder. If the amount ED advances to my holder(s) exceeds the amount needed to pay off the balance(s) of the selected loan(s), I understand that the holder will refund the excess to ED for application against the outstanding balance of this loan. If the amount that ED advances to my holder(s) is less than the amount needed to pay off the balance(s) of the loan(s) selected for consolidation, ED will include the remaining amount in this loan unless I pay the remaining balance myself.

(7) I authorize ED to contact the holder(s) identified on my application to determine the eligibility and/or payoff amount for the loan(s) I have identified. I further authorize release to ED or its agent any information required to consolidate my education loan(s) pursuant to the Act.

(8) I authorize ED to issue the proceeds of my Direct Consolidation Loan to the holder(s) of the loan(s) so selected to discharge the debt.

(9) I authorize ED to investigate my credit record and report information concerning my loan status to proper persons and organizations authorized to receive this information.

(10) I authorize the release of information pertinent to this loan: (i) by my school(s) and ED, to members of my immediate family unless I submit written direction otherwise; and (ii) by and amongst my school(s), ED, and their agents.

(11) I authorize my school(s), ED, and their agents, to verify my social security number with the Social Security Administration (SSA) and, if the number on my loan record is incorrect, then I authorize SSA to disclose my correct social security number to these parties.

P00486

# Direct Loans

William D. Ford Federal Direct Loan Program

EXHIBIT #12
'Pfeiffer v Spelling
C.A. #1:07cv00522 (EGS)



Page 1 of 2

---

### Billing Statement - Negative Amortization

Please send your payment. Note that (1) your monthly payment is less than interest owed on your loan and (2) uncapitalized accrued interest on your account is currently    $285.67. When unpaid interest is capitalized (added to principal) once a year, it will increase the cost of your loan. To avoid capitalization, you can (1) send a payment to cover all or part of interest owed or (2) pay at least the amount of interest charged monthly to your account (about    $657.75).

---

| | | | |
|---|---|---|---|
| Current Month Due Amount: | $507.57 | Current Payment Due Date: | 12/21/2002 |
| Past Due Amount: | $0.00 | | |
| Total Amount Due: | $507.57 | | |

If you think you may be unable to make a scheduled payment, please contact the Direct Loan Servicing Center immediately to discuss alternative arrangements.

All payments are applied first to unpaid fees due and then to unpaid accrued interest. Any remaining amount will automatically be applied to your principal.

| ACCOUNT NUMBER | CURRENT BALANCE | CURRENT DUE | PAST DUE | LATE CHARGES AND FEES | TOTAL DUE |
|---|---|---|---|---|---|
| REDACTED | $114,807.44 | $507.57 | $0.00 | $0.00 | $507. |
| | | | | | |
| TOTALS: | $114,807.44 | $507.57 | $0.00 | $0.00 | $507. |

BILFAV04                    **Please return coupon below with your payment**



CONFIDENTIAL

P00279

# Direct Loans
### William D. Ford Federal Direct Loan Program



**Page 1 of 2**

---

### Billing Statement – Negative Amortization

Please send your payment. Note that (1) your monthly payment is less than interest owed on your loan and (2) uncapitalized accrued interest on your account is currently      $216.76.  When unpaid interest is capitalized (added to principal) once a year, it will increase the cost of your loan.  To avoid capitalization, you can (1) send a payment to cover all or part of interest owed or (2) pay at least the amount of interest charged monthly to your account (about      $659.77).

---

| | | | |
|---|---|---|---|
| Current Month Due Amount: | $507.57 | Current Payment Due Date: | 09/21/2002 |
| Past Due Amount: | $0.00 | | |
| Total Amount Due: | $507.57 | | |

If you think you may be unable to make a scheduled payment, please contact the Direct Loan Servicing Center immediately to discuss alternative arrangements.

| | ACCOUNT NUMBER | CURRENT BALANCE | CURRENT DUE | PAST DUE | LATE CHARGES AND FEES | TOTAL DUE |
|---|---|---|---|---|---|---|
| All payments are applied first to unpaid fees due and then to unpaid accrued interest. Any remaining amount will be automatically applied to your principal. | REDACTED | $115,159.29 | $507.57 | $0.00 | $0.00 | $507.5 |
| **TOTALS:** | | $115,159.29 | $507.57 | $0.00 | $0.00 | $507.5 |

BILFAV04

**Please return coupon below with your payment**

**CONFIDENTIAL**

P00280

# Direct Loans

William D. Ford Federal Direct Loan Program



Page 1 of 2

## Billing Statement - Negative Amortization

Please send your payment. Note that (1) your monthly payment is less than interest owed on your loan and (2) uncapitalized accrued interest on your account is currently    $130.12. When unpaid interest is capitalized (added to principal) once a year, it will increase the cost of your loan. To avoid capitalization, you can (1) send a payment to cover all or part of interest owed or (2) pay at least the amount of interest charged monthly to your account (about    $660.07).

| | |
|---|---|
| **Current Month Due Amount:** | $507.57 |
| **Past Due Amount:** | $0.00 |
| **Total Amount Due:** | $507.57 |

**Current Payment Due Date:**  08/21/2002

If you think you may be unable to make a scheduled payment, please contact the Direct Loan Servicing Center immediately to discuss alternative arrangements.

| | ACCOUNT NUMBER | CURRENT BALANCE | CURRENT DUE | PAST DUE | LATE CHARGES AND FEES | TOTAL DUE |
|---|---|---|---|---|---|---|
| All payments are applied first to unpaid fees due and then to unpaid accrued interest. Any remaining amount will automatically be applied to your principal. | REDACTED | $115,212.02 | $507.57 | $0.00 | $0.00 | $507.5 |
| | **TOTALS:** | $115,212.02 | $507.57 | $0.00 | $0.00 | $507.5 |

BILFAV04

Please return coupon below with your payment

CONFIDENTIAL

P00281

# Direct Loans



William D. Ford Federal Direct Loan Program

Page 1 of 2

**Billing Statement – Negative Amortization**

Please send your payment. Note that (1) your monthly payment is less than interest owed on your loan and (2) uncapitalized accrued interest on your account is currently     $216.92. When unpaid interest is capitalized (added to principal) once a year, it will increase the cost of your loan. To avoid capitalization, you can (1) send a payment to cover all or part of interest owed or (2) pay at least the amount of interest charged monthly to your account (about     $660.24).

| | | |
|---|---|---|
| Current Month Due Amount: | $512.07 | Current Payment Due Date:    07/21/2002 |
| Past Due Amount: | $0.00 | |
| Total Amount Due: | $512.07 | |

If you think you may be unable to make a scheduled payment, please contact the Direct Loan Servicing Center immediately to discuss alternative arrangements.

|  | ACCOUNT NUMBER | CURRENT BALANCE | CURRENT DUE | PAST DUE | LATE CHARGES AND FEES | TOTAL DUE |
|---|---|---|---|---|---|---|
| All payments are applied first to unpaid fees due and then to unpaid accrued interest. Any remaining amount will automatically be applied to your principal. | REDACTED | $115,241.84 | $512.07 | $0.00 | $0.00 | $512.0 |
| **TOTALS:** | | $115,241.84 | $512.07 | $0.00 | $0.00 | $512.0 |

BILFAV04

Please return coupon below with your payment

CONFIDENTIAL





Page 1 of 2

**William D. Ford Federal Direct Loan Program**

---

## Billing Statement – Negative Amortization

Please send your payment. Note that (1) your monthly payment is less than interest owed on your loan and (2) uncapitalized accrued interest on your account is currently    $238.81. When unpaid interest is capitalized (added to principal) once a year, it will increase the cost of your loan. To avoid capitalization, you can (1) send a payment to cover all or part of interest owed or (2) pay at least the amount of interest charged monthly to your account (about    $660.79).

---

Current Month Due Amount:    $512.07    Current Payment Due Date:   06/21/2002
Past Due Amount:    $0.00
Total Amount Due:    $512.07

If you think you may be unable to make a scheduled payment, please contact the Direct Loan Servicing Center immediately to discuss alternative arrangements.

| | ACCOUNT NUMBER | CURRENT BALANCE | CURRENT DUE | PAST DUE | LATE CHARGES AND FEES | TOTAL DUE |
|---|---|---|---|---|---|---|
| All payments are applied first to unpaid fees due and then to unpaid accrued interest. Any remaining amount will automatically be applied to your principal. | REDACTED | $115,337.26 | $512.07 | $0.00 | $0.00 | $512.0 |
| | **TOTALS:** | $115,337.26 | $512.07 | $0.00 | $0.00 | $512.0 |

BILFAV04                    Please return coupon below with your payment

CONFIDENTIAL

P00283

# Direct Loans
### William D. Ford Federal Direct Loan Program



Page 1 of 2

## Billing Statement - Negative Amortization

Please send your payment.  Note that (1) your monthly payment is less than interest owed on your loan and (2) uncapitalized accrued interest on your account is currently    $152.04.  When unpaid interest is capitalized (added to principal) once a year, it will increase the cost of your loan.  To avoid capitalization, you can (1) send a payment to cover all or part of interest owed or (2) pay at least the amount of interest charged monthly to your account (about    $661.08).

Current Month Due Amount:     $512.07     Current Payment Due Date:  05/21/2002
Past Due Amount:              $0.00
Total Amount Due:             $512.07

If you think you may be unable to make a scheduled payment, please contact the Direct Loan Servicing Center immediately to discuss alternative arrangements.

All payments are applied first to unpaid fees due and then to unpaid accrued interest.  Any remaining amount will be automatically be applied to your principal.

| ACCOUNT NUMBER | CURRENT BALANCE | CURRENT DUE | PAST DUE | LATE CHARGES AND FEES | TOTAL DUE |
|---|---|---|---|---|---|
| REDACTED | $115,388.96 | $512.07 | $0.00 | $0.00 | $512. |
| TOTALS: | $115,388.96 | $512.07 | $0.00 | $0.00 | $512. |

BILFAV04

Please return coupon below with your payment

CONFIDENTIAL

P00284

# Direct Loans

William D. Ford Federal Direct Loan Program



**Page 1 of 2**

### Billing Statement - Negative Amortization

Please send your payment.  Note that (1) your monthly payment is less than interest owed on your loan and (2) uncapitalized accrued interest on your account is currently    $152.19.  When unpaid interest is capitalized (added to principal) once a year, it will increase the cost of your loan.  To avoid capitalization, you can (1) send a payment to cover all or part of interest owed or (2) pay at least the amount of interest charged monthly to your account (about    $661.75).

| | | | |
|---|---|---|---|
| Current Month Due Amount: | $512.07 | Current Payment Due Date: | 04/21/2002 |
| Past Due Amount: | $0.00 | | |
| Total Amount Due: | $512.07 | | |

If you think you may be unable to make a scheduled payment, please contact the Direct Loan Servicing Center immediately to discuss alternative arrangements.

| | ACCOUNT NUMBER | CURRENT BALANCE | CURRENT DUE | PAST DUE | LATE CHARGES AND FEES | TOTAL DUE |
|---|---|---|---|---|---|---|
| All payments are applied first to unpaid fees due and then to unpaid accrued interest. Any remaining amount will automatically be applied to your principal. | REDACTED | $115,505.20 | $512.07 | $0.00 | $0.00 | $512.0 |
| **TOTALS:** | | $115,505.20 | $512.07 | $0.00 | $0.00 | $512.0 |

BILFAV04                     Please return coupon below with your payment

**CONFIDENTIAL**

P00285

# Direct Loans



**Page 1 of 2**

William D. Ford Federal Direct Loan Program

---

### Billing Statement - Negative Amortization

Please send your payment. Note that (1) your monthly payment is less than interest owed on your loan and (2) uncapitalized accrued interest on your account is currently    $167.16. When unpaid interest is capitalized (added to principal) once a year, it will increase the cost of your loan. To avoid capitalization, you can (1) send a payment to cover all or part of interest owed or (2) pay at least the amount of interest charged monthly to your account (about    $662.33).

---

| | | | |
|---|---|---|---|
| **Current Month Due Amount:** | $512.07 | **Current Payment Due Date:** | 03/21/2002 |
| **Past Due Amount:** | $0.00 | | |
| **Total Amount Due:** | $512.07 | | |

If you think you may be unable to make a scheduled payment, please contact the Direct Loan Servicing Center immediately to discuss alternative arrangements.

| | ACCOUNT NUMBER | CURRENT BALANCE | CURRENT DUE | PAST DUE | LATE CHARGES AND FEES | TOTAL DUE |
|---|---|---|---|---|---|---|
| All payments are applied first to unpaid fees due and then to unpaid accrued interest. Any remaining amount will be automatically be applied to your principal. | REDACTED | $115,606.08 | $512.07 | $0.00 | $0.00 | $512.0 |
| | | | | | | |
| **TOTALS:** | | $115,606.08 | $512.07 | $0.00 | $0.00 | $512.0 |

BILFAV04

Please return coupon below with your payment

**CONFIDENTIAL**

P00286

# Direct Loans

William D. Ford Federal Direct Loan Program



Page 1 of 2

## Billing Statement - Negative Amortization

Please send your payment. Note that (1) your monthly payment is less than interest owed on your loan and (2) uncapitalized accrued interest on your account is currently     $282.88. When unpaid interest is capitalized (added to principal) once a year, it will increase the cost of your loan. To avoid capitalization, you can (1) send a payment to cover all or part of interest owed or (2) pay at least the amount of interest charged monthly to your account (about     $587.53).

Current Month Due Amount:       $512.07     Current Payment Due Date:   02/21/2002
Past Due Amount:                $0.00
Total Amount Due:               $512.07

If you think you may be unable to make a scheduled payment, please contact the Direct Loan Servicing Center immediately to discuss alternative arrangements.

All payments are applied first to unpaid fees due and then to unpaid accrued interest. Any remaining amount will automatically be applied to your principal.

| ACCOUNT NUMBER | CURRENT BALANCE | CURRENT DUE | PAST DUE | LATE CHARGES AND FEES | TOTAL DUE |
|---|---|---|---|---|---|
| REDACTED | $115,606.08 | $512.07 | $0.00 | $0.00 | $512.0 |
| **TOTALS:** | $115,606.08 | $512.07 | $0.00 | $0.00 | $512.0 |

BILFAV04                    Please return coupon below with your payment

CONFIDENTIAL

P00287

 

# Direct Loans

William D. Ford Federal Direct Loan Program

Page 1 of 2

---

### Payment Due Notice

Your Direct Loan payment is now due. Please pay the Total Amount Due, mailing the coupon below with your payment. Thank you. For your convenience, you may access loan payment information on your account via the Internet at:

**http://www.dlservicer.ed.gov**

---

| | |
|---|---|
| Current Month Due Amount: | $512.07 |
| Past Due Amount: | $0.00 |
| Total Amount Due: | $512.07 |

Current Payment Due Date: 01/21/2002

If you think you may be unable to make a scheduled payment, please contact the Direct Loan Servicing Center immediately to discuss alternative arrangements.

All payments are applied first to unpaid fees due and then to unpaid accrued interest. Any remaining amount will be automatically be applied to your principal.

| ACCOUNT NUMBER | CURRENT BALANCE | CURRENT DUE | PAST DUE | LATE CHARGES AND FEES | TOTAL DUE |
|---|---|---|---|---|---|
| REDACTED | $115,634.58 | $512.07 | $0.00 | $0.00 | $512. |
| **TOTALS:** | $115,634.58 | $512.07 | $0.00 | $0.00 | $512. |

BILLAV05

Please return coupon below with your payment

**CONFIDENTIAL**

P00288

**Term:**

1098-E
Ability to Benefit
Academic Year
Account
Account Number
Accrue
Accrued Through Date
Action Programs Deferment
Adjusted Gross Income (AGI)
Administrative Forbearance
Adverse Credit History
Alternative Documentation of Income
Alternative Repayment Plan
Americorps Forbearance
Amortization
Applied to Fees & Charges
Applied to Interest
Applied to Principal
Armed Forces Deferment
Authentication
Bankruptcy Discharge
Billing Cycle
Borrower
Call Code
Cancellation
Capitalization
Capitalized Interest
Child Care Facility
Child Care Provider
Child Care Provider Loan Forgiveness

*Payment Due Date*

**Definition:**

The date during the month when payment of the current due amount must be received. If any past due amounts or fees/charges are outstanding, they are due immediately.



Pfeiffer–Gov't Production (Nov. 2007) –002216

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Brenda Kay Pfeiffer, | ) | |
| | ) | |
| On behalf of herself and all others similarly situated, | ) | Civil No. 1:07-cv-00522 (EGS) |
| | ) | |
| *Plaintiff,* | ) | CLASS ACTION |
| v. | ) | |
| | ) | |
| Margaret Spellings, in her official capacity as United States Secretary of Education, the United States Department of Education, and the United States of America, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## <u>DECLARATION OF STEVEN M. SPRENGER</u>

I, Steven M. Sprenger, hereby declare and state, as follows:

1.    I am over the age of eighteen years.  I have personal knowledge of the facts set forth herein, and am competent to testify thereto.

2.    I am lead counsel for the plaintiff and proposed lead class counsel in the above-referenced action.  I am also the managing owner of Sprenger & Lang, PLLC ("S&L").

<u>Proposed Class Counsel's Work in Identifying and Investigating Claims</u>

3.    For the past year, I and other lawyers and staff of S&L have vigorously represented plaintiff Brenda Pfeiffer and the proposed plaintiff class in connection with the identification, investigation and prosecution of their claims.  Michael Lieder and I first spoke with referring attorneys Richard Fuller and Larry Schaefer, who described the potential case to us, in the fall of 2006.  Over the next several months, we then met with Dr. Pfeiffer, reviewed

documents in her possession, investigated the student loan programs that are the focus of the complaint, performed legal research concerning jurisdictional and procedural issues as well as merits issues such as the Department of Education's regulations concerning student loans, consulted with an attorney who specializes in loan transactions and loan documentation, and drafted the complaint. Since the filing of the complaint in March 2007, we have met and consulted with our client on numerous occasions, continued to research numerous legal issues, participated in case planning meetings and conferences, responded to inquiries from potential class members, conducted written discovery, reviewed documents produced by the defendants, deposed the defendants' Rule 30(b)(6) representative, defended our client's deposition, and drafted a class certification motion and supporting brief as well as a motion for partial summary judgment and supporting brief. In total, attorneys and staff have recorded over 500 hours to this case in our contemporaneously maintained time records through December 2007.

Qualifications of Proposed Lead Class Counsel

4.     I graduated with high distinction from the University of Iowa College of Law in 1988, and was a member of the Iowa Law Review and Iowa Moot Court Board. Following graduation from law school, I was employed as an associate attorney by Arent Fox Kintner Plotkin & Kahn in Washington, D.C. from 1988 until 1992, and by Shook Hardy & Bacon in Kansas City, Missouri from 1992 until 1993. Thereafter, I founded my own private practice in Kansas City, Missouri focusing on the representation of plaintiffs primarily in the area of individual and class employment litigation in federal court. In 2000, I joined S&L's Washington office. I was recently recognized by *Lawdragon Magazine* (Jan./Feb. 2007) as being one of "500 Leading Plaintiffs' Lawyers In America."

5.    I currently serve or have previously served as lead class counsel or co-lead class counsel for certified plaintiff classes in *Augst-Johnson, et al. v. Morgan Stanley & Co. Incorporated*, No. 1:06-cv-01142 (RWR/DAR) (D.D.C.) (Roberts, J.); *Carlson, et al.  v. C.H. Robinson Worldwide, Inc.*, No. 02-3780 (D. Minn.) (Ericksen, J.); *Nauman, et al. v. Abbott Laboratories and Hospira, Inc.*, No. 04C7199 (N.D. Ill.) (Gettleman, J.); *Turner v. Torotel, Inc.*, No. 96-0646-CV-W-5 (W.D. Mo.) (Laughrey, J.) and *Eickhoff v. City of Kansas City, Kansas*, No. 98-2372-KHV (D. Kan.) (Vratil, J.).  In addition, I have previously served as class counsel for the certified plaintiff class in *Kosen v. American Express Financial Advisors, Inc.*, No. 1:02CV00082 (HHK) (D.D.C.) (Kennedy, J.).

6.    All of the above-referenced class actions resulted in successful recoveries of monetary and injunctive relief for class members, with the exception of the *Abbott Labs* litigation which is ongoing.   In approving a recent class settlement in the *C.H. Robinson* litigation, Judge Ericksen observed that "[Sprenger & Lang, PLLC] achieved substantial monetary relief and substantial programmatic relief" and "demonstrated considerable skill and determination throughout [the] litigation."  *Carlson v. C.H. Robinson Worldwide, Inc.*, 2006 U.S. Dist. LEXIS 67108, *14 (D. Minn. Sept. 18, 2006).

7.    I have previously served as trial counsel in more than ten trials in federal and state courts, including as lead trial counsel in five jury trials.

8.    Daniel Bryden, an associate in our firm's Minneapolis office, is also representing the plaintiff in this action.  Mr. Bryden is a 2000 graduate, with honors, from the University of Minnesota law school, and has significant experience in complex state and federal court litigation. For example, he served as plaintiffs' class counsel in *Cosgrove v. State Farm Insurance Co.*, (Henn. Cty., MN Dist. Ct.), a breach of contract and bad-faith claims handling action on behalf of

a certified class of homeowner insureds.  Mr. Bryden was also recently named a "Rising Star" in

the December 2007 edition of *Minnesota Law and Politics Magazine*.

Counsel's Knowledge of the Applicable Law

9.     The attorneys and staff of Sprenger & Lang devote well over 90% of their billable

time to prosecuting class action lawsuits.  Accordingly, Mr. Bryden and I, and any other attorney

who is assigned work on this case, will be extremely knowledgeable concerning the procedural

law governing the case.  Prior to our introduction to the case, no lawyer at the firm was familiar

with the Department of Education's notes and regulations concerning its student loan programs.

However, through the many hours of research performed in connection with this case, Mr. Bryden

and I have become knowledgeable concerning the applicable law.  I am unaware of any class

action litigators with more knowledge concerning this area of law.

The Resources Counsel Will Commit to Representing the Class

10.     In accordance with S&L's long-established practice, we will commit whatever

resources are necessary to representing the class.  The firm often spends in excess of one million

dollars in out-of-pocket expenses in class cases and in excess of five million dollars in time valued

at lodestar rates, including in the *Carlson* litigation mentioned above.  The Court is familiar with

S&L's work through the *Thornton v. National Railroad Passenger Corp.*, No. 98-CV-0890

(EGS) (D.D.C.) and *McLaurin v. National Railroad Passenger Corp.*, No. 98-CV-2019 (EGS)

(D.D.C.) cases, both of which were prosecuted to settlements approved by this Court.

\* \* \*

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 31st day of January, 2008 in Washington, D.C.

/s/ Steven M. Sprenger
Steven M. Sprenger

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Brenda Kay Pfeiffer, | ) | |
| | ) | |
| On behalf of herself and all others similarly situated, | ) | Civil No. 1:07-cv-00522 (EGS) |
| | ) | |
| *Plaintiff,* | ) | CLASS ACTION |
| v. | ) | |
| | ) | |
| Margaret Spellings, in her official capacity as United States Secretary of Education, the United States Department of Education, and the United States of America, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## [PROPOSED] ORDER

Upon consideration of Plaintiff's Motion for Class Certification and Appointment of Class Counsel, the memoranda and materials filed by the parties, and the entire record herein, it is hereby ordered that the Motion be, and it is, **GRANTED**.

The Court further makes the following findings and rulings:

1.    **Jurisdiction.**  This Court has jurisdiction over the subject matter of the litigation and over all parties to this litigation, including all members of the class defined below.

2.    **Class Certification.**  The Court finds that the requirements of Fed. R. Civ. P. 23(a) have been satisfied, and that a class may be certified pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3).  The class shall consist of:

> All borrowers who elected to repay their student loans issued by the United States Department of Education under the *Income Contingent Repayment Plan* and whose annual *scheduled payments* at any time after March 19, 2001 were insufficient to cover the interest accruing on their loan.

The class consists of approximately 300,000 individuals.  There are numerous common questions of fact and law including, but not limited to, whether defendants' interest capitalization practice constitutes a breach of the form promissory note signed by the class members.  Pursuant to Fed. R. Civ. P. 23(c)(1)(B), the class claims and issues are identified below.  The class representative's claim is the same as the claims of the class members.  The class representative shares the same interests as the class members and has engaged competent and experienced class counsel to prosecute this action.  The plaintiff class is seeking injunctive and declaratory relief. The common class issues predominate over the individual damages issues.  A class action is superior to other available methods for adjudication of the controversy for numerous reasons including, but not limited to, the fact that individual damages are small and no class member has indicated a desire to control his or her own separate litigation.

    3.    **Class Claims and Issues.**

The class claims and issues are:

- Whether the class members signed promissory notes with identical or substantially identical language with respect to interest capitalization;

- Whether the class members' scheduled payments were less than the amount of interest accruing on their loans;

- Whether DOE capitalized interest accruing on the class members' loans between their June payment due dates and June 30th;  and,

- Whether DOE's practice of capitalizing interest accruing between the class members' June payment due dates and June 30th constitutes a breach of the form promissory note.

4.    **Appointment of Class Counsel**.  The Court appoints Steven M. Sprenger and Daniel C. Bryden of Sprenger & Lang, PLLC as class counsel and designates Steven M. Sprenger to serve as Lead Class Counsel.  In making this appointment and designation, the Court has considered:

- the substantial work class counsel has performed in identifying and investigating the class claims;

- the experience of class counsel and their firm in handling class actions and other complex litigation;

- counsel's knowledge of the applicable procedural and substantive law; and

- the resources counsel already have committed to this litigation, their stated willingness to commit whatever resources necessary to prosecute the claims, and their firm's history of commitment of resources to class action litigation.

5.    **Class Notice**.  Defendant United States Department of Education shall generate an electronic class member mailing list from its computer databases within 30 days of this Order.  The parties are directed to meet and confer concerning an appropriate form of class notice, and to submit their proposed form of class notice for the Court's consideration no later than _____ __, 2008.

So **ORDERED** this _____ day of _____, 2008.

_____
Emmet G. Sullivan
United States District Judge

cc:

John Warshawsky
U.S. Department of Justice
Civil Division, Commercial Litigation Branch
1100 L Street, N.W., Room 10030
Washington, D.C. 20530
Telephone: (202) 307-0010
Facsimile: (202) 514-9163
E-mail: john.warshawsky@usdoj.gov

Steven M. Sprenger
Sprenger & Lang, PLLC
1400 Eye Street N.W.
Suite 500
Washington, DC 20005
Telephone: (202) 772-1160
Facsimile: (202) 332-6652
E-mail: ssprenger@sprengerlang.com

Daniel C. Bryden
Sprenger & Lang, PLLC
310 Fourth Avenue S.
Suite 600
Minneapolis, MN 55415
Telephone: (612) 871-8910
Facsimile: (612) 871-9270
E-mail: dbryden@sprengerlang.com

2021176                                  4